# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| STATE OF TENNESSEE,<br>AND COMMONWEALTH OF VIRGINIA,<br><div align="right">*Plaintiffs*,</div><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION,<br><div align="right">*Defendant*.</div> | No. 3:24-cv-33 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 4

Legal Standard ...................................................................................................................... 6

Argument ............................................................................................................................... 7

    I. Plaintiffs have a likelihood of success on the merits of their Sherman Act claim. ....................... 7

        A. Labor markets within NCAA Division I athletics are relevant antitrust markets. ......... 8

        B. The NIL-recruiting ban harms prospective college athletes in the relevant markets ... 10

        C. The NIL-recruiting ban's effect on consumers of college athletics is irrelevant and unable to justify its restrictions. .................................................................................... 14

        D. Any procompetitive justifications for the NIL-recruiting ban are pretextual, and less restrictive alternatives accomplish the NCAA's goals for the policy. ................... 16

    II. Plaintiffs, through harm to prospective college athletes in their respective States, are suffering and will continue to suffer irreparable harm without injunctive relief. .............................. 19

        A. Plaintiffs face imminent and irreparable harm at this stage in the recruiting calendar, just as the NCAA ramps up enforcement of its NIL restrictions. ........................ 19

        B. For this Court's injunctive relief to be effective, the NCAA also must be enjoined from enforcing Bylaw 12.11.4.2 as applied to the NIL-recruiting ban. ................ 22

    III. The balance of the equities tip in Plaintiffs' favor. ........................................................ 23

    IV. Injunctive relief serves the public interest of promoting free and fair competition in labor markets ................................................................................................................................. 24

Conclusion ............................................................................................................................. 25

Case 3:24-cv-00033-DCLC-JEM   Document 2-1   Filed 01/31/24   Page 2 of 31   PageID #: 29

# TABLE OF AUTHORITIES

**Cases**

*Allied Mktg. Grp., Inc. v. CDL Mktg, Inc.*,
  878 F.2d 806 (5th Cir. 1989) ............................................................................................19

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)...........................................................................................................23

*Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*,
  793 F.3d 313 (3d Cir. 2015) ...............................................................................................7

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
  511 F.3d 535 (6th Cir. 2007) ......................................................................................19, 20

*Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust*,
  2021 WL 1734284 (S.D. Ohio 2021) .................................................................................6

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ............................................................................................24

*Deslandes v. McDonald's United States, LLC*,
  81 F.4th 699 (7th Cir. 2023) .............................................................................................15

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
  244 F.3d 521 (6th Cir. 2001) ..............................................................................................9

*FTC v. Nat'l Testing Servs., LLC*,
  2005 WL 2000634 (M.D. Tenn. 2005)................................................................................7

*FTC v. Super. Ct. Trial Law. Ass'n*,
  493 U.S. 411 (1990)...........................................................................................................17

*Handel's Enterprises, Inc. v. Schulenburg*,
  765 F. App'x 117 (6th Cir. 2019) .....................................................................................19

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020) ..........................................................................................14

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................................................19

*Massachusetts v. EPA*,
  549 U.S. 479 (2007)...........................................................................................................19

*Miss. River Corp. v. FTC*,
  454 F.2d 1083 (8th Cir. 1972) ..........................................................................................15

*Nat'l Soc. of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)...........................................................................................................17

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) ................................................................................................*passim*

*NHL Players Ass'n v. Plymouth Whalers Hockey Club*,
  419 F.3d 462 (6th Cir. 2005) ..............................................................................................9

Case 3:24-cv-00033-DCLC-JEM   Document 2-1   Filed 01/31/24   Page 3 of 31   PageID #: 30

*O.M. ex rel. Moultrie v. Nat'l Women's Soccer League,*
 541 F. Supp. 3d 1171 (D. Or. 2021) ............................................................................. 21

*O'Bannon v. NCAA,*
 7 F. Supp. 3d 955 (N.D. Cal. 2014), ............................................................................. 15

*O'Bannon v. NCAA,*
 802 F.3d 1049 (9th Cir. 2015). ...................................................................................... 18

*Obama for Am. v. Husted,*
 697 F.3d 423 (6th Cir. 2012) ............................................................................................ 6

*Ohio v. Am. Express Co.,*
 138 S. Ct. 2274 (2018) ............................................................................................... 7, 14

*Ohio v. NCAA,*
 2023 WL 9103711 (N.D.W. Va. Dec. 13) .............................................................. *passim*

*Provectus Biopharmaceuticals, Inc. v. Dees,*
 2016 WL 8738437 (E.D. Tenn. 2016) ............................................................................... 6

*Raycom Nat., Inc. v. Campbell,*
 361 F. Supp. 2d 679 (N.D. Ohio 2004) ............................................................................. 6

*Regents of Univ. of California v. Am. Broad. Companies, Inc.,*
 747 F.2d 511 (9th Cir. 1984) ........................................................................................... 20

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) .......................................................................................................... 21

*Tennessee v. United States Dep't of Educ.,*
 615 F. Supp. 3d 807 (E.D. Tenn. 2022) ........................................................................... 19

*Thompson v. DeWine,*
 976 F.3d 610 (6th Cir. 2020) ..................................................................................... 19, 21

*Tri-Cty. Wholesale Distrib., Inc. v. Wine Grp., Inc.,*
 565 F. App'x 477 (6th Cir. 2012) .................................................................................... 19

*United States v. Topco,*
 405 U.S. 596 (1972) .......................................................................................................... 15

*Univ. of Tex. v. Camenisch,*
 451 U.S. 390 (1981) ............................................................................................................ 6

*Winter v. Natural Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ......................................................................................................... 6, 23

**Statutes**

Tenn. Code Ann. §49-7-2801 ........................................................................................ 1, 17

Tenn. Code Ann. §49-7-2803 .............................................................................................. 1

Va. Code Ann. §23.1-408.1 ................................................................................................. 1

**Other Authorities**

11A Wright & Miller, *Federal Practice and Procedure* §2949 (3d ed. 2014) ..................... 7

*Interim NIL Policy*, NCAA (July 1, 2021).................................................................................... 5, 17

*January 2024 NCAA Division I Council-Governance Publication of Proposed Legislation*, NCAA (Dec. 5, 2023)....................................................................................................................................3, 5

*Name, Image and Likeness Policy Question and Answer*, NCAA (Feb. 2023) .................................... 5

*NCAA Division I 2023-24 Manual*, NCAA (Aug. 5, 2023) ................................................................*passim*

*NIL Guidance Memo.*, NCAA (June 27, 2023) .................................................................................... 5

## INTRODUCTION

The NCAA has long exercised monopoly control over college sports. Yet it somehow escaped much antitrust scrutiny for decades.

