# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE, et al.

    *Plaintiffs*,

v.     No. _____

NATIONAL COLLEGE ATHLETIC ASSOCIATION,

    *Defendant*.

## DECLARATION OF DR. DANIEL J. WHITE, VICE CHANCELLOR AND DIRECTOR OF ATHLETICS AT THE UNIVERSITY OF TENNESSE, KNOXVILLE

1. I am the Vice Chancellor and Director of Athletics at the University of Tennessee, Knoxville. UTK is a member of the National Collegiate Athletics Association and the Southeastern Conference. This declaration is based on my own personal knowledge, which is the product of my broader experience in the college sports industry and my role at UTK specifically, where I frequently get updates from my coaches and other staff members. If called to do so, I could testify competently to these facts under oath.

2. As an undergraduate, I was a college athlete on the Towson Tigers and Notre Dame Fighting Irish basketball teams.

3. I graduated from Notre Dame with a Bachelors in Business Administration in 2002. I continued my education at Ohio University, where I earned a Master's degree in Business Administration and Sports Administration, and then a Doctorate in Higher Education in 2016 from the University of Mississippi.

1

4. I began my career in athletics administration at Northern Illinois in 2006 as an Assistant Athletics Director for Development. The next year, I served as Associate Athletics Director for Development at Fresno State. In 2009, I was the Senior Associate Athletics Director at Ole Miss. I then served as the Athletic Director at the University of Buffalo from 2012 to 2015. After that, I was the Vice President and Director of Athletics at the University of Central Florida, where I assumed responsibility for overseeing and advancing the University's intercollegiate athletics program. I became the Vice Chancellor and Director of Athletics at UTK in 2021.

5. When I arrived at UTK, I created a five-year strategic plan for the Vols to increase revenue, boost season-ticket sales, improve academic success, and to win national and conference championships.

6. In my first full academic year at UTK, the Vols earned five SEC team championships. We won the SEC All-Sports Trophy (awarded to the best athletic department in the conference) two years in a row, while being only the second school to ever sweep both the men's and women's all-sports standings. We've won four men's and four women's SEC championships during my tenure, and our student-athletes have claimed at least 20 individual/relay SEC titles. Last year, we became the only school to ever win a New Year's Six Bowl Game in men's football, advance both men's and women's basketball to the Sweet Sixteen, and send the men's baseball and women's softball teams to the College World Series in the same year.

2

7. Though I'm certainly proud of our athletes' accomplishments on the field, I'm even prouder how our student-athletes have performed in the classroom. In fall 2023, our athletes earned a cumulative 3.40 grade-point average, an all-time record. Each of our teams earned a team GPA of at least a 3.0. During my tenure, Tennessee student-athletes have raised the all-sport GPA each semester, setting new school records each time.

8. The athletics department has also had back-to-back record-setting fundraising years. Fan attendance at our athletic events is up, and our athletic department has reached new revenue milestones. We reached our five-year strategic plan revenue goal in the first year. We're currently going through a multi-year construction process as part of a multi-million-dollar plan to modernize two of our premier athletic facilities—Neyland Stadium and Lindsey Nelson Stadium.

9. I understand that Plaintiffs are challenging NCAA rules that effectively prevent recruits from meaningfully discussing potential opportunities related to name, image, and likeness ("NIL") before they commit. I am familiar with the NCAA's rules restricting the use of NIL during the recruiting process ("NIL-recruitment ban"). But the NCAA's rules on NIL seem to frequently change and are often vague and in conflict with earlier guidance.

10. In Tennessee, our state law allows college athletes to earn compensation from their "own name, image, or likeness." Tenn. Code Ann. § 49-7-2802. I understand that Tennessee's law allows athletes to earn their "fair market value" for their NIL, so

3

long as that money is not "in exchange for athletic performance or attendance" at the school. And I understand that NIL compensation cannot come from the school itself, though the school can provide ancillary support for an athlete's NIL activities.

11. NIL is important for our athletes who earn it. Our student-athletes have limited free time. Between classes, labs, study hall, practice, film sessions, weight-lifting and conditioning sessions, they have very little time to work, even part-time, especially during the season. For our student-athletes on partial scholarships, earning NIL money also helps them avoid student debt. The overwhelming majority of college athletes do not play professional sports; given how dedicated college sports fans are, college athletics is a crucial—and often the only—time for these players to be compensated for their tremendous gifts.

12. The NCAA's NIL-recruitment ban harms prospective and current student-athletes. It aims to prohibit universities from meaningfully interacting with NIL collectives, and thus from talking to recruits about their potential NIL opportunities in their communities. Virtually every recruit asks about NIL. But under the current rules, recruits must rely on speculation to determine their potential NIL deals at a school. Almost every recruit, parent, and coach is frustrated with the current rules. Recruits can get taken advantage of because some actors in this space provide inconsistent information to schools, recruits, and parents.

13. This frustration is fueled by just how vague, confusing, and ever-changing the NCAA's rules have been. Prospective athletes, many of whom are 16- and 17-year-

4

old high schoolers, can't keep straight the NCAA's amorphous standards. Even our current athletes have a difficult time understanding and implementing the NCAA's guidance around NIL. Yet if a prospect or current athlete makes a mistake, they can become ineligible to play. That penalty is devastating to our students who have worked very hard and have invested a lot of time to have the opportunity to perform at the collegiate level.

14. The NIL-recruitment ban hinders recruits as they pursue the best deal. Before it is time for athletes to submit a National Letter of Intent ("LOI"), athletes evaluate colleges. It is during this time that athletes have the greatest amount of leverage and universities have a significant demand for their services. With scholarships, for example, prospective recruits—especially in sports that give only partial athletic scholarships—will use this period to evaluate our scholarship offer and compare it against other schools.

15. If it was not for the NCAA's NIL-recruitment ban, recruits would be able to transparently negotiate and explore their NIL opportunities as well. However, because of the NCAA's rules (and the confusion they cause), recruits cannot truly evaluate their NIL opportunities prior to deciding between schools. Prospective student-athletes are forced to enroll in a school and then discover that area's NIL opportunities *after* committing. Or they risk crossing the NCAA and its NIL-recruitment ban and thus risking their eligibility to play. All because they want to have a full financial picture of what their life will look like after enrolling in college.

5

16. The recruiting period for each sport is a little different. But in Division I football, there are two periods when recruits sign national letters of intent: the early signing period and the regular signing period. The early signing period for this year's class of high-school recruits was open for a few days this past December. The regular signing period opens February 7, 2024. This is a particularly important date for football recruits. The regular signing period is the last chance for a Division I college football team to get a recruit to sign a letter. Once an athlete signs a letter they are committed to play for that school for the next upcoming academic year and cannot attend another university with eligibility, unless the school releases them. Athletic departments really want their best recruits to sign a letter so their first year of eligibility is tied to enrollment at the university. The moment a letter is signed, recruits lose negotiating power. They cannot negotiate between competing school's offers at that point. Other schools are prohibited from recruiting that athlete from that point forward.

17. After the February 7 regular signing period, these football players will not have any negotiating power and will be subject to marketing restraints at their selected schools. I understand most schools have one main NIL collective.

18. If schools were permitted to discuss NIL opportunities during the recruiting process, schools would be fiercely competing with other institutions to recruit the best athletes.

19. Based on my personal experience as a college athlete and athletics administrator, and my knowledge of the competitive forces, dynamics and

6

considerations that athletes face and consider, I believe that the NCAA's confusing, nebulous, and harmful rules challenged here should no longer be in force.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on **January 29**, 2024, in Knoxville, TN.

_____
Danny White