Exhibit B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| STATE OF TENNESSEE, *et al.*, | |
| --- | --- |
| Plaintiffs, | |
| v. | No. _____ |
| NATIONAL COLLEGE ATHLETIC ASSOCIATION, | |
| Defendant. | |

## DECLARATION OF JAMES CLAWSON

1. I am James Clawson. This declaration is based on my personal knowledge as Co-Founder and Chief Executive Officer of The Volunteer Club, Co-Founder and Chief Executive Officer of Spyre Sports Group, LLC, and a founding member of The Collective Association. If called to do so, I could testify competently to these facts under oath.

2. Spyre is an industry leading sports marketing company founded by experienced marketing professionals that offers income-generating solutions for athletes in various sports, including the newly created name, image, and likeness (NIL) marketplace. Spyre's services include athlete representation, marketing, brand creation, support, and advocacy. While Spyre continues to be an advocate and thought leader in the NIL space, its NIL activity is now limited to facilitation of The Volunteer Club. The Volunteer Club, which benefits exclusively intercollegiate athletes at the University of Tennessee Knoxville (UTK), is a NIL collective providing fans the opportunity to pool their resources and provide NIL opportunities to UTK student-athletes. As Co-Founder and Chief Executive Officer of The Volunteer Club, I strive

to address the complex and dynamic market for NIL compensation, creating a best-in-class model for collectives to match students with optimal NIL opportunities.

3. The Collective Association (TCA) is a trade association of 30 similarly situated NIL collegiate collectives across the country, supporting schools across all Power 4 (formerly Power 5) conferences and serving as advocates for over 50,000 student-athletes in 25+ sports. TCA continues to add like-minded organizations with a common purpose of providing a voice for intercollegiate athletes and their best interests, a space in which collectives may discuss issues and share strategies, and a unified front for collectives to further their common interests.

4. Prior to my current roles, I spent fourteen years at an athletic agency, including time as Vice President of Athlete Marketing, representing professional American football and basketball players, golfers, and coaches.

5. Based on my current roles and experiences participating in marketing and operations within the sports industry, I understand how college sports collectives operate, the issues that college athletes face, and the ways in which the NCAA can harm the welfare of college athletes.

6. I understand that the Plaintiffs are challenging NCAA rules and guidance that prevent prospective student-athletes (meaning both recruits and current student-athletes in the transfer portal) from fully engaging in NIL opportunities before they formally commit to attend a school.

7. Since the NCAA first permitted NIL compensation in 2021—after the NCAA's hand was forced by the U.S. Supreme Court and a wave of state laws—the NIL industry has grown significantly.

8. Prior to the government's intervention, the NCAA deprived generations of college athletes of their right to earn NIL compensation. Collectives quickly emerged to meet the needs of student-athletes to have stable, secure, and trusted entities representing their interests. Over the last few years, collectives have continued to evolve and develop resources, tools, and information to create and enhance each student-athlete's NIL platforms while also protecting their well-being.

9. To make money from their NIL, athletes need opportunities. Collectives help athletes find those opportunities and are a vital part of the college sports ecosystem.

10. Collectives have significant value to student-athletes in the college sports ecosystem. We act as their partner but also coordinate compliance between our partner institutions and other entities to ensure the student-athletes are protected from bad actors but also simple mistakes that could affect their NCAA eligibility. Collectives thus protect students from unscrupulous behavior and exploitative NIL contracts (and will continue to do so).

11. Collectives serve students by providing guidance and resources in understanding and navigating the world of NIL. Collectives seek to create opportunities for athletes to match with national and local sponsors, market themselves directly to fans (via merchandise, memorabilia, social posts, and appearances), and connect with the nonprofits and charities the

athletes most value. A collective's assets, contacts, and knowledge provide athletes more profitable sponsorships and endorsement deals and help them grow their personal brand.

12. Collectives are incentivized to maximize the value that students obtain from NIL deals. Collectives are independent businesses, separate from universities and athletic departments. Student-athletes are best served by that independence.

13. The Volunteer Club strives to create an enhanced experience for Tennessee athletes by creating NIL opportunities. We do that not only through direct financial support, but also by helping student-athletes secure connections and create partnerships through our extensive contacts and support team. A fan can find background about athletes on our website. We also have a dedicated staff for player marketing so that athletes can succeed both on and off the field. These efforts have created sustainable NIL opportunities for our athletes.

14. Since 2021, Spyre and The Volunteer Club have secured over 500 athlete brand deals resulting in over $22,000,000.00 worth of NIL compensation for student-athletes at UTK. The Volunteer Club currently has over 115 UTK intercollegiate athletes on active NIL contracts across several Division I sports.

15. The interest in NIL opportunities is growing among businesses, student-athletes, alumni, and other donors. In my experience, prospective student-athletes are very interested in learning of NIL opportunities. Likewise, businesses and donors are increasingly interested in providing NIL opportunities to current and prospective student-athletes.

16. The NCAA's rules and recent guidance on NIL create uncertainty and place arbitrary limits on how students monetize their NIL rights. The arbitrary nature of these rules

and this uncertainty is extremely detrimental to athletes and universities, and places them at extreme risk of being accused of violating NCAA rules.

17. The NCAA's rules do not protect student-athletes from falling prey to predatory NIL deals. Instead, the NCAA's rules prevent the NIL market from functioning properly and *increase* the likelihood that unscrupulous parties will take advantage of student-athletes.

18. The NCAA incorrectly assumes that collectives are central to athlete recruiting. A school can attract students through many features, including by being associated with a well-run collective that generally facilitates high-quality NIL deals. While NIL opportunities are a matter of interest to most student athletes, the importance of such opportunities to each current or prospective student athlete really varies.

19. The potential value of an athlete's NIL – and the commercial interest in that athletes' NIL – turns, in part, on the school they attend and the region in which that school is located. Without NCAA restrictions, student-athletes and prospective student-athletes would be able to gain value and profit from what they are worth.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on January 30th, 2024, in Knoxville, Tennessee.

James Clawson