Exhibit C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

The State of Tennessee, *et al*.

**Plaintiffs,**

v.

The National Collegiate Athletic Association,

**Defendant.**

No. _____

**DECLARATION OF ANDREW D. SCHWARZ ISO TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

January 30, 2024

| 1 | Qualifications | 1 |
|---|---|---|
| 2 | Scope of Work | 2 |
| 3 | Summary of Opinions | 3 |
| | 3.1 The commercialization of athletes' NIL is commercial activity estimated at over $1 billion in value in 2023-24. | 3 |
| | 3.2 The terms "anticompetitive" and "procompetitive" have a specific economic meaning. | 3 |
| | 3.3 Restrictions on NIL prior to 2021 had no positive impact on competitive balance in athlete recruiting. | 4 |
| | 3.4 The term "exploitation" has a specific economic meaning within antitrust economics. | 4 |
| 4 | College sports, including the commercialization of athletes' NIL, is commercial in nature with annual revenues measured in billions. | 5 |
| 5 | What makes a restraint economically procompetitive? | 8 |
| 6 | There is no evidence that NIL inducements harm competitive balance in college sports | 14 |
| 7 | Under an economic definition of "exploitation," allowing inducements is not exploitative, but preventing them can be. | 19 |
| 8 | Signature | 21 |

# 1  QUALIFICATIONS

1. My name is Andrew D. Schwarz.  I am a Member of OSKR, LLC, an economic consulting and research firm specializing in the application of economic analysis to complex legal issues.  I received a Master's Degree in Business Administration from the Anderson School at UCLA in 1994, a Master's Degree in History from the Johns Hopkins University in 1990, and studied Ph.D.-level economics and marketing at UCLA and UC Berkeley from 1995 through 1997, before starting work as an economist.  I then spent ten years with LECG, an international economic consulting firm.  In 2007, I co-founded OSKR.  I have also worked as a financial analyst for Hewlett-Packard.  In my educational background, as a financial analyst, and in more than two decades of analyzing markets and the economic issues surrounding litigated disputes, I have had the opportunity to apply many economic and statistical tools in the course of my work to questions relevant to the anticompetitive conduct in sports.

2. I have a particular focus in my research and in my consulting on the antitrust economics of college sports.  I have consulted on several cases alleging the NCAA and its members engaged in anticompetitive conduct vis-à-vis economic restrictions on athletes including *White v. NCAA*, *O'Bannon v. NCAA*, *Rock v. NCAA*, *Alston v. NCAA*, and *House v. NCAA*. I submitted an expert declaration in *Keller v. NCAA* related to the terms of that case's settlement.  I also helped initiate California's "Fair Pay to Play Act" (also known as California SB206), which was the first state law aimed at recovering for college athletes

*1*

their existing name, image, and likeness (NIL) rights, including the right to commercialize the licensing of their NIL.[1]

3.  A copy of my C.V. is attached as Appendix A. My C.V. includes all cases in which I have testified as an expert witness at deposition and trial, as well as my complete list of publications. A list of documents reviewed in connection with this report is attached as Appendix B. I also relied on my education and training in economics, particularly my extensive work on the economics of NCAA restraints. For my work on this matter, I am being compensated at an hourly rate of $675 per hour, plus reimbursement of expenses. The billing rates of my staff working on this matter at OSKR range from $200 to $375 per hour. I have been assisted in this matter by OSKR staff working under my direct supervision and control. I have no financial interest in the outcome of this matter.

## 2   SCOPE OF WORK

4.  I was asked by attorneys for the State of Tennessee to provide testimony related to the commercial nature of college sports, the economic concepts of anticompetitive and procompetitive conduct, the economics of competitive balance, and the economic definition of exploitation. In each case I was asked to apply these economic frameworks to an analysis of Defendants' collective agreement to prohibit the use of NIL as an "inducement" to attend a specific school.

5.  I am an economist, not a lawyer, and I do not purport to present a legal opinion. In order to properly fit my economic analysis within the framework of antitrust litigation, I have developed an understanding of the use of economic concepts like anticompetitive conduct and procompetitive benefits within antitrust law, but my opinions on these topics remain solely economic and in this Declaration I do not in any way intend to opine on what the law is or should be.

---

[1]   California's first-in-the-nation legislation opened the door for multiple states to add weight to the movement and ultimately led to the NCAA suspending some of its rules against the commercialization of NIL on an "interim" basis. See https://www.latimes.com/sports/story/2021-07-01/how-southern-california-helped-launch-ncaa-nil-revolution for a full discussion of my contributions, and the work Senators Skinner and Bradford undertook to open up this billion-dollar marketplace.

## 3 SUMMARY OF OPINIONS

### 3.1 THE COMMERCIALIZATION OF ATHLETES' NIL IS COMMERCIAL ACTIVITY ESTIMATED AT OVER $1 BILLION IN VALUE IN 2023-24.

6. Public data reported to the federal government as part of Title IX compliance reveal that Division I schools, in aggregate, reported over $16 billion in revenue across 351 athletic departments who reported data via EADA for the 2021-22 academic year.[2] Public data for media deals reveal that the four largest conferences[3] in terms of media revenue (excluding the Pac-12), are estimated to earn over $2.4 billion combined for the upcoming 2024-25 academic year's media rights payments. Public estimates from companies in the business of assisting schools and athletes land NIL deals project that these deals will exceed $1 billion in the 2023-24 academic year.[4] All of this is evidence of robust commercial activity in the college sports, media, and NIL space.

### 3.2 THE TERMS "ANTICOMPETITIVE" AND "PROCOMPETITIVE" HAVE A SPECIFIC ECONOMIC MEANING.

7. Restraints on commercial conduct can be anticompetitive, but they can also be procompetitive. Anticompetitive conduct includes, *inter alia*, collusive coordination among competitors to restrain welfare-enhancing commercial activity. "Procompetitive benefits" is a specific economic concept, different from simply achieving the preference of one side of a transaction. Rather, to be procompetitive, a restrain must generally show positive gains to economic welfare: better pricing, enhanced quality, or greater output/consumption.

8. Shielding competitors from commercial competition is the antithesis of a procompetitive benefit flowing from a restraint. Under the economic definition of the term, preventing the use of NIL deals as a means of "inducement" (i.e., as a means to compete for athletes to

---

[2] See Exhibit 1. Penn State is not included in this analysis because in the 2020-21 season the university began reporting its data for the entire Penn State system, rather than for the main campus.

[3] In college sports, a "conference" plays a role similar to a professional sports league, organizing a season-long schedule of games leading to a championship. In most college sprots the NCAA then hosts a tournament where conference champions and other invited teams compete for a national champion. In FBS football this role is played by CFP Administration, LLC.

[4] Opendorse. "NIL at Two," p 5. June 2023. Accessed at https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf.

attend a specific university) would not qualify as "procompetitive" but instead reflects a classic example of anticompetitive conduct: preventing welfare-enhancing transactions between willing buyers and sellers.

9.  As I discuss in more detail below, restrictions on NIL transactions reduce the quantity of commerce and have the potential to alter price from the competitive outcome, both of which tend to reduce aggregate economic welfare; this is anticompetitive. In contrast, arguments that NIL must be restricted because athletes might choose the "wrong" school based on financial factors would not qualify as a procompetitive benefit of an otherwise anticompetitive restraint.

### 3.3 RESTRICTIONS ON NIL PRIOR TO 2021 HAD NO POSITIVE IMPACT ON COMPETITIVE BALANCE IN ATHLETE RECRUITING.

10. The limited data available since the NCAA relaxed its ban on the commercialization of athletes' NIL indicates that small improvements have been made in competitive balance during that period, though generally the "NIL era" has shown the truth of the economic theory known as the Invariance Principle (which I discuss below), which says that restraint on athletes' earning will have little or no impact on the distribution of talent across a sport, and instead, talent flows towards where it can generate the most revenue, regardless of caps on compensation to that talent.

### 3.4 THE TERM "EXPLOITATION" HAS A SPECIFIC ECONOMIC MEANING WITHIN ANTITRUST ECONOMICS.

11. When assessing whether a provider of labor services has been exploited, one assesses whether compensation has been reduced from the market outcome by means of the use of market power. Under that definition, the rules against inducement do not protect athletes from economic exploitation, but rather are an example of a cause of exploitation: the use of market power to depress earnings below the unconstrained market rate.

## 4   COLLEGE SPORTS, INCLUDING THE COMMERCIALIZATION OF ATHLETES' NIL, IS COMMERCIAL IN NATURE WITH ANNUAL REVENUES MEASURED IN BILLIONS.