That all changed in 2021, when the U.S. Supreme Court decided *Alston*. That case rejected the NCAA's long-believed arguments about why its amateurism rules are exempt from the Sherman Act. *NCAA v. Alston*, 141 S. Ct. 2141 (2021). Those rules are in fact "subject to the Sherman Act," "subject to the rule of reason," and often illegal. *Id.* at 2155-66. The Court there affirmed a decision invalidating one of the NCAA's rules limiting compensation for athletes. *Id.* at 2166. After all, the NCAA runs a business—a "massive business," *id.* at 2150, that is not "exempt from the usual operation of the antitrust laws," *id.* at 2160.

After *Alston*, the NCAA understood that it could no longer ban college athletes from earning money from their name, image, and likeness (better known as "NIL"). And States across the country embraced college athletes' right to be compensated fairly and adequately for their remarkable gifts and the tremendous value they bring to their States, cities, and schools. Among them, Tennessee and Virginia have each expressed a clear state interest in protecting prospective and current college athletes' NIL opportunities. *See* Tenn. Code Ann. §49-7-2801, *et seq.* and Va. Code Ann. §23.1-408.1. Plaintiff States also each prohibit athletic associations—like the NCAA—from interfering with athletes' ability to earn NIL compensation. Tenn. Code Ann. §49-7-2803; Va. Code Ann. §23.1-408.1(B). Plaintiffs, and many other States like them, have facilitated a vibrant and growing marketplace for NIL deals.

Yet the NCAA is thumbing its nose at the law. After allowing NIL compensation to emerge nationwide, the NCAA is trying to stop that market from functioning. On January 10, the NCAA passed new bylaws on NIL that go into effect before the upcoming fall semester and cement challenged aspects of its current, interim NIL policy. Wright, *Division I Council Approves NIL Disclosure*

*and Transparency Rules*, NCAA (Jan. 10, 2024) (Exhibit D). The NCAA allows *current* college athletes' to pursue NIL compensation—thus affirming the existing NIL marketplace. But the NCAA bans *prospective* college athletes (including current college athletes looking to transfer to another school who are in the "transfer portal") from meaningfully discussing potential NIL opportunities before they actually commit to a school. It's like a coach looking for a new job, and freely talking to many different schools, but being unable to negotiate salary until after he's picked one (the depressive effect on coaches' wages in such a dysfunctional market is obvious).

The NCAA has also started to enforce its NIL rules at a critical juncture in the recruiting cycle. One day after approving formal NIL bylaws, the NCAA—on January 11, 2024—announced its first major NIL-related recruiting violation enforcement action. Wright, *NIL-Related Recruiting Violation Occurred in Florida State Football Program*, NCAA (Jan. 11, 2024) (Exhibit E). And the NCAA is now threatening the University of Tennessee with imminent enforcement actions as well. Letter from Chancellor Plowman to President Baker (Jan. 29, 2024) (Exhibit F). The NCAA's newfound interest in enforcement comes just weeks before prospective college athletes will decide where to enroll for the fall. *NLI Signing Dates*, National Letter of Intent (2023) (Exhibit G) (regular signing period for Division I football opens February 7). The NCAA thus artificially blinds prospective college athletes to NIL opportunities and their fair market value. If those prospective athletes are to gain access to a competitive and fair marketplace before committing to schools for next season, time is of the essence.

In the aftermath of *Alston*, one federal court has already enjoined similar NCAA bylaws that artificially restrained a market. The NCAA permits athletes to transfer schools once without penalty, but tried to restrict athletes' eligibility if they sought a second transfer. *Ohio v. NCAA*, 2023 WL 9103711, at *4 (N.D.W. Va. Dec. 13). In a lawsuit joined by Tennessee and Virginia, the court found that "the NCAA's transfer rules" imposed a "direct restraint on trade" that violates the Sherman Act. *Id.* (granting a TRO, which was later converted to a preliminary injunction). The NCAA's restriction

on second transfers violates federal antitrust law because the rule "restricts the options of affected college athletes," *id.*, and inhibits college athletes from realizing "the present and future economic potential of their participation in college athletics," *id.* at *11. The NCAA's NIL-recruiting ban does the same thing by limiting competition and artificially decreasing NIL compensation that college athletes could otherwise obtain in a free market.

Plaintiffs seek a temporary restraining order and a preliminary injunction enjoining the NCAA's NIL-recruiting ban, which would allow this market to function fairly and competitively while this case is pending. Specifically, Plaintiffs seek enjoinment of *all* NCAA rules that prohibit prospective college athletes from discussing NIL opportunities prior to commitment, including NCAA bylaws that classify NIL opportunities as a "recruiting inducement." *NCAA Division I 2023-24 Manual*, NCAA (Aug. 5, 2023), at 92 (Exhibit H) (Bylaw 13.2.1 prohibits "offers and inducements" from schools or their representatives to prospective student athletes before an athlete enrolls at an institution.); *January 2024 NCAA Division I Council-Governance Publication of Proposed Legislation*, NCAA (Dec. 5, 2023), at 27 (Exhibit I) (Bylaw 22.01.2: "Name image and likeness activities may not be used as an inducement to enroll or remain enrolled at a specific institution."); *see also infra* p.4-5. To be clear, Plaintiffs do not challenge NCAA rules that prohibit pay, including through NIL compensation, tied directly to athletic participation or performance. *See, e.g.*, Ex. H, at 36-42 (prohibition on "pay-for-play" under Bylaw 12.1 and subsections), 48 (governing direct payments from institutions under 12.5.1.1(f)), nor do Plaintiffs challenge the NCAA's broader recruiting rules. *See, e.g.*, *id.* at 109-10 (governing publicity prior to an athlete's commitment). Rather, the requested relief would permit schools and related entities to meaningfully discuss with prospective college athletes—and permit prospective college athletes to accept—NIL opportunities *before* an athlete commits to a specific institution, thus removing the NCAA's restrictions on competition among schools and NIL providers.