12. College sports is a major business. According to figures Division I athletic departments report to the federal government in support of Title IX, Division I revenues exceeded $16 billion in total in 2021-22, the most recent year for which public data are available. Of this, FBS football programs reported revenues of $5.2 billion (with FCS reporting another $580 million). Division I men's basketball programs reported $1.9 billion in revenue. When schools report these data they include revenues generated by the athletic department, both from outside sources such as television deals, ticket sales, and donations, and from sources within the university community, such as student fees and direct payments by the university to the athletic department for the athletic services provided. Exhibit 1 lays these revenues out in greater detail.

Exhibit 1: 2022 Division I Revenue Breakdown

|  | Division I | Power 5 | Group of 5 | Total FBS | FCS/Rest of D-I |
|---|---|---|---|---|---|
| Grand Total Revenue | $16,247,165,989 | $8,729,398,959 | $2,643,094,549 | $11,372,493,508 | $4,874,672,481 |
| Men's Football & Basketball | $7,737,537,937 | $5,365,246,021 | $1,108,767,610 | $6,474,013,631 | $1,263,524,306 |
| Men's Football | $5,805,321,991 | $4,381,092,005 | $844,196,695 | $5,225,288,700 | $580,033,291 |
| Men's Basketball | $1,932,215,946 | $984,154,016 | $264,570,915 | $1,248,724,931 | $683,491,015 |
| Other Men's Sports | $1,469,265,789 | $442,980,134 | $224,560,335 | $667,540,469 | $801,725,320 |
| Women's Basketball | $694,464,133 | $184,961,121 | $132,294,120 | $317,255,241 | $377,208,892 |
| Other Women's Sports | $2,062,862,635 | $581,088,794 | $410,652,555 | $991,741,349 | $1,071,121,286 |
| Co-Ed Sports | $9,523,898 | $4,701,789 | $1,512,197 | $6,213,986 | $3,309,912 |
| Unallocated by Sport | $4,271,984,974 | $2,149,537,484 | $765,307,730 | $2,914,845,214 | $1,357,139,760 |

*Note: EADA reporting understates "Unallocated by Sport", i.e. sub-categories do not sum to 100 percent of Grand Total Revenue.*
*Source: EADA 2022 data.*

13. Within these revenues are media revenues that are sold primarily by conferences, which aggregate the media rights of their members across multiple sports. In Exhibit 2, below, I provide public estimates of each FBS conference's current deal's payment for next year, and use a media expert's estimate (from a public filing in other litigation) of the portion of those deals attributable to football and men's basketball.[5]

---

[5] "Order Denying Motion to Exclude Desser and Rascher Opinions," from "In Re: College Athlete NIL Litigation" (Case 4:20-cv-03919-CW Document 386 Filed 11/03/23). Desser concluded that, for Defendants' broadcast agreements that cover multiple sports, the overall average allocation of the revenue is seventy-five percent to football..." (Page 3 of 24). Mr. Edwin Desser estimates that football and men's basketball value comprise 75% and 15%, respectively, of school multi-sport deals.

Exhibit 2: Current FBS Media Deals

| Conference | | Estimated Annual Media Deal | Estimated Football Share (75%) | Estimated Men's Basketball Share (15%) |
|---|---|---|---|---|
| Big Ten | | $1 billion | $750 million | $150 million |
| SEC | | $811 million | $608 million | $121.7 million |
| Pac-12 | * | $250 million | $188 million | $37.5 million |
| ACC | * | $240 million | $180 million | $36 million |
| Big 12 | ** | $220 million | $285 million | $57 million |
| AAC | | $83.3 million | $62 million | $12.5 million |
| MWC | | $45 million | $34 million | $6.8 million |
| MAC | | $8 million | $6 million | $1.2 million |
| Sun Belt | | $7 million | $5 million | $1.1 million |
| CUSA | | $4.4 million | $3 million | $0.7 million |

Notes:
*   Pac-12 and ACC deals will likely change in the coming 2024-25 season due to conference realignment.
** Big 12's contract will increase to 380 million starting in the 2025-26 season.

Sources:
https://247sports.com/article/acc-pac-12-conference-expansion-realignment-tv-contract-deals-205637161/
https://businessofcollegesports.com/current-college-sports-television-contracts/
Order Denying Motion to Exclude Desser and Rascher Opinions, from "In Re: College Athlete NIL Litigation" (Case 4:20-cv-03919-CW Document 386 Filed 11/03/23)

14. Note that these figures do not include the payments the NCAA receives from its television deals and tournaments (including media rights to March Madness men's and women's basketball tournaments), which the NCAA reported to be worth over $1.1 billion for 2021-22.[6] Much of this revenue is then distributed to the ten conferences listed above. Exhibit 2 also does not include the money the FBS conferences receive for the College Football Playoff (CFP), which is estimated to rise to $1.3 billion per year starting in the 2025-26 season.[7]

15. On July 1, 2021, the NCAA adopted an "interim policy" which allowed athletes to commercialize their NIL,[8] though there is no guarantee this "interim" policy will be made permanent. To facilitate the commercialization of these rights, the NCAA also lifted its ban

---

[6]   See 2022 NCAA Form 990, p. 10. NCAA reported a total of approximately $940 million for television rights and another $198 million for "Championships and NIT."

[7]   https://www.espn.com/college-football/story/_/id/39267884/college-football-playoff-espn-discuss-6-year-rights-contract

[8]   https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf.

(again on an interim basis) on athletes hiring an agent (euphemistically referred to as a "professional services provider").[9]

16. Prior to a move by states[10] to reaffirm that athletes had NIL rights and to expressly prohibit coordinated agreements which banned the commercialization of those rights, the NCAA and its members fixed the price the athletes could receive in payment for the use of these rights at zero. When those rules were temporarily suspended[11] by the current interim policy (which continues through today), the marketplace for athletes NIL services exploded. Opendorse, a firm that provides ancillary services to school and athletes related to athlete NIL estimates that by next year (the third year since the "interim policy" temporarily lifted the NCAA's ban), the value of transactions for these rights will reach $1.17 billion nationwide.[12]

Exhibit 3: Opendorse Projected 2023-24 Academic Year NIL Market Size

| $1.17B YEAR 3 PROJECTED MARKET SPEND | | | | |
|---|---|---|---|---|
| LEVEL | FOOTBALL | MBB | WBB | OTHER |
| POWER 5 | $595.0M | $212.5M | $37.0M | $58.5M |
| GROUP OF 5 | $83.8M | $61.3M | $17.6M | $4.5M |
| NCAA DI | $46.8M | $28.6M | $3.9M | $10.1M |
| NCAA DII, DIII, NAIA, NJCAA | $560.0K | $563.7K | $1.1M | $2.5M |
| TOTAL | $726.2M | $303.0M | $59.4M | $76.5M |

*Source: Opendorse. "NIL at Two," p 5. June 2023. Accessed at https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf*

17. In other words, the agreement that had been in place prior to July 1, 2021, held back over a billion dollars of annual commerce. And while the NCAA temporarily suspended some of

---

[9] "Use of a professional services provider is permissible for activities related to use of NIL." See https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf.

[10] For my own rule in this process, see FN 1 above.

[11] As the NCAA explained, this is a "specific, short-term action with respect to applicable NCAA rules" that will only remain in place "until such time that either federal legislation or new NCAA rules are adopted…" See https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf.

[12] INFLCR, just one of the several firms working on facilitating NIL transactions, reported that their transaction volume was in excess of $100 million in 2023. See INFLCR, "A look back on 2023," Dec 13, 2023, accessed at https://www.linkedin.com/pulse/look-back-2023-inflcr-skyqf.

its restrictions on these transactions, it continues to enforce many rules that have limited the volume of commerce to well below its true market value. In the absence of restrictions on direct payments from schools/conferences to athletes for the packaging of athletes' NIL into conferences media rights deals and the absence of restrictions on the use of NIL as a so-called "inducement" in the recruiting process, the values above would certainly increase.

## 5    WHAT MAKES A RESTRAINT ECONOMICALLY PROCOMPETITIVE?

18.    For a specific outcome to be economically procompetitive requires more than just asserting that parties engaging in the putatively anticompetitive conduct prefer the resulting outcome. As part of the *Alston v. NCAA* case (on which I served as a consulting economist for the class of athletes who prevailed, and whose victory was upheld by the Supreme Court in a 9-0 ruling), I helped my colleague, Professor Daniel Rascher, develop an explanation of the economic meaning of "procompetitive" and "anticompetitive" outcomes. That testimony is publicly available,[13] and I have drawn on it in developing this section of my Declaration.