Because the athletes harmed by this illegal restraint have only a small window to engage in the

recruiting process and compete in Division I athletics, the harm inflicted by the NIL-recruiting ban is irreparable and imminent, and injunctive relief is necessary. Without relief, the NCAA will continue to deprive Plaintiffs' athletes of information about the market value for their NIL rights, and the full, fair-market value for those rights. Their talent and effort generate massive revenues for the NCAA, its members, and other constituents in the college sports industry—none of whom would dare accept such anticompetitive restrictions on their ability to negotiate their own rights. The athletes—the ones primarily responsible for generating those massive revenues in the first place—shouldn't have to endure them either. Plaintiffs' imminent, irreparable harm compels the issuance of a TRO by **Tuesday, February 6, 2024**—the day before the Division I football regular signing period opens.

## BACKGROUND

The NCAA dominates college sports. The NCAA and its member institutions, which include approximately 1,100 public and private colleges and universities across the United States, are organized under a constitution, and member institutions are grouped into three divisions. Ex. H, at 3; *see also Our Three Divisions*, NCAA (2024) (Exhibit J). The NCAA sets the rules on and off the field, organizes championship events, and amasses billions of dollars of revenue in the process. *See NCAA Consolidated Financial Statements*, NCAA (Dec. 12, 2022), at 4 (Exhibit K). As a practical matter, an academic institution that wants to participate in the highest and most popular level of collegiate athletics, Division I, must maintain NCAA membership and abide by the rules that the NCAA promulgates. *See* Ex. H, at 9 (each member institution must "hold itself accountable to support and comply with the rules and principles approved by the membership").

NCAA Bylaw 13.2.1 provides that "[a]n institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or the prospective student-athlete's family members or friends, other than expressly permitted by NCAA regulations."

4

Ex. H, at 92. This prohibition on recruiting inducements extends to NIL opportunities. *Interim NIL Policy*, NCAA (July 1, 2021) (Exhibit L); *see also Name, Image and Likeness Policy Question and Answer*, NCAA (Feb. 2023), at 1 (Exhibit M). The NCAA has proclaimed that "[NIL] activities may not be used as an inducement to enroll or remain enrolled at a specific institution." Ex. I, at 27; *see id.* ("Name, image and likeness activities may not be used to compensate student-athletes for athletics participation or achievement."); *id.* at 28 (NIL activities must "[n]ot be contingent upon initial or continued enrollment at a particular institution" and must "[n]ot be in return for athletic participation or achievement"). And the NCAA may rely on myriad other rules to enforce its NIL-recruiting ban. *See, e.g.*, Ex. H at 26 (restrictions on marketing activities under Bylaw 11.1.3), 48-52 (limits on "promotional activities" under Bylaw 12.5), 77 (restricting booster/collective involvement under Bylaw 13.1.2.1), & 210 (extra benefits under Bylaw 16.02.3).

NCAA bylaws and guidance reflect its misplaced view that it operates above the law. The NCAA posits that its NIL rules trump conflicting state laws. "[S]chools must adhere to NCAA legislation (or policy) when it conflicts with permissive state laws." *NIL Guidance Memo.*, NCAA (June 27, 2023), at 1 (Exhibit N). "In other words, if a state law permits certain institutional action and NCAA legislation prohibits the same action, institutions must follow NCAA legislation." *Id.*

NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," also purports to put the NCAA's rules over court orders enjoining those rules:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness …

Ex. H, at 66-67. Potential retaliatory punishments under this Rule of Restitution—which NCAA can mete out against parties for having complied with lawful court orders—include vacating wins,

postseason bans, and financial penalties. *Id.* If this Court grants preliminary relief, and the NCAA's NIL-recruiting ban is later restored, the NCAA could retaliate against players and schools who benefit from the relief. Courts have responded by enjoining the NCAA from enforcing not just its illegal rules, but also its Rule of Restitution against actions taken consistent with the preliminary relief. *See Ohio*, 2023 WL 9103711, at *13 (enjoining the NCAA from enforcing the Rule of Restitution). Plaintiffs thus request that the Court also enjoin the Rule of Restitution with respect to the relief it grants here.

## LEGAL STANDARD

To succeed on a motion for a temporary restraining order or preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Provectus Biopharmaceuticals, Inc. v. Dees*, 2016 WL 8738437, at *1 (E.D. Tenn. Sept. 16) ("The standard for determining whether to grant a temporary restraining order is the same as the standard for ... a preliminary injunction.").

Temporary restraining orders and "[p]reliminary injunctions are governed by less strict rules of evidence." *Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust*, 2021 WL 1734284, at *7 (S.D. Ohio May 3) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395. "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*; *Raycom Nat., Inc. v. Campbell*, 361 F. Supp. 2d 679, 688 (N.D. Ohio 2004) (same for a TRO). For instance, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the

injunctive proceeding." *FTC v. Nat'l Testing Servs., LLC*, 2005 WL 2000634, at *2 (M.D. Tenn. Aug. 18); *see also Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 325 (3d Cir. 2015) ("[I]n practice[,] affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of" rules applicable at summary judgment, and "hearsay evidence also may be considered." (quoting 11A Wright & Miller, *Federal Practice and Procedure* §2949 (3d ed. 2014))).

## ARGUMENT

Plaintiffs meet each of the four requirements for a temporary restraining order and a preliminary injunction against the NCAA's enforcement of its NIL-recruiting ban.

### I. Plaintiffs have a likelihood of success on the merits of their Sherman Act claim.

On the merits, Plaintiffs can prove that the NCAA's NIL-recruiting ban is a horizontal restraint of trade that violates section 1 of the Sherman Act.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §1. When analyzing a section 1 claim, "a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The plaintiff first must prove that the challenged restraint has an "anticompetitive effect that harms consumers in the relevant market." *Id.* The burden then shifts to the defendant to show "a procompetitive rationale for the restraint." *Id.* The burden then shifts back to the plaintiff to demonstrate that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

The Supreme Court has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Alston*, 141 S. Ct. at 2151 (cleaned up). "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what [courts] have described as a 'rule of reason analysis.'" *Id.* (collecting cases). This "analysis generally requires a court to conduct a fact-specific

assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Id.* (cleaned up). The goal is to suss out harmful "restraints with anticompetitive effect" from those "stimulating competition" in a manner helpful to consumers. *Id.*

While "'[t]he amount of work needed to conduct a fair assessment of these questions can vary,'" the Supreme Court "'has suggested that sometimes [courts] can determine the competitive effects of a challenged restraint in the twinkling of an eye.'" *Ohio*, 2023 WL 9103711, at *3 (quoting *Alston*, 141 S. Ct. at 2155; cleaned up). Sometimes, "restraints may be so obviously incapable of harming competition that they require little scrutiny," whereas "some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful per se or rejected after only a quick look." *Id.* at *4 (quoting *Alston*, 141 S. Ct. at 2155-56). As the *Alston* Court explained, and the transfer-rule court agreed, "the NCAA admits that it participates in 'horizontal price fixing in a market where the defendants exercise monopoly control.'" *Id.* (quoting *Alston*, 141 S. Ct. at 2154). In those cases, the NCAA did not (and could not) dispute that the "'NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a competitive market would yield'" and that these "'decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed.'" *Id.* (quoting *Alston*, 141 S. Ct. at 2154).