19.    As that testimony explains:

> "Procompetitive effects" is an economic term of art with specific economic meaning. In the context of competition economics, the term is not a malleable, catch-all phrase, synonymous with socially desirable aims (regardless of how laudable those aims may be outside of the context of competition economics). To be procompetitive, a restraint must cause increases in overall economic welfare or the reduction in economic exploitation, as economists define those terms. As such, demonstrating "procompetitive effects" is tightly bound to economic theory and decades of research about economic welfare. Economists use generally accepted tools to test whether behavior enhances or diminishes economic welfare. If a restraint causes net improvement to economic welfare according to economic theory and consistent with the results of studying the effects in the marketplace, a restraint can be characterized as causing "procompetitive effects."[14]

20.    A good source for understanding the economic concept of a "procompetitive" benefit is the guidance published jointly by the Federal Trade Commission and the Department of

---

13    *Direct Testimony of Dr. Daniel A. Rascher*, July 3, 2018, pp. 4-11. Available through PACER at Case 4:14-md-02541-CW Document 1017 (Filed 09/02/18).

14    *Direct Testimony of Dr. Daniel A. Rascher*, July 3, 2018, p. 3. Available through PACER at Case 4:14-md-02541-CW Document 1017 (Filed 09/02/18).

Justice's antitrust division.  Most important of these, for assessing coordination between independent business entities (such as separate universities or college sports conferences) are the Antitrust Guidelines for Collaborations among Competitors, (the "Joint Venture Guidelines" or "JVGs").[15]  Also of use in understanding how the economic concepts of anticompetitive conduct and procompetitive benefit fit within the antitrust enforcement framework are the agency's horizontal merger guidelines, which have been recently updated.[16]  (When necessary, I distinguish between the recently published version  and the prior edition by date, so the "2023 Merger Guidelines" and "2010 Merger Guidelines").

21.  These publications make clear that not every benefit from coordination among firms, whether via a joint venture or a merger, qualifies as procompetitive. For example, the 2023 Merger Guidelines explain that a claim that coordination (in this Guidelines' example, a full merger) between firms generates a benefit is "not cognizable" if that benefit only flows to the coordinating parties.[17]

22.  Because the questions I have been asked to address in the present matter involve an agreement among independent businesses (i.e., the NCAA and its member institutions), rather than a merger, the JVGs are particularly salient.  The focus of the JVGs is on how to determine whether the cooperation in question generates enough benefit to offset the anticompetitive aspects of any collaboration among otherwise competing companies.  Here, the metric for making that assessment is the economic concept of "welfare."  To be clear, this has nothing to do with the entitlement programs commonly known as "Welfare" but rather is an economic term related to the benefits that parties receive when they engage in trade.  For example, if I value a good at $50 and you value it at $30, if you sell it to me at $40, the transaction adds $20 of value to the world, and at that price, you gain $10 of value,

---

[15]  U.S. DOJ and FTC; "Antitrust Guidelines for Collaborations among Competitors"; April 2000; FTC (ftc.com); (https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf).

[16]  The recently published update is "Merger Guidelines" (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf). Many of the same principles were also explained in the prior version of these guidelines. See U.S. DOJ and FTC; "Horizontal Merger Guidelines"; August 19, 2010; FTC (ftc.com); (https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf).

[17]  New Merger Guidelines, p. 33: "To the extent efficiencies merely benefit the merging firms, they are not cognizable."

and I also gain $10 of value. That increase is a gain in what economists refer to as "welfare" and it is in that sense that I use the term.

23. Economists agree that the proper economic framework for assessing whether coordination among competitors is pro- or anticompetitive focuses on measuring welfare gains and losses.[18] When economists are asked to opine within a litigation context, the term "procompetitive" corresponds with welfare-enhancing conduct and "anticompetitive" with welfare-reducing conduct.[19]

24. Welfare is enhanced when pricing, quantity, and quality move towards their optimum level. JVG's discussion of what would make a consumer-facing (output) agreement procompetitive reflects this, when it explains that procompetitive cooperation will "enable participants to offer goods or services that are cheaper, more valuable to consumers, or brought to market faster than would be possible absent the collaboration."[20] This test is not just a question of whether the coordination can generate benefits, but rather whether the positives that flow from the venture are more valuable "than would otherwise be possible."[21] The JVGs also flag an important issue, which is that a claim that commerce is itself a problem to be solved is not an economically procompetitive justification for firms to coordinate; [22] when the goal of cooperation is to prevent welfare-increasing transactions, a better verb than coordinate is "collude," which captures the anticompetitive intent.

25. Economist Roger Blair and his co-author Daniel Sokol cite to Richard Posner to reinforce the understanding that "the only goal of the antitrust laws should be to promote economic welfare."[23] Posner explained:

---

18    Newman, J. (2019). Procompetitive Justification in Antitrust Law. Indiana Law Journal 94(2): 501–544. "The modern consensus is that antitrust should seek to maximize the economic conception of consumer welfare" (p. 504, footnote 25).

19    Blair, Roger D. & Sokol, D. Daniel, The Rule of Reason and the Goals of Antitrust: An Economic Approach, 78 Antitrust L.J. 471 (2012), available at http://scholarship.law.ufl.edu/facultypub/292, p. 473: "From an economic perspective, the rule of reason inquiry should center on total welfare. Note that in some cases, the use of market power for a transfer of wealth, independent of output, could also constitute anticompetitive conduct; one example of this would be bid-rigging.

20    JVGs, Section 2.1, pp. 5-6.

21    JVGs, Section, Section 3.36 (p. 23).

22    JVGs, Section 3.2 (p. 8).

23    Blair, Roger D. & Sokol, D. Danie, The Rule of Reason and the Goals of Antitrust: An Economic Approach, 78 Antitrust L.J. 471 (2012), available at http://scholarship.law.ufl.edu/facultypub/292.

"Almost everyone professionally involved in antitrust today - whether as litigator, prosecutor, judge, academic, or informed observer - not only agrees that the only goal of the antitrust laws should be to promote economic welfare, but also agrees on the essential tenets of economic theory that should be used to determine the consistency of specific business practices with that goal. Agrees, that is, that economic welfare should be understood in terms of the economist's concept of efficiency; that business firms should be assumed to be rational profit maximizers, so that the issue in evaluating the antitrust significance of a particular business practice should be whether it is a means by which a rational profit maximizer can increase its profits at the expense of efficiency…."[24]

26. I cannot stress enough that something can be seen as positive, perhaps even socially beneficial, without being economically procompetitive. Collusion to raise prices is not procompetitive even if all of the profits are donated to charity. Nor does the argument that consumers or suppliers generally prefer a given outcome, necessarily justify collusion to achieve that outcome. If consumers truly reject a product that includes a specific feature, it's not rational for any individual firm to add that feature. When no individual firm wants to add a feature, no coordination among suppliers would thus be needed to avoid that feature being added.[25]

27. Economically, it is somewhat nonsensical to assert that consumers do not want X, with a claim that absent collusion, firms will engage in costly competition to add X to their product.[26] An example I often give is that coffee retailers do not need a collusive agreement not to add plutonium to their coffee, as plutonium is expensive to acquire and would tend to lower, rather than increase, revenue.[27] Similarly, in the context of NIL inducements, if it is the case that a school building its athletic program on such inducements will lose consumer interest – and thus sell fewer tickets, generate fewer donations, etc. –

---

[24] Posner, Richard A., Antitrust Law, pp. viii-ix (2d ed. 2001).

[25] Schwarz, Andy & Volante, Richard J., *The Ninth Circuit Decision in O'Bannon and the Fallacy of Fragile Demand*, 26 Marq. Sports L. Rev. 391 (2016) Available at: http://scholarship.law.marquette.edu/sportslaw/vol26/iss2/7. See also Schwarz, Andy and Trahan, Kevin, *The Mythology Playbook: Procompetitive Justifications for "Amateurism," Biases and Heuristics, and "Believing What You Know Ain't So,"* The Antitrust Bulletin, 62(1), 140-183. Available at https://journals.sagepub.com/doi/abs/10.1177/0003603X17691382.

[26] This would remain true if the inducement expense is borne by third parties.