Here, as in the transfer-rule case, the NCAA's "bylaws are essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics." *Id.* The restraints on "compensation provided to athletes" in *Alston* and the NCAA's transfer restrictions both amounted to likely "violation[s] of the Sherman Antitrust Act." *Id.* *Alston* and the transfer-rule case compel the same result here.

### A. Labor markets within NCAA Division I athletics are relevant antitrust markets.

"The relevant market for this purpose "is composed of products that have reasonable

interchangeability for the purposes for which they are produced." *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001). When analyzing a restriction in the context of "supplier markets such as the employment market ... the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005).

The Supreme Court in *Alston* explained that "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." 141 S. Ct. at 2156. There, the NCAA did not even contest "that [college] athletes have nowhere else to sell their labor." *Id.* College athletes have no realistic alternative.

Within NCAA Division I sports, the NIL-recruiting ban affects two broad categories of labor markets: "(1) athletic services in men's and women's Division I basketball and football bowl subdivision, wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market." *Ohio*, 2023 WL 9103711, at *4. Within these markets, athletes compete for roster spots on teams at NCAA Division I schools, and those schools compete against each other to recruit the best prospective college athletes to compete on their teams.

The relevant geographic market is the United States. The NCAA and its approximately 1,100 member institutions—over 350 of which compete in Division I—are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States. *See Our Division I Members*, NCAA (2024) (Exhibit O).

There are also no alternatives to the benefits that college athletes receive from participating in NCAA Division I sports. The opportunity to showcase athletic skills at the highest level of collegiate competition while pursuing a college degree makes participation in this market unique. The NCAA itself frequently reiterates the unique nature of its model, arguing in *Alston* that this model "widens

9

Case 3:24-cv-00033-DCLC-JEM   Document 2-1   Filed 01/31/24   Page 14 of 31   PageID #: 41

consumer choice by providing a unique product—amateur college sports as distinct from professional sports." 141 S. Ct. at 2152. The opportunity, post-*Alston*, includes athletes' ability to monetize NIL rights, most of which comes from school-specific collectives. *See* Decl. of Daniel J. White ("White Decl.") ¶11 (Exhibit A) (discussing the benefits of NIL compensation to college athletes); Decl. of James Clawson ("Clawson Decl.") ¶¶8-14 (Exhibit B) (discussing the role of collectives in college athletes' NIL compensation) So, when schools compete for an athletes' labor, NIL compensation is one of many factors that a prospective student athlete considers—albeit in a market hindered by information asymmetry under the NIL-recruiting ban. Clawson Decl. ¶18.

Within these relevant markets, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I sports. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect college athletes' future earning potential and yield significant financial revenue for the member institutions from the sizable consumer interest in college sports. Decl. of Andrew D. Schwarz ("Scharwz Decl.") ¶¶6, 12-17 (Exhibit C). Accordingly, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.

**B. The NIL-recruiting ban harms prospective college athletes in the relevant markets.**

For the athletic competitions the NCAA oversees to exist, there must be some level of coordination among member institutions that simultaneously compete against one another. Indeed, "some degree of coordination between competitors within sports leagues can be procompetitive," for without agreed upon rules of a given sport, "the very competitions that consumers value would not be possible." *Alston*, 141 S. Ct. at 2156. "Without some agreement among rivals—on things like how many players may be on the field or the time allotted for play—the very competitions that consumers value would not be possible." *Id.* However, "[t]hat *some* restraints are necessary to create or maintain

a league sport does not mean *all* aspects of elaborate interleague cooperation are." *Id.* (cleaned up). This is the excess to which the Supreme Court put a stop in *Alston*. Like the compensation-related restrictions at issue there, the NIL-recruiting ban "fall[s] on the far side of this line." *Id.* at 2157.

The NIL-recruiting ban is a coordinated agreement among NCAA member institutions (horizontal competitors) to interfere with the setting of price by free market forces for the labor of prospective college athletes. Schwarz Decl. ¶¶30-33. Rather than promoting competition or benefits to prospective college athletes, the NIL-recruiting ban "hamstrings student-athletes by limiting the choices they have within the relevant market to find a Division I institution that provides the best environment for their academic, mental, and economic well-being." *Ohio*, 2023 WL 9103711, at *5. The NIL-recruiting ban harms prospective college athletes in at least two areas of the relevant markets: (1) when prospective college athletes are going through the recruitment process to decide where to commit to enroll, and (2) when college athletes decide to transfer and are searching for a new school to attend. *See* White Decl. ¶¶16-18 (discussing the recruitment phase); Clawson ¶¶16-17, 19 (harms).

***First***, the NIL-recruiting ban imposes immediate, irreparable harm on prospective college athletes, who are under significant time pressure imposed by the NCAA's recruiting calendar. NCAA rules define sport-specific windows in which coaches can contact, visit, or engage with an athlete. Principally, for intensely recruited athletes, colleges seek to obtain an athlete's commitment via a National Letter of Intent. White Decl. ¶¶16-17. If an athlete signs a letter to enroll at a particular school, that athlete cannot renege on the commitment and enroll elsewhere with immediate eligibility. *Id.* That is, a prospective athlete who executes a letter provides the school with a promise that it has secured that athlete's services for at least the athlete's first term of the upcoming school year.