[27] Raising costs *and* lowering revenue is a double-negative hit to profit, and not something we would expect a rational business to undertake voluntarily. To the extent we see firms/schools incurring a cost, the most likely explanation is that the expect to see a benefit of some kind, either in revenue or in some nonpecuniary form, not a loss.

then there is little incentive (or need) for a collusive agreement to ban such conduct.  Other law and economic scholars agree.[28]

28. Absent some unusual quirk of a given industry, market-driven, competitive outcomes will optimize economic welfare and widen choice.[29]  Hence, market demand will tend to steer schools away from conduct that lowers consumer demand and to steer schools towards conduct that raises demand.  If inducements lower consumer demand, the market will punish those schools that offer these inducements, even without NCAA enforcement of a rule against such conduct.  Moreover, to the extent that third-party collectives[30] are comprised of avid consumers of the product, their conduct is particularly informative; if they find a team based on inducements to be more valuable as an entertainment product, it is very hard to fit a collective agreement against such inducements into the concept of a "procompetitive" benefit, absent some showing that consumers who participate in collectives have very different demand preferences that other consumers of the same programs' sports offerings.

29. Another important economic concept to understand when thinking about what it means to be procompetitive is the antitrust distinction between protecting competition versus protecting competitors.  It is not an economically valid justification of a competitive restraint to argue that if competition is left unfettered, more efficient firms will fare better than less efficient ones.  Restraining competition on that basis may protect weak competitors but not enhance competition.

30. In my work as an economist who specializes in the economics of college sports, I have often encountered the argument that it is bad for an athlete to include money in his/her

---

28  See Alexander, Laura and Salop, Steven C., "Antitrust Worker Protections," The University of Chicago Law Review, March 2023, Vol. 90, No. 2 (March 2023), pp. 273-338, here p. 336: "Even taking as given the claim that there is distinct demand for college football played by underpaid student-athletes, the NCAA's mandatory rule would be condemned because the rule is not necessary to achieve the claimed benefit. If there is such demand, each college can make its own independent decision of whether and how to compensate student-athletes."

29  For example, it has been incorrectly argued in the past that certain restraints on athlete compensation were needed for college sports to exist at all, repeatedly when those restraints were relaxed, college sports continued to thrive.  Absent a showing that athletes receiving inducement would cause this sort of market failure, there's no reason to see a deviation from the competitive outcome as welfare-enhancing.

30  "Collectives, which are independent of a university, can serve a variety of purposes. Most often, they pool funds from boosters and businesses, help facilitate NIL deals for athletes and also create their own ways for athletes to monetize their brands."  See https://www.on3.com/nil/news/what-are-nil-collectives-and-how-do-they-operate/.

choice of where to go to college.[31]  With the advent of NIL deals within the college sports space in 2021, this particular line of argument emerged as an argument that it is somehow bad to use NIL as an "inducement" as to where to attend college.  Competition for athletes' NIL is, without a doubt, procompetitive, whereas taking away athletes' ability to consider financial impacts in their decision-making process offers no economically procompetitive benefits.

31. We ask most high-school students and their parents to factor in the price of college when choosing post-secondary education.  An agreement among all Division I schools to deny athletes that same opportunity, simply because the money might flow out from the universities (or third-parties affiliated with those universities) rather than in, is anticompetitive.  There is no economically valid procompetitive argument that athletes must be denied their full worth out of a concern their choice of school might be driven by financial considerations.  Limiting choice, especially when done out of a distrust of market outcomes, is the opposite of what "procompetitive" means.

32. An individual school that finds so-called "inducements" to athletes to be offensive might choose to insist, as a condition of receiving a scholarship, that its athletes not accept NIL deals prior to enrollment, or take other steps to ensure its athletes do not receive inducement offers.  This sort of unilateral conduct is not anticompetitive.  In an open market, a school should make that choice if that is how it wishes to compete, but also live with the consequences if that business strategy yields poor results compared to a strategy that uses NIL inducements.  My analysis here is in no way invalidating that sort of unilateral conduct.  Instead, I am focused on how it is anticompetitive for such a school to form an agreement with other schools, especially across conferences, to replace each single school's choice of how to compete with a coordinated decision to forbid competition entirely.  As my colleague Daniel Rascher testified in Alston:

---

[31] The Commissioner of the Big Ten, Tony Petitti, "… testified at a Senate Judiciary Committee hearing that college athletes shouldn't consider financial factors when making recruiting decisions." Playing By the Rules: Bringing Law and Order to the NCAA Katherine Van Dyck November 2023, p. 5, Available at https://www.congress.gov/118/meeting/house/116756/documents/HHRG-118-IF17-20240118-SD156.pdf (PDF page 51). North Carolina State head football coach, Dave Doeren, has stated that NIL "… shouldn't be a part of recruiting and hopefully the NCAA can get their arms around that." https://www.wralsportsfan.com/acc-looks-for-national-regulation-on-nil-as-players-seek-more-opportunities/20384391/.

"Arguing that consumers or other market participants, if left to choose among the options available in a competitive market, might purchase the "wrong" kind of product or service (too inexpensive, déclassé, etc.) is not what economists recognize as being procompetitive."[32]

33. It is also worth considering how a ban on inducements narrows the commercial options available to an athlete and reduces his/her negotiating leverage. In this example, I use a football athlete, but the same principles would apply across all other Division I sports. When a football athlete fields commercial offers prior to choosing a school, there may only be a limited number of would-be sponsors in any given category, e.g., there may only be one local fast-food chain adjacent to campus interested in having him be the official nose tackle of that particular eatery. This leaves the athlete in a position where, once he is committed to that market, his only response to a lowball offer is to refuse the deal entirely, which may not be a credible threat. But if the athlete can field offers from multiple local food chains, and contract in advance of his college choice, he can credibly counter that he will choose a different market, and thus a different local restaurant chain, in reaction to the lowball offer. Denying an athlete this sort of negotiating leverage, by means of a collusive agreement across these local marketplaces, will tend to lower the level of payment and is clearly anticompetitive under the economic definition I have laid out above.

## 6   THERE IS NO EVIDENCE THAT NIL INDUCEMENTS HARM COMPETITIVE BALANCE IN COLLEGE SPORTS

34. To establish that efforts to create competitive balance are procompetitive, one would need to demonstrate two distinct economic effects. First, one must show the specific restriction on competition in question (here, limitations on athlete NIL transactions) improves competitive balance; second, one must show that competitive balance improves consumer demand. I take these up in turn.

35. Central to the academic literature on competitive balance is a concept known as the Invariance Principle, which flows from the very first sports economics article ever published, in 1956, by Simon Rottenberg. Rottenberg explained:

---

[32]   Direct Testimony of Dr. Daniel A. Rascher, July 3, 2018, p. 8. Available on PACER at Case 4:14-md-02541-CW Document 1017 Filed 09/02/18.

> "…free markets would give as good aggregate results as any other kind of market for industries, like the baseball industry, in which all firms must be nearly equal if each is to prosper. On welfare criteria, of course, the free market is superior to the others, for in such a market each worker receives the full value of his services, and exploitation does not occur."[33]

36. What Rottenberg showed (and which has been corroborated by 60 years of empirical evidence) was that restraints on individual athlete compensation do not change what the industry looks like in terms of competitive balance. Teams end up with essentially the same distributions of talent with or without the caps – though teams profit and athletes lose when competition for athletes is restricted.

37. More recent scholarship has shown there is a "**college version of the invariance principle** …: The distribution of talent in a college sport is invariant to who gets the revenues generated by players; talent moves to its highest valued use in the sport whether players or athletic directors receive players' MRPs."[34]

38. The economic mechanism underlying the Invariance Principle is the understanding that even where direct payment to athletes is banned or curtailed, teams (including college teams) still compete through less efficient alternative means (such as building excessively lavish facilities) for the same talent, resulting in approximately the same distribution of talent; this distribution is based on where the athletes have the highest potential to generate revenue. This indirect competition is inefficient but also means that restrictions of NIL-based inducements are unlikely to alter competitive balance in any substantive way, since the indirect competition – such as through extravagant athletic facilities – yields the same general level of balance/imbalance. Loosening the NIL restrictions would allow the universities to reallocate resources towards a more efficient balance of spending on NIL payments, facilities, and coaches, but would not substantively change the competitive balance.[35]

---

[33] Rottenberg, Simon. "The Baseball Players' Labor Market," *The Journal of Political Economy 64*(3), p. 258.