For most sports, athletes have two recruiting windows when they can execute a National Letter of Intent—the "early signing period" and the "regular signing period." Both the early and regular periods are open only for a short window. For example, in Division I football, the early signing period

for the 2024-25 academic year was open for only a few days in December 2023. Ex. G. The regular signing period for Division I football runs from February 7, 2024, until April 1, 2024. *Id.* That is, for a brief time starting February 7, 2024, the most heavily recruited prospective college athletes will have significant bargaining power with the schools seeking to secure their skills. White Decl. ¶¶16-18. The regular signing period also functions as each school's "last chance" to get an athlete (including the most highly skilled, highly desired recruits) to commit to its team. *Id.*

Under the current restrictions, athletes must commit to a school without knowing what NIL opportunities might be available. Very few collegiate athletes go "pro" in their sport, and thus their NIL value is at its highest (and may exist at all only) during their short collegiate career. *Id.* Athletes' ability to negotiate the best NIL deal is critical to their financial and overall welfare. But by blocking discussions of NIL opportunities with collectives at each school during the recruitment process, the NCAA denies prospective college athletes information about the value of their NIL rights and suppresses the level of compensation these athletes will receive in exchange for their talents. Schwarz Decl. ¶33. And again, time is of the essence, as the regular signing period for Division I football opens in only one week and closes in short order. Ex. G.

*Second*, college athletes currently in the "transfer portal," or who are contemplating entry, are in a similar position. These athletes are likewise denied information about the value of their NIL rights at potential transfer destinations and are unable to negotiate NIL opportunities prior to committing to transfer to a particular school. For these athletes, the clock is also ticking because the NCAA permits students to seek a transfer only during designated periods. For instance, the Division I football transfer window to select a new school for the upcoming fall season was open for about one month ending January 2 and reopens from April 16 to April 30, 2024. *NCAA Division I Transfer Windows*, NCAA (Oct. 2023) (Exhibit P). The transfer window for men's and women's basketball players is open only from March 18 to May 1, 2024. *Id.* College athletes may also enter the transfer portal for

up to 30 days after a coach leaves the program. With recent, high-profile departures, many college athletes have the opportunity to transfer or are already in the transfer portal seeking a new school right now. David Suggs, *How Long will the Transfer Portal be Open for Michigan, Alabama, Washington Players?*, Sporting News (Jan. 24, 2024), at 3 (Exhibit Q) (University of Alabama football players, for instance, may enter the transfer portal until February 8). But once the window closes, college athletes no longer have the opportunity to transfer schools and play for a new team during the upcoming season. Many of these athletes are upperclassmen and thus have an even shorter opportunity to monetize their NIL rights, with rising seniors likely having just one season left to utilize the platform of college sports. Yet the NIL-recruiting ban prevents these athletes from obtaining information about their NIL value before their short opportunity to make a move disappears.

For each category of athlete, the NIL-recruiting ban prevents them from realizing the benefits of their NIL rights' fair market value. The NCAA frequently touts the benefits of competing in college sports, especially for college athletes who will not move on to the professional ranks. *See, e.g.*, *The Value of College Sports*, NCAA (Jan. 3, 2014), at 2 (Exhibit R) (The NCAA boasts that participating in college sports provides unparalleled exposure and experiences through "the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports."). For most prospective college athletes, the short window during which they are eligible to compete in NCAA competitions is their only chance to monetize their NIL rights using the platform of sports. By restricting the market during this short time in prospective college athletes' lives, the NCAA harms prospective college athletes in the United States.

The logical application of *Alston* compels this conclusion. There, the Court drew no distinction among forms of compensation for college athletes. It held: "No one disputes that the NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a

competitive market would yield. No one questions either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed." *Alston*, 141 S. Ct. at 2154. Just as there, disallowing NIL competition "decrease[s] the overall compensation student athletes receive compared to what a competitive market would yield" and "depress[es] participation by student-athletes in the relevant labor market[s]." *Id.* But unlike cases past, which mainly involved compensation by schools, conferences, or the NCAA, this case involves compensation by third parties. *See supra* Part A; Clawson Decl. ¶¶8-14. The conduct is nevertheless a restraint on athlete compensation in the relevant markets, in violation of the Sherman Act.

### C. The NIL-recruiting ban's effect on consumers of college athletics is irrelevant and unable to justify its restrictions.

The NCAA cannot defend its NIL-recruiting ban as good for consumers. *See Alston*, 141 S. Ct. at 2152 (explaining that the NCAA's preservation of amateurism justification is an "asserted benefit [that] accrues to consumers in the NCAA's seller-side consumer market rather than to student-athletes whose compensation the NCAA fixes in its buyer-side labor market"). But this Court should reject the notion that "a restraint's procompetitive benefits in a market outside the market" is "relevant for the purpose of evaluating a restraint's anticompetitive effects." *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1257 n.14 (9th Cir. 2020). Per the amicus brief that the Court cited in *Alston*, "competition in input markets is incommensurable with competition in output markets," so "a court should not 'trade off' sacrificing a legally cognizable interest in competition in one market to better promote competition in a different one." *Alston*, 141 S. Ct. at, 2155 (cleaned up). Instead, review must "be limited to the particular market in which antitrust plaintiffs have asserted their injury." *Id.*

At a minimum, a "Sherman Act §1 defendant can rarely, if ever, show that a pro-competitive benefit in the market for one product offsets an anticompetitive harm in the market for another." *Am. Express*, 138 S. Ct. at 2302-03 (Breyer, J., dissenting). For that reason, most courts, in horizontal-restraint and merger cases, have rejected the proposition that competitive harms in one market can be

balanced against competitive benefits in another market. *See, e.g.*, *United States v. Topco*, 405 U.S. 596, 610 (1972) (concluding in a Section 1 case that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote great competition in a more important sector of the economy"); *Miss. River Corp. v. FTC*, 454 F.2d 1083, 1089 (8th Cir. 1972) ("anticompetitive effects of an acquisition in one market cannot be justified by procompetitive effects in another market").

As applied here, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." *Deslandes v. McDonald's United States, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). It "is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise." *Id.* Accordingly, consumers' supposed desire for college athletes to be shackled to a particular team cannot balance against the harm caused to those athletes.

Even so, the NIL-recruiting ban does not benefit consumers of college athletics. By all accounts, consumer demand for college athletics has only *increased* with the rise of NIL. *See* Schwarz Decl. ¶¶12-14. And there is no evidence that NIL inducements harm competitive balance. *Id.* ¶¶34-47. Instead, the data demonstrates that competitive balance in recruiting and college sports is unhindered by a permissive NIL regime. *Id.*; *see also O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 978 (N.D. Cal. 2014) (finding that the NCAA's "restrictions on student-athlete compensation do not promote competitive balance"), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015). Even if competitive balance had suffered under NIL—again, it has not—there is no evidence that effect would decrease consumer demand. Schwarz Decl. ¶43 & n.41. Instead, the opposite is true, as consumer demand (and dollars) for college sports is as high as ever. *See id.* ¶¶12-17. The NCAA is without excuses for its anticompetitive measure that removes a tool from schools' recruiting toolbox, harms participants in

the relevant labor market (athletes), and cannot be offset by any cognizable benefit to consumers.