[34] Fort, Rodney D., Sports Economics, Second Edition, Pearson, p. 500. Emphasis in original. See also Berri, David J., "Is There a Short Supply of Tall People in the College Game?" in J. Fizel & R. Fort (Eds.), *Economics of College Sports*, pp. 211-223. Westport, CT: Praeger Publishers., p. 221.

[35] Santesteban, Cristian J., and Leffler, Keith B., "Assessing the Efficiency Justifications for the NCAA Player Compensation Restrictions," *The Antitrust Bulletin*, 2017, Vol. 62(1) 91-111. See also Stigler, George J., "Price and Non-Price Competition," *Journal of Political Economy*, Vol. 76, No. 1 (Jan. - Feb., 1968), pp. 149-154.

39. One exception is when the act of competing for talent increases a given team's revenue potential. If a team is able to use NIL competition to permanently propel itself into the upper echelons of a given sport, this allows schools outside of the elite to have an additional, less expensive means of competing than, say, extensive construction projects. This may increase competitive balance. Competition across how schools choose to allocate their resources and to allow schools to grow their revenue potential (and thus their long-term recruiting strength) through investment in a more feasible fashion.

40. Numerous academic studies have concluded that restrictions by the NCAA on the level of compensation an athlete may receive (or the number of athletes to whom a school can give scholarships) are not effective tools for improving competitive balance. Professor Katie Baird studied the question of whether the NCAA's limits on compensation had any positive benefit to competitive balance, finding that:

> This suggests preliminary support for Rottenberg's invariance principle: where talent goes (and thus competitive balance) is invariant with the degree of restrictions over player pay. No statistically significant change in competitive balance has occurred in college football since greater restrictions over paying athletes have been introduced. ... In short, little evidence supports the claim that NCAA regulations help level the playing field; at best they appear to have had a very limited effect, and, at worst, they have served to strengthen the position of the dominant teams.[36]
>
> …
>
> "…the findings here support the position that restrictions on player pay – analogous to a salary cap in professional sports – have had no effect on college football's competitive balance."[37]

41. Professor Rodney Fort concluded that restrictions on athlete pay merely shifted money to the athletic department (AD):

> "Transfers from athletes to ADs do not impact the revenue maximizing distribution of talent in a conference of revenue-maximizing ADs. This is important because it puts the focus on the distributional results of the

---

[36] Baird, K. (2004). "Dominance in College Football and the Role of Scholarship Restrictions." *Journal of Sport Management,* 18(3), pp. 217-235 at 222, 226.

[37] Baird, K. (2004). "Dominance in College Football and the Role of Scholarship Restrictions." *Journal of Sport Management,* 18(3), pp. 217-235 at 233.

amateur requirement rather than its impacts on efficiency (that is, the talent distribution)."[38]

42. Other studies have found the same result, that there is little economic evidence that restrictions on athlete compensation, such as a limit on NIL, have had any beneficial impact on recruiting balance, and that some evidence exists to suggest these caps actually hurt the balance.[39] This also holds true to limits on the number of scholarships allowed.[40]

43. This research concludes that there is no support for simply assuming that restrictions on compensation, including on compensation for athletes' NIL services, improve competitive balance of recruiting. Nor is there support for (b) that improving competitive balance of recruiting increases consumer demand.[41]

44. There are many ways to measure competitive balance with respect to recruiting. In 2014, I published an analysis (working with Professor Joel Maxcy of Temple University) that looks at one measure of competitive balance with respect to recruiting success (as opposed to on-field success).[42] This analysis used the year-to-year correlation in football recruiting

---

[38] Fort, R. (2017). "College Sports Competitive Balance 'Beliefs' and the Rule of Reason: Applied Theory and a Literature Review." *The Antitrust Bulletin*, 62(1), pp. 15-30 at 25, internal footnotes omitted.

[39] While there are many examples, to list just two see Peach, Jim, "College athletics, universities, and the NCAA," The Social Science Journal 44, 2007, and Eckard, Woodrow E., "The NCAA Cartel and Competitive Balance in College Football," Review of Industrial Organization 13, 1998.

[40] Sutter, Daniel & Winkler, Stephen, "NCAA Scholarship Limits and Competitive Balance in College Football," *Journal of Sports Economics*, Vol. 4, No. 1 (February 2003), pp. 3-18.

[41] My co-authors and I explained this as follows: "… despite the existence of so many team-sport league policies, such as restrictions on competitive markets for players' services and revenue sharing between clubs, that are publicly justified by an appeal to the need for outcome uncertainty and competitive balance, empirical tests by sports economists have repeatedly found (a) little effect of outcome uncertainty on consumers demand for sports, and (b) little effect of most policy changes on competitive balance. In lay terms, the rules do not seem to help competitive balance, and competitive balance doesn't seem to sell that many tickets anyway." See Rascher, D., Maxcy, J. & Schwarz, A. (2019). The Unique Economic Aspects of Sports, *Journal of Global Sport Management*, p. 8.

Given the dynastic nature of college football and women's basketball, to name just two examples, it may be the case that consumers prefer to see powerhouse schools dominate and then clash in the postseason, rather than to watch a series of battles among teams with records hovering close to 0.500. One study on FBS football attendance has found that "fans prefer *less outcome uncertainty* when (1) the team is the home favorite and (2) the team is the home underdog." See R. Paul, B. R. Humphreys, and A. Weinbach," Uncertainty of Outcome and Attendance in College Football: Evidence from Four Conferences," 23 ECON. & LABOUR RELATIONS REV.69(2012).

Another study, focused on FBS football television audience, found that the first half audience for BCS championship games did not grow just because, on paper, the two teams seem evenly matched – which argues against a demand benefit flowing from balanced recruiting. Second-half viewership did grow if the game was close. See S. Salaga & S. Tainsky, The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations in Nielsen Ratings for Bowl Championship Series Games,16J.SPORTSECON.439(2015).

[42] A version of this research can be found at http://regressing.deadspin.com/the-competitive-balance-argument-against-paying-athlete-1576638830, published May 15, 2014.

rankings (by school) to measure how likely it is for a school that performs poorly in recruiting in a given year, to turn its fortunes around the following year (or vice versa). The idea is that if we see the same schools winning the recruiting battles, year after year, this points to a high degree of competitive imbalance in recruiting.[43]

45. I have now extended this analysis to include the 2022 and 2023 recruiting classes, the first two years in which athletes signed commitments with the NCAA's interim NIL policy in effect.[44]

46. In college football, prior to changes in the transfer rules and the introduction of NIL, the data show a very high level of "stickiness" in football recruiting, with the same teams dominating year after year. This was still true for the incoming classes of 2022 and 2023, the first two classes to commit while NIL compensation was possible. However, after years of growing imbalance, 2022, the first full NIL year in the data, shows imbalance at its lowest point since 2009. Even though 2023 showed slightly more concentration than 2022, it still represented less imbalance than the years immediately before NIL, and the two NIL years mark a substantial deviation from the trend that had existed prior to 2022.

---

[43] For the precise definition, see https://statistics.laerd.com/statistical-guides/spearmans-rank-order-correlation-statistical-guide.php.

[44] Note that while NIL has been allowed under NCAA rules since July 2021, the 2021 class was almost entirely committed to their schools in December 2020, well before the change in NCAA policy.

Exhibit 4 : Competitive Imbalance in Recruiting Has Not Gotten Worse Since NIL



*Note:*
*Analysis includes 114 NCAA FBS schools with complete data provided by 247Sports between 2003 and 2023. Trendline covers 2004-2021.*
*Sources:*
*"The Chase for the Recruiting Champion powered by 247Sports Composite", 247Sports (247Sports.com), last accessed on January 16, 2024 at*
*https://247sports.com/Season/2023-Football/CompositeTeamRankings/.*

47. As can be seen from the graph, the last two years fall well below the annual trend from 2004 through 2021: more than a decade of growing imbalance. What differs for the last three data points are more relaxed transfer rules and, for the final two data points, the more relaxed NIL rules; the final two years on the chart are the only ones during which NIL commerce was allowed under the NCAA's interim policy. While it may be too soon to conclude the NIL era has led to *improved* balance, it is quite easy to conclude that NIL has not led to increased competitive imbalance in recruiting.

**7   UNDER AN ECONOMIC DEFINITION OF "EXPLOITATION," ALLOWING INDUCEMENTS IS NOT EXPLOITATIVE, BUT PREVENTING THEM CAN BE.**

48. Much like the words "welfare" (discussed above) and "cartel" (referring to a group of independent firms that agree on common prices) which have specific meaning in

economics, the economic concept of "exploitation" can differ from common usage. In the context of competition by schools for college athletes, one salient definition of exploitation is that "a group of workers are being exploited when their wage is less than the marginal physical product that they are producing, valued at the price at which it is being sold"[45] which flows from groundbreaking work on the topic by Arthur Pigou[46] and Joan Robinson[47] in the 1920s and 1930s. Pigou and Robinson explained that "exploitation is incompatible with long-period competitive equilibrium."