### D. Any procompetitive justifications for the NIL-recruiting ban are pretextual, and less restrictive alternatives accomplish the NCAA's goals for the policy.

Given the clear anticompetitive effects of the NIL-Recruiting Restrictions in the labor market for Division 1 college athletes, the burden shifts to the NCAA under the rule of reason to provide legally valid procompetitive justifications for these restraints. *See Alston*, 141 S. Ct. at 2168 (Kavanaugh, J., concurring) ("The NCAA acknowledges that it controls the market for college athletes."). Based on its guidance documents and arguments in cases past, the NCAA is likely to proffer two potential justifications for the NIL-recruiting ban. These involve both college athletes as individuals and the NCAA model as a whole. First, the NCAA might argue that one potential justification for the rule is that it promotes the protection of college athletes. A second argument the NCAA might raise, and one it raised in response to the bylaw challenges in *Alston*, is that restrictions like the NIL-recruiting ban preserve the amateurism model of the NCAA. *Id.* at 2152. Restrictions like the NIL-recruiting ban, the NCAA might argue, help it "widen[] consumer choice by providing a unique product— amateur college sports as distinct from professional sports." *Id.* However, these justifications are pretextual and, even if valid, could be accomplished through less restrictive alternatives.

While the NIL-recruiting ban may be intended to "protect" college athletes, the rule itself does nothing to promote this goal. The NIL-recruiting ban denies athletes information about the value of their NIL rights, thereby preventing them from obtaining the fair market value of those rights. The NCAA may assert that its ban protects athletes from "exploitation" by commercial enterprises "not subject to the authority of the student-athlete's school" Ex. H, at 5. But the NCAA's policy does the opposite; by keeping schools and coaches out of NIL discussions, the commercial enterprises that might exploit prospective college athletes have all the information and the athletes have none. Clawson Decl. ¶17 ("The NCAA's rules do not protect student-athletes from falling prey to predatory NIL deals. Instead, the NCAA's rules prevent the NIL market from functioning properly and increase the

likelihood that unscrupulous parties will take advantage of student-athletes."); *see also* White Decl. ¶4.

In any event, preventing the commercial "exploitation" of labor is not a legally valid procompetitive justification. *See, e.g., Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 690-695 (1978) (rejecting the premise that anticompetitive restraints can be saved by social justifications); *see also FTC v. Super. Ct. Trial Law. Ass'n*, 493 U.S. 411, 424 (1990) ("The statutory policy underlying the Sherman Act precludes inquiry into the question whether competition is good or bad," so "social justifications proffered for [the defendants'] restraint of trade thus do not make it any less unlawful." (cleaned up)). That is why the *Alston* Court rejected the NCAA's argument that it can avoid the import of the Sherman Act because its "restraints of trade serve uniquely important social objectives beyond enhancing competition." 141 S. Ct. at 2159. Conversely, the NCAA's purported concern about athlete exploitation is better addressed by States, which have adopted measures to effectively curb athlete exploitation, foster economic fairness, and create additional opportunities for athletes. *See, e.g.*, Tenn. Code Ann. §49-7-2801, *et seq.*

Further, the NIL-recruiting ban does not aid the NCAA in promoting its unique product of amateur sports as distinct from professional sports. For starters, nothing in the NIL-recruiting ban affects the amateur status of college athletes as defined by the NCAA because the NCAA has already agreed that college athletes must be commercialize their NIL rights post-*Alston*. *See* Ex. L. NCAA simply seeks to prevent the legally required NIL marketplace from being a dimension of competition. The NCAA is thus left with the specious argument that the *existence* of NIL licensing is somehow less injurious to "amateurism" than would be *competition* in NIL licensing.

Next, although the NCAA has argued in the past that amateurism increases consumer demand, supposed benefits in the consumer market cannot offset harm in the distinct markets for student-athlete labor. *See supra* Part C. Regardless, these benefits do not exist as a factual matter. *See id.*; Schwarz Decl. ¶¶34-47. Additionally, both the NCAA's academic and amateurism goals are accomplished

through less restrictive alternatives already in place within NCAA bylaws. NCAA bylaws require college athletes to maintain progress toward degrees to be eligible for competition. *Id.* at 151-52 (Bylaw 14.4.1 requiring athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition). Other NCAA bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. *Id.* at 152, 155 (Bylaw 14.4.3). NCAA bylaws also prohibit in-season transfers within the same sport, preventing unbounded free agency. *Id.* at 169 (Bylaw 14.5.5.3). Unlike professional athletes, a college athlete unhappy during the current season cannot demand a transfer only to compete for another member institution in the same athletic season. Existing bylaws governing academics and preventing in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the NIL-recruiting ban. *See O'Bannon*, 802 F.3d at 1059-60 (affirming the district court's finding that "benefits of academic and athletic 'integration' are not the result of the NCAA's rules restricting compensation," but instead "are achieved by other NCAA rules—such as those requiring student-athletes to attend class"). Thus, to the extent that these procompetitive justifications for the NIL-recruiting ban are cognizable, they can be accomplished through less restrictive alternatives.

In sum, within the relevant markets, the NIL-recruiting ban harms college athletes by hindering them from identifying the most beneficial institution for their overall well-being, limiting their options before making the decision to commit to a particular school, and denying them the full benefits of their NIL market value. White Decl. ¶¶14-15; *see also* Clawson Decl. ¶¶17-19. The NIL-recruiting ban instead stifles competition in college athletics, without any procompetitive justification. Schwarz Decl. ¶¶24, 28. And, the goals of the NIL-recruiting ban can be accomplished through less restrictive alternatives that already exist within the NCAA bylaws. A rule-of-reason analysis of the NIL-recruiting ban demonstrates that it is the exact kind of unreasonable restraint of trade within labor markets that the antitrust laws prohibit. Thus, Plaintiffs have a strong likelihood of success on

the merits of their claim that the NIL-recruiting ban violates Section 1 of the Sherman Act.

## II. Plaintiffs, through harm to prospective college athletes in their respective States, are suffering and will continue to suffer irreparable harm without injunctive relief.