49. In simpler English, the more competitive the offers to an athlete (whether scholarship, stipend, salary, or NIL licensing), the more likely an athlete will earn his/her full worth, and therefore, the less he/she will be exploited. This creates an obvious tie between increased competition for a given athletes' services – whether athletic or related to NIL – and whether those offers are, or are not, exploitative. To employ the technical terms of pro- and anticompetitive discussed above in Section 5: when competition for inputs to production of college sports is restrained, that is anticompetitive and leads to exploitation of college athletes (by denying them the true market value of the inputs they provider their schools). On the other hand, when competition for inputs is relaxed, that leads to a more procompetitive outcome and to less exploitation. In a truly open market, exploitation of this sort would disappear as competition would push athletes' NIL offers up to their full market value.

50. One can thus equate an assessment of whether a market outcome is pro- or anticompetitive with respect to athlete NIL to a test of whether the level of athlete exploitation rises or falls. As a result, my conclusion above that the restriction on NIL inducements offer no procompetitive benefits also shows that those restrictions do not avoid economic exploitation of athletes, but instead contribute to increased exploitation, as defined above.

---

[45] Flatau, Paul. (2001) Some Reflections on the 'Pigou-Robinson' Theory of Exploitation, History of Economics Review, 33:1, p. 1, quoting Robinson 1933, p. 283, referencing Pigou 1920.

[46] Pigou, A.C. (1920) The Economics of Welfare, first edition, London: Macmillan

[47] Robinson, J.V. (1933a) The Economics of Imperfect Competition, London: Macmillan.

## 8 SIGNATURE

I certify that, to the best of my knowledge and belief:

- The statements of fact in this report are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

ANDREW D. SCHWARZ declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the preceding is true and correct.

Signed on the 30th of January, 2024, in Lafayette, CA

Andrew D. Schwarz

# Curriculum Vitae of Andrew D. Schwarz

2200 Powell Street, Ste. 430    Phone 510/333-6591
Emeryville, CA 94608    E-mail aschwarz@oskr.com

| Economic Consulting Experience | 2007 – present    OSKR    Emeryville, CA |

**Economic Consulting Experience**

2007 – present    OSKR    Emeryville, CA

**Partner (2011-present); President/Managing Partner (2007-2011)**

- Submitted Expert Report in *Roberson, et al., v. Kansas City Southern Railway Co.*, 2023.
- Testified in Federal Court, submitted 3 Expert Reports, one Declaration, and gave Deposition testimony twice in Munguia-Brown, et al., v. Equity Residential, et al., 2021-2023.
- Submitted 2 Expert Report, 1 Declaration, and gave Deposition testimony twice in *Center for Independence of the Disabled, et al., v. Metropolitan Transit Authority, et al.*, 2019-2023.
- Submitted Expert Report and gave Deposition testimony in *Liberty Resources, Inc., et al., v. The City of Philadelphia*, 2021.
- Authored *Analysis and Suggested Revisions to the University of Hartford Athletics Feasibility Study*, 2021.
- Submitted Declaration in *National Federation Of The Blind, et al., v. Uber Technologies, Inc.*, 2019.
- Testified to *Committee on Higher Education*, California Senate, 2019.
- Testified to *Committee on Higher Education and Work Force*, Washington Senate, 2019.
- Testified to *Committee on Higher Education*, California Assembly, 2018.
- Submitted Expert Report and gave Deposition testimony in *Ochoa et al. v. City of Long Beach,* et al., 2016.
- Co-Authored confidential study on cost/benefits of a Division-1 athletic program's conference switch.
- Submitted 2 Expert Declarations in *Keller, et al. v. NCAA*, 2015.
- Co-Authored *The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham*, 2015.
- Submitted 2 Expert Declarations on Class Certification and gave Deposition testimony in *Il Fornaio, et al. v. Lazzari, Fuel Co., Inc.*, et al., 2014.
- Designated as Class Certification Expert in *Keller et al. v. NCAA*, 2014.
- Testified to *Committee on Education and the Work Force*, United States House of Representatives, 2014.
- Submitted Expert Affidavit in *Jordan Cohen and 9113-5699 Quebec Inc. v. LG Chem Ltd. et al.*, 2014.
- Submitted 2 Expert Affidavits in *Lloyd C. Wilson v. LG Chem Ltd. et al.*, 2014.
- Submitted Expert Declaration in *Eva Perez, et al. v. rue 21, Inc.*, 2012.
- Submitted Expert Report in *United Spinal Association, et al., v. Board of Elections in the City of New York*, 2012.
- Submitted Expert Declaration in *Alice Williams, et al. v. H&R Block Enterprises, Inc.*, 2012.
- Designated as Damages Expert in *Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc.*, 2011
- Testified at Hearing on Plaintiffs Motion to Compel in *Sarah Perez, et al., v. State Farm, et al.*, 2011.
- Submitted Expert Report in *International Accessories Corporation, v. Biasia Francesco S.p.A.*, 2010.
- Submitted Expert Declaration in *United Spinal Association, et al., v. Board of Elections in the City of New York*, 2010.
- Submitted Expert Declaration in *LaLiberte, et al. v. Pacific Mercantile Bank*, 2010.
- Submitted Expert Reports and gave Deposition testimony in *Kirola, et al. v. City and County of San Francisco*, 2009- 2010.
- Submitted Expert Report and gave Deposition testimony in *CDR v. Caltrans*, 2009.
- Designated as Damages Expert in *Flahavan v. State Fund*, 2008.
- Managed or contributed to cases in professional and college sports, high technology, payment systems, insurance, telecommunications, consumer products, consumer lending, entertainment, on issues of causation, and damages.  Allegations have included antitrust violations, patent infringement, breach of contract, breach of fiduciary duty, and unfair business practices.
- Worked with counsel drafting of complaints to ensure sufficient economic content to survive a *Twombly* challenge in a Motion to Dismiss, as well performing other pre-expert consulting expertise.  Provided similar consulting expertise to Federal Trade Commission.
- Extensive experience in the creation and analysis of large databases across a variety of industries, as well as managing large complex cases through the entire litigation process, including trial.

- Ran the full operations of a small professional services firm, including managing staff hiring/development, cash flow, payroll, facilities, and developing business opportunities.

2017-present        The PCL (formerly HBL)                               Cleveland, OH

**Co-Founder, Chief Innovation Officer**

Working with African-American community to develop a professional collegiate basketball league, including working with VCs, media companies, and other strategic partners.

1997 - 2007        LECG                                                 Emeryville, CA

**Principal (2007); Senior Managing Economist (2003-2006); Managing Economist (2001-2002); Senior Economist (1998–2000); Economist (1997–1998)**

- Managed or contributed to cases in professional and college sports, high technology, communications, payment systems, automotive, petroleum, electricity, entertainment, pharmaceuticals, insurance, and healthcare supporting testimony on liability, causation, and damages. Allegations have included antitrust violations, fraud, patent/copyright/trademark infringement, tortious interference, breach of contract, breach of fiduciary duty, and unfair business practices.
- Submitted Expert Declaration on Class Certification issues in *Flahavan v. State Fund*, 2007.
- Testified at trial regarding economic analysis in *A&J Liquor v. State Fund*, 2003.
- Directly involved as consultant on class certification issues for both plaintiffs and defendant, including mediation, deposition, arbitration, and trial. Played extensive trial roles as consulting expert in billion-dollar insurance case, major league sports case, Federal merger challenge, and sports licensing dispute.
- Experience shepherding mergers through Department of Justice and the European Commission in entertainment, high technology, and commercial printing.
- Emeryville Assistant Office Director, 2005 – 2007. Antitrust Practice Coordinator, 2000-2001.