Plaintiffs have quasi-sovereign interests in protecting their citizens—including prospective college athletes, and consumers of college athletics—from economic harm and in ensuring their economy and labor market are not suppressed by unjustified restraints of trade. *See Massachusetts v. EPA*, 549 U.S. 479, 518-20 (2007) (States afforded "special solicitude" in standing inquiry); *see also Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 821 (E.D. Tenn. 2022) (same). The requested relief will protect the welfare of Plaintiffs' over 250,000 high school and college athletes.

### A. Plaintiffs face imminent and irreparable harm at this stage in the recruiting calendar, just as the NCAA ramps up enforcement of its NIL restrictions.

A plaintiff's harm "is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.*; *see also Allied Mktg. Grp., Inc. v. CDL Mktg, Inc.*, 878 F.2d 806, 810 (5th Cir. 1989) (recognizing that plaintiffs suffer irreparable harm "where economic rights are involved, when the nature of those rights makes establishment of the dollar value of the loss … especially difficult or speculative"). Accordingly, "the loss of fair competition and customer goodwill" are irreparable. *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019); *see also Tri-Cty. Wholesale Distrib., Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 483 (6th Cir. 2012) ("The loss of a product which is 'unique' … can cause a drop in customer goodwill" and thus constitute irreparable harm). Further, a State "suffers a form of irreparable injury" any time it is prevented from "effectuating statutes enacted by representatives of its people." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Plaintiffs easily clear this threshold.

Prospective college athletes are under significant time pressure to maximize their NIL rights before their applicable signing period closes. The Division I football signing period opens February 7 and the most heavily recruited prospective college athletes have significant bargaining power with the schools seeking to secure their skills right now and only for a short window. White Decl. ¶¶16-17. Schools are particularly motivated to secure commitments during this period because the regular signing period is schools' last chance to obtain a prospective college athlete's letter of intent. White Decl. ¶16. But the NIL-recruiting ban restricts athletes from obtaining information about their market power because they cannot weigh NIL offers or even discuss their market value with schools under the challenged ban. Clawson Decl. ¶¶17-19. These prospective college athletes will never be able to recover the lost NIL opportunities that could be available to them in a free market once they commit to one particular school, to the exclusion of all others. White Decl. ¶16. This information asymmetry can make the extent of the loss difficult to calculate and thus irreparable. *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 550. Without injunctive relief an entire class of prospective college athletes—and those in the transfer portal—will suffer harm this recruiting cycle and throughout the short window during which they are able to compete in the NCAA.

To be sure, the irreparable harm imposed by the NIL-recruiting ban extends far beyond Division I football. Prospective college athletes in all sports have to consider signing period deadlines and stand to benefit greatly from a free and fair NIL marketplace. After all, the overwhelming majority of college athletes do not go on to play professional sports. White Decl. ¶11. So this is a particularly critical time in their athletic careers where athletes hold the unique and time-sensitive opportunity to monetize their NIL rights. Without the ability to even become aware of the best bargains available for NIL rights, prospective college athletes in all sports will miss out on this once-in-a-lifetime opportunity that cannot be readily valued or recovered absent injunctive relief. *See Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (affirming injunctive relief for a Sherman

Act section 1 claim by recognizing that college sports provide a "unique opportunity" for "exposure" and the injuries inflicted by "non-exposure" cannot be "fully compensable in monetary terms"); *O.M. ex rel. Moultrie v. Nat'l Women's Soccer League*, 541 F. Supp. 3d 1171, 1177 (D. Or. 2021) (league rules that forced a plaintiff to suffer "a missed opportunity for her [athletic] career" constituted irreparable harm). And the NIL-recruiting ban prevents Plaintiff States from providing the full benefit of their statutory NIL protections. *See Thompson*, 976 F.3d at 619.

Time is also of the essence due to the NCAA's recent decision to commence enforcement actions for NIL activities. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (concluding that a "credible threat of enforcement" of the challenged guidance supports injunctive relief). This month, the NCAA published a report of its first major NIL enforcement action and imposed significant penalties on Florida State University's football program. *Negotiated Resolution, Florida State Case No. 020169*, NCAA (Jan. 12, 2024) (Exhibit S). The punishment handed down by the NCAA included two years of probation, a periodic disassociation from the collective and its former CEO, and a reduction in football scholarships for the Florida State program. *Id.* And the NCAA is apparently not stopping there. About one week ago—on January 20, 2024—news broke that the NCAA is also investigating the University of Florida football program "after a failed NIL deal" with a former recruit. *Florida is Under NCAA Investigation a Year After a Failed NIL Deal with QB Signee Jaden Rashada*, CBS News (Jan. 20, 2024) (Exhibit T). Just yesterday, reports surfaced that the NCAA is threatening the University of Tennessee with an imminent NIL enforcement action. Ex. F. As the NCAA ramps up enforcement and doles out punishment for failure to abide by anticompetitive restrictions, schools, student-athletes, and consumers will immediately feel the brunt of sanctions and a diminished product on the field that can be preserved only through injunctive relief.

The NCAA's newfound interest in NIL enforcement actions highlights the urgent nature of the issues raised in this case. NCAA member institutions must abide by the NCAA's prohibitions on

NIL discussions with prospective college athletes or risk severe sanctions. This chilling effect on NIL discussions deprives prospective college athletes of the ability to negotiate with collectives for the best NIL compensation package. Even the "risk of being accused of violating NCAA rules" and jeopardizing eligibility has a significant chilling effect on athletes' willing to speak publicly about open secrets under the NIL recruiting ban. Clawson Decl. ¶16; *see also* White Decl. ¶15. Yet some of the most sought after prospective college athletes have spoken anonymously about the realities of NIL opportunities as one factor in recruitment, along with other inducements they consider when selecting a school. Raynor & Navarro, *Recruiting Confidential: High School Football Stars Dish on NIL Deals, Arrogant Coaches and More*, The Athletic (Jan. 3, 2024), at 2, 5-8 (Exhibit U). The NIL-recruiting ban shields certain NIL discussion in darkness when athletes and schools alike would benefit from bringing the subject into the light. *See id*; White Decl. ¶¶18-19.

The NCAA also inhibits prospective student athletes from realizing the full benefit of NIL protections codified in state law. Absent the restraints imposed by the NCAA, schools supported by collectives with enthusiastic alumni networks and boosters would be able to offer NIL compensation to prospective college athletes at true fair market value, and schools could facilitate those discussions as part of the recruiting process, including by providing services to help prospective college athletes navigate NIL discussions and compare NIL offers. Relief is needed most right now.