**Lectures, Panels, and TV/Film appearances**

Panelist at **The Future of College Athletics**, Washington, DC, 2023.
Panelist at annual meeting of NCAA Division I FARA, 2022.
Panelist at Drexel University, Pennoni Honors College Panel, 2022.
Presenter at Sloan Analytics Conference ("Don't Call Them Non-Revenue Sports"), 2021.
Panelist at ABA Trade, Sport, and Professional Association "Hot Topics" event, 2020.
Panelist at University of Arizona: *Name, Image & Likeness in College Athletics*, 2019.
Panelist at UCLA: *NCAA Sports in Flux: The Fate of College Athlete Pay and Health & Safety*, 2019
Lecturer at the North Carolina Legislative Commission on the Fair Treatment of College Student-Athletes, 2019
Panelist at College Sports Research Institute, 2017, 2018.
Panelist at Black Student-Athlete Summit, 2018.
Panelist at the Harvard Sports Law Symposium, 2018
Panelist at the National Association for Equal Opportunity in Higher Education annual conference, 2017
**The Business of Amateurs**, 2016
Panelist at Sports Lawyers Association Annual Meeting, 2015.
**Schooled: The Price of College Sports**, 2013
Moderator at Santa Clara Sports Law and Ethics Symposium, 2012.
Panelist at *Congressional Panel on American Collegiate Student Athletics*, United States House of Representatives, 2011.
Panelist at Santa Clara Sports Law and Ethics Symposium, 2011.
ESPN: **Outside the Lines**, 2011.

Guest Lecturer at University of South Carolina, University of Oklahoma, University of San Francisco, Ohio University, Tulane University, University of Louisville, Wake Forest University, University of New Hampshire, University of Maryland, University of San Diego, University of Massachusetts, Lowell, and Harvard University.

**Publications and Awards**

"Special Issue Introduction: Name, Image, and Likeness and the National Collegiate Athletic Association," **Journal of Sport Management,** August 2023, with Steven Salaga, Natasha Brison, Joseph Cooper, and Daniel Rascher. Served as Co-Editor for the issue.

**American Antitrust Institute Antitrust Enforcement Award for Outstanding Antitrust Litigation Achievement in Economics** for work on *National Collegiate Athletic Association v. Alston*, 2021.

"Opinion: New California bill could cause Pac-12 schools to 'become more like … the Ivy League in their approach to sports'" in **San Jose Mercury News**, March 17, 2021.

"Competitive Balance in Sports: 'Peculiar Economics' Over the Last Thirty Years," in **Entertainment and Sports Law Journal**, Winter 2020, with Daniel A. Rascher.

"The Unique Economic Aspects of Sports," **Journal of Global Sport Management**, July 2019, with Joel C. Maxcy and Daniel A. Rascher.

"Competitive Balance in Sports: 'Peculiar Economics' Over the Last Thirty Years," in **Competition**, 29(1), Fall 2019, with Daniel A. Rascher.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught: The Case of Division I Basketball," in **Journal of Issues in Intercollegiate Athletics**, v.12, 2019, with Andrey Tselikov, Daniel A. Rascher, and Mark Nagel.  Awarded "Session Best Paper" at the 2018 Applied Business and Entrepreneurship Association International Annual Conference.  Awarded "Outstanding Article 2019" by Journal of Intercollegiate Athletics.

"The NCAA Is Gaslighting You," **Deadspin**, October 17, 2018.

"The Great Debate Over Compensation for College Athletes," **CollegeAD**, January 8, 2018, with Jonathan Yates as Debate Opponent.

"Competitive Equity: Can There Be Balance between Athletes' Rights and a Level Playing Field?" in **College Athletes' Rights and Well-Being** (Chapter 11), ed. Eddie Comeaux, Johns Hopkins University Press, 2017, with Daniel A. Rascher.

"No, Paying NCAA Athletes Won't Cost Them Money," **Deadspin**, February 24, 2017.

"The Mythology Playbook: Procompetitive Justifications for 'Amateurism,' Biases and Heuristics, and 'Believing What You Know Ain't So'," **The Antitrust Bulletin** (Vol 62, Issue 1, pp. 140 – 183) with Kevin Trahan.

"The Ninth Circuit Decision in *O'Bannon* and the Fallacy of Fragile Demand," **Marquette Sports Law Review** (Spring 2016, 26(2), pp. 391-410) with Richard J. Volante.

"The NCAA isn't Going Broke, No Matter How Much You Hear It," **FiveThirtyEight**, April 20, 2016.

"Why the NCAA Is America's Longest-Running Cartel," **Medium,** March 21, 2016.

"Jim Harbaugh is Annexing Spring break, and the NCAA is Pretending to be Upset About It," **Vice Sports**, February 24, 2016.

"The NCAA's Economic Exploitation Of Athletes Won't Be Solved By More Of The Same," **Vice Sports**, October 20, 2015.

"Jay Bilas and Oliver Luck are Going to Debate Paying College Athletes, and It Could Go Like This," **Vice Sports**, October 15, 2015

"Why Daily Fantasy Is Such a Problem For The NCAA," **Deadspin**, September 24, 2015.

"Let the Market Solve the College Sports Problem," **The New Republic**, September 3, 2015.

"The NCAA Has Always Paid Players; Now It's Just Harder To Pretend They Don't," **Deadspin**, August 29, 2015.

"It's Official: UAB Did Not Need to Kill Football," **Vice Sports**, May 20, 2015.

"How Title IX Actually Makes Money For Some Schools," **Deadspin**, May 14, 2015.

"Net Gains," **The Point**, April 2015, with Colin Weaver.

"An Economist Explains Why Darren Rovell Is Wrong About Paying College Athletes," **Vice Sports**, March 30, 2015.

"Exciting NCAA Tourney Upsets: Not Brought To You By Enforced Amateurism," **Deadspin**, March 16, 2015.

"The Big Ten Knows What's Best For Your Tall, Talented Child," **Vice Sports**, March 6, 2015.

"College Sports Programs Are Playing Poor, Here's How To Fix It," **Vice Sports**, January 12, 2015.

"Gender Equity Is Not A Zero-Sum Game," **Deadspin**, January 9, 2015.

"Wait, The NCAA Can Pay Players' Parents Now?" **Deadspin**, January 7, 2015

"UAB's Tangled Web Of Numbers Doesn't Add Up," **Vice Sports**, January 5, 2015

"The NCAA Is Humblebragging About Giving Athletes A 4 Percent Tip" **Vice Sports**, December 11, 2014.

"Screw the Math: UAB Can Afford Football, So Why Is It Choosing Otherwise?" **Vice Sports**, December 8, 2014.

"Michigan's Problem Isn't Commercialism; Michigan's Problem Is It Stinks," **Deadspin**, September 29, 2014.

"Amateur Bluff: Stanford's Unlikely Ploy to Get Out of Paying Athletes," **Vice Sports**, September 15, 2014.

"Don't Let Anyone Tell You The O'Bannon Ruling Conflicts With Title IX," **Deadspin**, August 13, 2014.

"In The O'Bannon Decision, Truth Wins Out Over Rhetoric," **Deadspin**, August 11, 2014.

"How Not to Reform the NCAA," **Deadspin**, August 1, 2014.

"What's Karl Marx Doing In These Arguments Against College Athlete Pay?" **Deadspin**, July 22, 2014.

"The Competitive-Balance Argument Against Paying Athletes Is [Wrong]," **Deadspin**, May 15, 2014.

"How Athletic Departments (And The Media) Fudge the Cost of Scholarships," **Deadspin**, May 2, 2014.

"Iowa AD: Paying Players is Too Complicated For Me and My $450K Salary," **Deadspin**, February 17, 2014.

"But Nobody Even Makes Any Money on College Sports," **Slate**, January 6, 2014.

"Teams In The Orange Bowl Don't Make Any Money, And Other Lies," **Deadspin**, January 4, 2014

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," **Journal of Competition Law & Economics** (May 2013, 9(3), pp. 655-708) with Daniel A. Rascher.

"Competitive Balance in Sports: 'Peculiar Economics' Over the Last Quarter Century," **Entertainment, Arts and Sports Law Journal** Spring/25th Anniversary Special Issue (Spring 2013, Vol.24, No. 1), with Daniel A. Rascher.

"National Letter of Indenture: How College Athletes are similar to, and in many ways worse off than, the indentured servants of colonial times," **Selected Proceedings of the Santa Clara Sports Law Symposium**, September 6, 2012, with Jason Belzer.

"National Letter of Indenture: Why College Athletes are Similar to Indentured Servants of Colonial Times," **Forbes Online**, July 25, 2012, with Jason Belzer.

"College Sports Should Work as Free Market," in **USA Today**, January 12, 2012, with Dan Rascher.

"Illustrations of Price Discrimination in Baseball," in **Oxford Handbook of Sports Economics** (Vol. 2: Economics Through Sports, pp. 380-399), eds. Stephen Shmanske and Leo H. Kahane, Oxford University Press, 2012, with Daniel A. Rascher.