### B. For this Court's injunctive relief to be effective, the NCAA also must be enjoined from enforcing Bylaw 12.11.4.2 as applied to the NIL-recruiting ban.

The NCAA's Rule of Restitution, in a nutshell, provides that, if a plaintiff obtains an injunction against the unlawful conduct of the NCAA, and a college athlete and his or her school conduct themselves in conformity with that injunction, the NCAA may still punish both the athlete and the institution if the injunction is later "vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified." Ex. H, at 66-67 (Bylaw 12.11.4.2).

As a federal court has already found, "[t]he breadth of the Rule of Restitution is staggering

and goes well beyond final adjudication on the merits in the NCAA's favor." *Ohio*, 2023 WL 9103711, at *12. "It is in fact a measure designed to inhibit a person's access to the courts." *Id.* Its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *Id.* "The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order." *Id.* Absent relief enjoining the Rule of Restitution, if this Court was to determine preliminarily that the NIL-recruiting ban is unlawful, temporarily and preliminarily enjoin its enforcement, and permit the consideration of NIL opportunities in recruitment, schools and NIL organizations still might not engage in NIL discussions for fear of future retaliation by the NCAA. For injunctive relief to be effective, that relief must enjoin the NCAA—as the transfer-rule court did—from punishing prospective college athletes and schools under the Rule of Restitution simply for doing what a court of law ordered. *See id.* at *13.

### III. The balance of the equities tip in Plaintiffs' favor.

The balance of the equities supports Plaintiffs' motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the NIL-recruiting ban. In weighing the equities, courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

As noted above, prospective college athletes hampered by the NIL-recruiting ban face immediate and irreparable harm during the current recruiting cycle. Further, student athletes considering a transfer or already searching for a new institution in the active transfer windows are artificially disadvantaged by the NIL-recruiting ban's restraint on competition for their labor and face

immediate and irreparable harm each day the transfer windows get closer to closing. The equities favor allowing prospective college athletes to realize the full market value of their NIL rights and maximize their welfare that the NIL-recruiting ban encumbers. Clawson Decl. ¶¶ 16-19; *see also* White Decl. ¶11.

On the other hand, the NCAA would suffer no substantial harm from the granting of preliminary injunctive relief. The NCAA already allows college athletes to receive compensation through NIL opportunities, thus demonstrating that the NCAA experiences no real harm by allowing NIL compensation to permissibly exist for athletes. Preliminary injunctive relief for Plaintiffs would not force the NCAA to take any action at all or incur any damages. Such relief would merely prevent the enforcement of limited subparts of the NCAA's many bylaws on a temporary basis.

Further, the recruiting process is already underway for several sports. *See* Ex. G. Removing the NIL-recruiting ban before prospective college athletes must commit for the fall 2024 season adds little to no burden on the NCAA, as the recruitment process places the onus on prospective college athletes and coaches to find efficient matches. Thus, the balance of the equities tips in Plaintiffs' favor and supports issuance of immediate injunctive relief to prevent enforcement of the NIL-recruiting ban before the Division I football's regular signing period opens on February 7.

## IV. Injunctive relief serves the public interest of promoting free and fair competition in labor markets.

Temporary and preliminary injunctive relief preventing the NCAA from enforcing the NIL-recruiting ban, as the transfer-rule court found, "would serve the public interest by promoting free and fair competition in labor markets guaranteed by the antitrust laws." *Ohio*, 2023 WL 9103711, at *11. Put simply, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).

The commercial nature of transactions between NCAA member institutions and college athletes creates the functional equivalent of a labor market in NCAA sports. College athletes compete for scholarship positions on NCAA rosters, and NCAA member institutions compete for the best

college athletes, providing them with scholarships and other benefits to attend the institution in exchange for participation on a given athletic team. White Decl. ¶¶18-19; *see also* Clawson Decl. ¶15. "Free and fair competition in labor markets is essential to the American economy." *Ohio*, 2023 WL 9103711, at *11. So "[p]rotecting competition in the labor market for NCAA Division I student-athletes serves the public's interest in free and fair competition in labor markets." *Id.*

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court enter a temporary restraining order by **February 6, 2024**, and then preliminarily enjoin the NCAA from enforcing the NIL-recruiting ban until a full and final decision on the merits. Further, Plaintiffs respectfully request that this Court enjoin the NCAA from retaliating against prospective or current college athletes or NCAA member institutions by punishing them under the Rule of Restitution, NCAA Bylaw 12.11.4.2, for conduct allowed by any such relief.[1]

---

[1] Plaintiffs respectfully request that this Court not require security prior to issuing injunctive relief. The requested relief would not require any affirmative steps on the part of the NCAA, nor would the NCAA suffer any financial burden to comply with the requested relief. Rather, it would prevent the NCAA from enforcing the NIL-recruiting ban against prospective college athletes and schools. Because injunctive relief would prevent the NCAA from taking action rather than require any action from the NCAA, Plaintiffs request that this Court not require security. *Ohio*, 2023 WL 9103711, at *13 ("Security will not be required prior to issuing a temporary restraining order because the NCAA will not suffer financial burden in compliance with such injunctive relief.").

Respectfully submitted,

Dated: January 31, 2024

Adam K. Mortara
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Cameron T. Norris
David L. Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
david@consovoymccarthy.com

Patrick Strawbridge*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, Massachusetts 02109
(617) 227-0548
patrick@consovoymccarthy.com

*Counsel for Plaintiffs*

*pro hac vice* application forthcoming

*/s/ Cameron T. Norris*

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

LACEY E. MASE
Chief Deputy Attorney General

J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS
Senior Assistant Attorney General
TYLER T. CORCORAN
MARILYN GUIRGUIS
Assistant Attorneys General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 741-8722
Ethan.Bowers@ag.tn.gov
Tyler.Corcoran@ag.tn.gov
Marilyn.Guirguis@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

JASON S. MIYARES
ATTORNEY GENERAL OF VIRGINIA

ANDREW N. FERGUSON
Solicitor General

STEVEN G. POPPS
Deputy Attorney General, Civil Division

*/s/ Tyler T. Henry*
TYLER T. HENRY*
Assistant Attorney General & Manager, Antitrust Unit

*/s/ Jonathan M. Harrison II*
JONATHAN M. HARRISON II*
Assistant Attorney General
Consumer Protection Section

*Counsel for Plaintiff Commonwealth of Virginia*