"The $2,000 Stipend and the Rule of Reason: an Antitrust Analysis," in **Sports Litigation Alert**, Volume 8: Issue 24, December 30, 2011.

"The Conversation," in **The Atlantic**, December 2011.

"Excuses, Not Reasons: 13 Myths About (Not) Paying College Athletes," in **Selected Proceedings of the Santa Clara University Sports Law Symposium**, September 2011.

"Pay-for-play -- the truth behind the myths," **ESPN.com**, July 15, 2011.

"BCS: Antitrust storm clouds gather," **ESPN.com**, May 11, 2011.

"Motions to Dismiss: Has the Supreme Court Lowered Litigation Costs?" in **Trade Practices Law Journal**, March 2009.

"Dealing in Imaginary Goods: Implications for Antitrust and Intellectual Property Policy," in **Trade Practices Law Journal**, March 2007, with Christopher J. Pleatsikas.

"Rivalrous Consumption and the Boundaries of Copyright Law: Intellectual Property Lessons from Online Games," in **Intellectual Property Law Bulletin**, Fall 2005, with Robert Bullis.

"The Oracle/PeopleSoft Merger Case: Market Definition and Unilateral Effects Analysis in the Software Industry" in **Trade Practices Law Journal**, December 2004, with Christopher J. Pleatsikas.

"Neither Reasonable nor Necessary: 'Amateurism' in Big-Time College Sports" in **Antitrust**, Spring 2000, with Daniel A. Rascher.

Peer Reviewer for **Journal of Sport Management, Review of Industrial Organization,** and **International Journal of Sports Science and Coaching**.

**Education And Educational Awards**

**A.B.**, with Distinction, Honors in History, STANFORD UNIVERSITY, 1989.
- Phi Beta Kappa, Stanford University, 1987.
- President's Award for Academic Excellence in Freshman Year, 1986.

**M.A.**, History, THE JOHNS HOPKINS UNIVERSITY, 1990.

**M.B.A.**, Anderson Graduate School of Management, UCLA, 1994.
- Carter Award for outstanding academic achievement, UCLA, 1994.
- Dean's List, 5 quarters, 1992-4.

**Ph.D. Coursework**, Marketing, Anderson Graduate School of Management, UCLA, 1995-6
Haas School of Business, UNIVERSITY OF CALIFORNIA, BERKELEY, 1996-7.

**Other Professional Experience**

1994-1997          HEWLETT-PACKARD                          Palo Alto, CA
**Financial Analyst**
* Responsible for understanding trends in company-wide and division-specific operating expense categories (R&D, Marketing, Sales, and G&A).  Liaison to regional HQs in Geneva, Hong Kong, and Atlanta.  Developed process improvements, cutting significant time from the close/forecast process.

1993               IL FORNAIO (America)                     San Francisco, CA
**Strategic Consultant**
* Developed and evaluated blueprint for firm's public offering.   Worked with CEO and CFO to present strategy to board of directors, and investment bank community. Built extensive models to analyze company's need for capital and for investors' projected returns.  Designed and carried out studies of critical operations, evaluating business activities for profitability and value.

1991-92            COPITHORNE & BELLOWS                     San Francisco, CA
**Account Coordinator**
- Work in all elements of public relations/strategy work for Silicon Valley high technology clients. Clients included Hewlett-Packard (components), Xerox (printers), Apple USA (distribution), VESA (graphics), and Syntellect (IVR).

# Appendix B - Documents Considered

**<u>Data</u>**

2022 NCAA Form 990

EADA Data


**<u>Legal Filings and Guidelines</u>**

Antitrust Guidelines for Collaborations among Competitors, April 2000.

Direct Testimony of Dr. Daniel A. Rascher (*Alston*), July 3, 2018.

Horizontal Merger Guidelines, August 19, 2010.

Merger Guidelines, 2023 revision.

Order Denying Motion to Exclude Desser and Rascher Opinions, In Re: College Athlete NIL Litigation, November 3, 2023.


**<u>Literature, Articles, and Publications</u>**

Alexander, L. & Salop, S.C. (March 2023). "Antitrust Worker Protections," *The University of Chicago Law Review*, 90(2).

Baird, K. (2004). "Dominance in College Football and the Role of Scholarship Restrictions." *Journal of Sport Management,* 18(3).

Berri, D.J. (2004). "Is There a Short Supply of Tall People in the College Game?" in Fizel, J. & Fort, R. (Eds.), *Economics of College Sports.* Westport, CT: Praeger Publishers.

Blair, R. and Sokol, D. (2012). "The Rule of Reason and the Goals of Antitrust: An Economic Approach." *Antitrust Law Journal*, 78.

Eckard, W.E. (1998). "The NCAA Cartel and Competitive Balance in College Football." *Review of Industrial Organization*, 13.

Flatau, P. (2001). "Some Reflections on the 'Pigou-Robinson' Theory of Exploitation." *History of Economics Review*, 33(1).

Fort, R. (2017). "College Sports Competitive Balance 'Beliefs' and the Rule of Reason: Applied Theory and a Literature Review." *The Antitrust Bulletin*, 62(1).

Fort, R.D. (2006). Sports Economics, Second Edition, Pearson

Newman, J. (2019). "Procompetitive Justification in Antitrust Law." *Indiana Law Journal*, 94(2).

Paul, R., Humphreys, B.R. & Weinbach, A. (2012). "Uncertainty of Outcome and Attendance in College Football: Evidence from Four Conferences." *The Economic and Labour Relations Review*, 23(2).

Peach, J. (2007). "College athletics, universities, and the NCAA." *The Social Science Journal*, 44(1).

Pigou, A.C. (1920). The Economics of Welfare, First Edition, London: Macmillan.

1

Posner, R.A. (2001). Antitrust Law, Second Edition. University of Chicago Press.

Rascher, D., Maxcy, J. & Schwarz, A. (2019). "The Unique Economic Aspects of Sports." *Journal of Global Sport Management*, 6(1).

Robinson, J.V. (1933) The Economics of Imperfect Competition, London: Macmillan.

Rottenberg, S. (1956). "The Baseball Players' Labor Market," *The Journal of Political Economy*, 64(3).

Salaga, S. and Tainsky, S. (2015). "The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations in Nielsen Ratings for Bowl Championship Series Games." *Journal of Sports Economics*, 16(5).

Santesteban, C.J. & Leffler, K.B. (2017). "Assessing the Efficiency Justifications for the NCAA Player Compensation Restrictions." *The Antitrust Bulletin*, 62(1).

Schwarz, A. & Trahan, K. (2017). "The Mythology Playbook: Procompetitive Justifications for 'Amateurism,' Biases and Heuristics, and 'Believing What You Know Ain't So,'" *The Antitrust Bulletin*, 62(1).

Schwarz, A. & Volante, R.J. (2016). "The Ninth Circuit Decision in O'Bannon and the Fallacy of Fragile Demand." *Marquette Sports Law Review*, 26.

Stigler, G.J. (1968). "Price and Non-Price Competition." *Journal of Political Economy*, 76(1).

Sutter, D. & Winkler, S. (2003). "NCAA Scholarship Limits and Competitive Balance in College Football." *Journal of Sports Economics*, 4(1).

Van Dyck, K. (November 2023). "Playing By the Rules: Bringing Law and Order to the NCAA." *American Economic Liberties Project*.

**Third Party Sources**

http://regressing.deadspin.com/the-competitive-balance-argument-against-paying-athlete-1576638830

https://247sports.com/Article/ACC-Pac-12-conference-expansion-realignment-TV-contract-deals-205637161/

https://247sports.com/Season/2023-Football/CompositeTeamRankings/

https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf

https://businessofcollegesports.com/current-college-sports-television-contracts/

https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf

https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf

https://statistics.laerd.com/statistical-guides/spearmans-rank-order-correlation-statistical-guide.php

https://www.espn.com/college-football/story/_/id/39267884/college-football-playoff-espn-discuss-6-year-rights-contract

https://www.latimes.com/sports/story/2021-07-01/how-southern-california-helped-launch-ncaa-nil-revolution

https://www.linkedin.com/pulse/look-back-2023-inflcr-skyqf

https://www.on3.com/nil/news/what-are-nil-collectives-and-how-do-they-operate/

https://www.wralsportsfan.com/acc-looks-for-national-regulation-on-nil-as-players-seek-more-opportunities/20384391/