# Exhibit S

# NEGOTIATED RESOLUTION[1]

Florida State University – Case No. 020169

January 12, 2024

## I. CASE SYNOPSIS

Florida State University (Florida State); assistant football coach (assistant football coach); and the NCAA enforcement staff agree with the violations and penalties detailed below.

<u>Impermissible recruiting activities</u>.

In April 2022, a football student-athlete at another institution (PSA) entered the transfer portal and communicated with assistant football coach about taking an official visit to Florida State's campus.

On April 14, 2022, during PSA's official visit, assistant football coach facilitated impermissible contact between PSA, PSA's father, PSA's mother and a representative of the institution's athletics interests (booster), who was then chief executive officer of a name, image and likeness (NIL) collective that was also a representative of the institution's athletics interests (the collective). Specifically, assistant football coach informed PSA and his family members about the meeting with booster and transported them to and from the off-campus meeting location. At that meeting, booster encouraged PSA to enroll at the institution and offered PSA an NIL opportunity with the collective for approximately $15,000 per month for a period of at least one year. Assistant football coach did not attend the meeting.

Following the meeting, booster sent a text message to PSA and called and sent a text message to PSA's mother. On April 18, 2022, PSA withdrew his name from the transfer portal and remained at his original institution.

The parties considered whether these impermissible recruiting activities would be appropriately assessed as a Level I or Level II violation. When analyzing the appropriate level, the parties recognized the importance of the established conduct as well as institutional efforts to comply with the then-novel nature of certain aspects of NIL activities. Weighing these factors, the parties believe these impermissible recruiting activities are most appropriately assessed as a Level II violation.

<u>Provision of false or misleading information</u>.

PSA, PSA's father and PSA's mother all reported that assistant football coach informed them of the plan to meet booster and that assistant football coach knew he was transporting them to meet with booster. Assistant football coach acknowledged providing PSA and his parents transportation to and from the locale of the meeting. However, in his interviews with the enforcement staff, assistant football coach denied facilitating the meeting between PSA, PSA's father, PSA's mother, and booster.

The parties considered whether assistant football coach's provision of false or misleading information should be assessed as a Level I violation. When analyzing the appropriate level, the parties

---

[1] In reviewing this agreement, the hearing panel made editorial revisions pursuant to NCAA Division I Committee on Infractions (COI) Internal Operating Procedure (IOP) 4-7-1-2. These modifications did not affect the substance of the agreement.

noted that assistant football coach acknowledged certain aspects of the underlying impermissible activity. For example, assistant football coach admitted knowing PSA communicated with the collective. Additionally, assistant football coach acknowledged transporting PSA, PSA's father and PSA's mother to a location where they met with booster. Finally, assistant football coach was not present for the meeting among PSA, PSA's father, PSA's mother and booster, and therefore had no knowledge of some key aspects of the violation. Considering these case-specific factors, and although the provision of false or misleading information is presumptively a Level I violation, the parties believe assistant football coach's provision of false or misleading information is most appropriately assessed as a Level II violation.[2]

The Committee on Infractions has previously concluded that ethical conduct violations for knowingly providing false or misleading information were Level II when unique circumstances did not warrant Level I violations. For example, in *University of Mississippi (Mississippi)* (2016), the Committee on Infractions concluded that an assistant coach's provision of false or misleading information was a Level II violation when the assistant coach acknowledged certain aspects, but not the entirety, of a violation.[3] Specifically, in *Mississippi* (2016), the assistant coach acknowledged that student-athletes and prospective student-athletes participated in weekend runs but provided false or misleading information about the prospective student-athletes being kept separate by having different start times.[4] Similarly, in this case, assistant football coach acknowledged aspects of the violation and his involvement in the activity, but he also provided information that was irreconcilable with other credible record information.

Also, in *Siena College* (2020), the Committee on Infractions concluded that a head coach's provision of false or misleading information was a Level II violation where the head coach's denials did not substantially impede the investigation because the enforcement staff had already established the information to substantiate the violation. Here, too, the information reported by assistant football coach did not impede the enforcement staff's investigation, which separately established information to substantiate the underlying violation.

---

[2] While agreeable to submitting these violations as Level II with the belief that doing so is in the best interests of the Association, the enforcement staff cautions that this negotiated resolution agreement, like all others, is specific to the facts of this case and has no precedential value. The panel agrees and emphasizes that the unique facts and circumstances outlined in this section of the agreement—namely, the assistant football coach's acknowledgment of the impermissible activity aside from his role in facilitating the meeting—led the panel to accept the parties' agreed-upon Level II designation despite the examples of Level I violations provided in Bylaw 19.1.2.

[3] *Mississippi* (2016), Page Nos. 27 and 28.

[4] *Mississippi* (2016), Page Nos. 27 and 28.

## II. PARTIES' AGREEMENTS

### A. Agreed-upon findings of fact, violations of NCAA legislation and violation levels.

1. [NCAA Division I Manual Bylaws 13.01.2, 13.1.2.1, 13.1.2.4-(a), 13.1.2.5, 13.1.3.5.1, 13.1.3.5.1.1, 13.2.1 and 13.2.1.1-(e) (2021-22)][5] (Level II)

The institution, assistant football coach and enforcement staff agree that April 14, 2022, assistant football coach, facilitated the impermissible recruitment of PSA by booster and the collective. Specifically, during PSA's official visit to the institution, assistant football coach transported PSA, PSA's father and PSA's mother to an off-campus meeting with booster on behalf of the collective. During the meeting, booster encouraged PSA to enroll at the institution and communicated an offer by the collective of approximately $15,000 per month for a period of at least one year as compensation for an NIL opportunity regarding PSA. Following the meeting, assistant football coach did not question or inquire about the substance of the meeting with PSA, PSA's father or PSA's mother. After PSA's visit, booster communicated with PSA by text message and PSA's mother by text message and phone call. PSA did not transfer to the institution, enter any NIL agreement offered on the visit or receive related compensation.

2. [NCAA Division I Manual Bylaws 10.01.1, 10.1, 10.1-(c), 19.2.3 and 19.2.3-(b) (2022 through December 2022) and 19.2.1, 19.2.1-(d), 19.2.2-(a) and 19.2.2-(c) (as of January 2023)][6] (Level II)

The institution, assistant football coach and enforcement staff agree that on November 30, 2022, and February 1, 2023, assistant football coach, violated the NCAA principles of ethical conduct and failed to cooperate with the enforcement staff when he knowingly provided false or misleading information to the institution and enforcement staff regarding his knowledge of and/or involvement in the violations detailed in Agreed-Upon Finding of Fact No. 1. Specifically, assistant football coach denied facilitating the meeting among booster, PSA, PSA's father and PSA's mother that occurred on PSA's official visit to the institution; however, the factual information substantiates that assistant football coach was aware he was transporting PSA and his family to meet with booster.

---

[5] Pursuant to NCAA Bylaw 19.7.3, effective January 1, 2023, in cases involving NIL offers, agreements and/or activities in which related communications and conduct are subject to NCAA regulation, the infractions process (including interpretive requests) shall presume a violation occurred if circumstantial information suggests that one or more parties engaged in impermissible conduct. The institution and involved individual in this matter acknowledged the violations occurred and accepted responsibility in this matter because the violations were supported by direct and on-the-record information.

[6] Effective January 1, 2023, prior applicable responsibility to cooperate (Bylaw 19.2.3) and unethical conduct (Bylaw 10.1) legislation became responsibility to cooperate (Bylaw 19.2.1) and failure to cooperate (Bylaw 19.2.2).

### B. Agreed-upon aggravating and mitigating factors.

Pursuant to NCAA Bylaw 19.10.3-(e), the parties agree that the aggravating and mitigating factors identified below are applicable. The parties assessed the factors by weight and number and agree that this case should be properly resolved as Level II – Standard for the institution and Level II – Aggravated for assistant football coach.

When analyzing the aggravating and mitigating factors applicable to the institution, the institution and enforcement staff gave significant weight to the institution's affirmative steps to expedite the resolution of this matter, healthy reporting of Level III violations and absence of Level I/II violations in recent years. The institution and enforcement staff also considered applicable aggravating factors for the institution. Although the institution's aggravating factors outnumber the institution's mitigating factors by one, the nature and weight of the factors support resolving the case as Level II – Standard for the institution.

When analyzing the aggravating and mitigating factors applicable to assistant football coach, assistant football coach and the enforcement staff gave significant weight to assistant football coach's affirmative steps to expedite the resolution of this matter. The enforcement staff acknowledges the challenges to involved individuals in accepting responsibility for substantial violations and recognizes the importance of such accountability to a well-functioning infractions process. Assistant football coach and the enforcement staff also considered the applicable aggravating factors for assistant football coach, which underscore the significance of the violations and are more numerous than the applicable mitigating factors. Despite the significant weight given to one of assistant football coach's mitigating factors, the nature, weight and number of the aggravating factors support resolving the case as Level II – Aggravated for assistant football coach.

**Institution:**

1. Aggravating factors (Bylaw 19.12.3.1).

   a. Multiple Level II violations for which the institution is responsible [NCAA Bylaw 19.12.3.1-(a)].

   b. Violations were premeditated, deliberate, or committed after substantial planning [NCAA Bylaw 19.12.3.1-(d)].

   c. Persons of authority condoned, participated in or negligently disregarded the violation or related wrongful conduct [NCAA Bylaw 19.12.3.1-(e)].

   d. Involvement by a representative of the institution's athletics interests in violations [NCAA Bylaw 19.12.3.1-(k)].

2. <u>Mitigating factors (Bylaw 19.12.4.1)</u>.

    a. Affirmative steps to expedite final resolution of the matter [NCAA Bylaw 19.12.4.1-(d)].

    b. An established history of self-reporting Level III or secondary violations [NCAA Bylaw 19.12.4.1-(e)].[7]

    c. The absence of prior conclusions of Level I, Level II or major violations committed by the institution within the past 10 years [NCAA Bylaw 19.12.4.1-(h)].

**Involved Individual (assistant football coach):**

1. <u>Aggravating factors (Bylaw 19.12.3.2)</u>.

    a. Multiple Level II violations [NCAA Bylaw 19.12.3.2-(a)].

    b. Violations were premeditated, deliberate, or committed after substantial planning [NCAA Bylaw 19.12.3.2-(c)].

    c. Persons of authority condoned, participated in or negligently disregarded the violation or related wrongful conduct [NCAA Bylaw 19.12.3.2-(d)].

    d. Intentional, willful, or blatant disregard for NCAA bylaws [NCAA Bylaw 19.12.3.2-(i)].

    e. Involvement by a representative of the institution's athletics interests in violations [NCAA Bylaw 19.12.3.2-(j)].

2. <u>Mitigating factors (Bylaw 19.12.4.2)</u>.

    a. Affirmative steps to expedite final resolution of the matter [NCAA Bylaw 19.12.4.2-(c)].

    b. The absence of prior conclusions of Level I, Level II or major violations committed by the involved individual [NCAA Bylaw 19.12.4.2-(e)].

**III. OTHER VIOLATIONS OF NCAA LEGISLATION SUBSTANTIATED; NOT ALLEGED**

None.

---

[7] The institution reported 124 Level III or secondary violations from 2018 to 2022, approximately 25 violations each year.

Florida State University – Public Decision
NEGOTIATED RESOLUTION
January 12, 2024
Page No. 6

## IV. REVIEW OF OTHER ISSUES

The enforcement staff considered whether factual information substantiated a head coach responsibility violation. Factual information demonstrated that the head football coach rebutted the presumption of responsibility for the violations by promoting an atmosphere of compliance and monitoring his staff. Specifically, the head football coach set clear expectations regarding compliance within the football program, which the head football coach actively monitored.

The enforcement staff also considered whether the institution failed to monitor its football program. Factual information demonstrated that the institution's compliance staff provided effective rules education to staff members and trained staff to routinely seek guidance from compliance when questions or concerns arose. Accordingly, the institution did not fail to monitor its football program.

## V. PARTIES' AGREED-UPON PENALTIES[8]

All penalties agreed upon in this case are independent and supplemental to any action that has been or may be taken by the NCAA Division I Committee on Academics through its assessment of postseason ineligibility, historical penalties or other penalties.

Pursuant to Bylaw 19.10.3-(e), the parties agree to the following penalties:

**Core Penalties for Level II – Standard Violations (Bylaw 19.12.6)**

1. Two years of probation from January 12, 2024, through January 11, 2026.

2. Financial penalty: The institution shall pay a fine of $5,000 plus 1% of the budget for the football program.[9]

3. Scholarship reductions: The institution shall reduce the number of grants-in-aid awarded in the football program by 5% during the two-year probationary period. Specifically, the institution will reduce the number of grants-in-aid awarded in the football program by a total of five during the 2024-25 and 2025-26 academic years.

---

[8] All penalties must be completed during the time periods identified in this decision. If completion of a penalty is impossible during the prescribed period, the institution shall make the Committee on Infractions aware of the impossibility and must complete the penalty at the next available opportunity.

[9] The fine from the program budget must be calculated in accordance with Committee on Infractions Internal Operating Procedures 5-15-6 and 5-15-6-1.

4. Recruiting restrictions:

   a. The institution shall reduce official paid visits in the football program during the 2023-24 academic year by seven from the number of visits permissible. Additionally, the institution shall not rollover six unused official paid visits from the 2022-23 academic year.

   b. The institution shall prohibit recruiting communications by members of the football program for a total of six weeks during the 2023-24 and 2024-25 academic years. Specifically, the institution shall prohibit recruiting communications by members of the football program:

      i. With all prospective student-athletes, during the one-week period of January 12 through January 18, 2024;

      ii. With all prospective student-athletes, for three weeks, applied during recruiting contact or dead periods in the 2024 calendar year on dates of the institution's choosing, provided that the weeks chosen are served in full-week (seven-day) increments and the dates selected do not overlap with the dates of any other recruiting communication bans applied under this subsection;

      iii. With prospective student-athletes in the transfer portal, during the one-week period of April 15 through April 21, 2024; and

      iv. With prospective student-athletes in the transfer portal, for one week, applied during recruiting contact or dead periods in the 2024 calendar year on dates of the institution's choosing, provided that the week chosen is served in a full-week (seven-day) increment and the dates selected do not overlap with the dates of any other recruiting communication bans applied under this subsection.

   c. The institution shall reduce the number of evaluation/recruiting person days in the football program during the 2023-24 academic year by six evaluation days in the fall of 2023 and 18 recruiting person days in the spring of 2024 from the total number of evaluation/recruiting person days permissible.

   d. The institution restricted assistant coach from all off-campus recruiting in fall 2023.

**Core Penalties for Level II – Aggravated Violations (Bylaw 19.12.6)**

5. Show-cause order: Assistant football coach violated recruiting and responsibility to cooperate legislation. Therefore, assistant football coach shall be subject to a two-year show-cause order from January 12, 2024, through January 11, 2026. In accordance with Bylaw 19.12.6.4 and Committee on Infractions Internal Operating Procedure 5-15-5, any employing member institution shall suspend assistant football coach from

the next three regular season contests. The institution, or any member institution that employs assistant football coach in an athletically related position during the two-year show-cause period, shall abide by the terms of the show-cause order unless it contacts the office of the Committees on Infractions to make arrangements to show cause why the terms of the order should not apply. The provisions of this suspension require that assistant football coach not be present in the facility where the contests are played and have no contact or communication with football program coaching staff members or student-athletes during the three contest-suspension period. The prohibition includes all coaching activities for the period of time that begins at 12:01 a.m. on the day of the contest and ends at 11:59 p.m. that day. During that period, the assistant football coach may not participate in any coaching activities, including, but not limited to, team travel, practice, video study, recruiting and team meetings. Additionally, any employing member institution shall prohibit recruiting communications by assistant football coach for a total of two weeks during the 2024-25 academic year and require assistant football coach to attend NCAA Regional Rules in May 2025.

**Additional Penalties for Level II – Standard Violations (Bylaw 19.12.8)**

6. Public reprimand and censure through the release of the negotiated resolution agreement.

7. Disassociation: The institution shall disassociate booster for a period of three years beginning with the release of this infractions decision on January 12, 2024 and ending January 11, 2027. Pursuant to Bylaw 19.12.8-(i), the disassociation shall include:

    a. Refraining from accepting any assistance from booster and/or his business interests that would aid in the recruitment of prospective student-athletes or the support of enrolled student-athletes. Any business interest to which this term applies is expressly permitted to continue working directly with student-athletes for NIL opportunities;

    b. Refusing financial assistance or contributions to the institution's athletics program from booster and/or his business interests;

    c. Ensuring that no athletics benefit or privilege is provided to booster and/or his business interests, either directly or indirectly, that is not available to the general public; and

    d. Taking such other actions that the institution determines to be within its authority to eliminate the involvement booster in the institution's athletics program.

8. Disassociation: The institution shall disassociate the collective for a period of one year beginning with the release of this infractions decision on January 12, 2024 and ending January 11, 2025. Pursuant to Bylaw 19.12.8-(i), the disassociation shall include:

    a. Refraining from accepting any assistance from the collective and/or its business interests that would aid in the recruitment of prospective student-athletes or the support of enrolled student-athletes. This term only precludes the institution from accepting such assistance. The collective is expressly permitted to continue working directly with student-athletes for NIL opportunities;

    b. Refusing financial assistance or contributions to the institution's athletics program from the collective and/or its business interests. Any payment by the collective in exchange for tickets or other items generally available to the public is expressly permitted and not considered "financial assistance or contributions" under this term;

    c. Ensuring that no athletics benefit or privilege is provided to the collective and/or its business interests, either directly or indirectly, that is not available to the general public; and

    d. Taking such other actions that the institution determines to be within its authority to eliminate the involvement of the booster in the institution's athletics program.

9. During this period of probation, the institution shall:

    a. Continue to develop and implement a comprehensive educational program on NCAA legislation to instruct coaches, the faculty athletics representative, all athletics department personnel and all institutional staff members with responsibility for recruiting and certification legislation.

    b. Submit a preliminary report to the office of the Committees on Infractions by March 1, 2024, setting forth a schedule for establishing this compliance and educational program.

    c. File with the office of the Committees on Infractions annual compliance reports indicating the progress made with this program by December 1st during each year of probation. Particular emphasis shall be placed on rules education and monitoring related to recruiting.

    d. Inform prospects in the football program in writing that the institution is on probation for two years and detail the violations committed. If a prospect takes an official paid visit, the information regarding violations, penalties and terms of probation must be provided in advance of the visit. Otherwise, the information must be provided before a prospect signs a National Letter of Intent.

    e. Publicize specific and understandable information concerning the nature of the infractions by providing, at a minimum, a statement to include the types of violations and the affected sport programs and a direct, conspicuous link to the public infractions decision located on the athletics department's main webpage

    "landing page" and in the media guides for the football program. The institution's statement must: (i) clearly describe the infractions; (ii) include the length of the probationary period associated with the case; and (iii) give members of the general public a clear indication of what happened in the case to allow the public (particularly prospects and their families) to make informed, knowledgeable decisions. A statement that refers only to the probationary period with nothing more is not sufficient.

10. Following the receipt of the final compliance report and prior to the conclusion of probation, the institution's president shall provide a letter to the Committee on Infractions affirming that the institution's current athletics policies and practices conform to all requirements of NCAA regulations.

## VI.   OTHER AGREEMENTS

The parties agree that this case will be processed through the NCAA negotiated resolution process as outlined in Bylaw 19.10, and a hearing panel comprised of members of the Committee on Infractions will review the negotiated resolution. The parties acknowledge that the negotiated resolution contains agreed-upon findings of fact of NCAA violations and agreed-upon aggravating and mitigating factors based on information available at this time. Nothing in this resolution precludes the enforcement staff from investigating additional information about potential rules violations. The parties agree that, pursuant to Bylaw 19.1.3, the violations identified in this agreement occurred and should be classified as Level II – Standard for the institution and Level II – Aggravated for assistant football coach.

If a hearing panel approves the negotiated resolution, the institution and assistant football coach agree that they will take every precaution to ensure that the terms of the penalties are observed. The institution and assistant football coach acknowledge that they have or will impose and follow the penalties contained within the negotiated resolution, and these penalties are in accordance with those prescribed in Bylaws 19.12.6, 19.12.7 and 19.12.8. The office of the Committees on Infractions will monitor the penalties during their effective periods. Any action by the institution or assistant football coach contrary to the terms of any of the penalties or any additional violations may be considered grounds for prescribing more severe penalties or may result in additional allegations and violations.

The parties acknowledge that this negotiated resolution may be voidable by the Committee on Infractions if any of the parties were aware or become aware of information that materially alters the factual information on which this negotiated resolution is based.

The parties further acknowledge that the hearing panel, subsequent to its review of the negotiated resolution, may reject the negotiated resolution. Should the hearing panel reject the negotiated resolution, the parties understand that the hearing panel will issue instructions for processing of the case pursuant to hearing resolution (Bylaw 19.8) or limited resolution (Bylaw 19.9) and prior agreed-upon terms of the rejected negotiated resolution will not be binding.

Should a hearing panel approve the negotiated resolution, the parties agree that they waive NCAA hearing and appellate opportunities.

### VII. DIVISION I COMMITTEE ON INFRACTIONS APPROVAL

Pursuant to NCAA Bylaw 19.10.1, the panel approves the parties' negotiated resolution agreement. The panel's review of this agreement is limited. Panels may only reject a negotiated resolution agreement if the agreement is not in the best interests of the Association or if the agreed-upon penalties are manifestly unreasonable. *See* Bylaw 19.10.4. In this case, the panel determines the agreed-upon facts, violations, aggravating and mitigating factors, and classifications are appropriate for this process. Further, the parties classified this case as Level II – Standard for Florida State and Level II – Aggravated for the assistant football coach. The agreed-upon penalties align with the ranges identified for core penalties for Level II – Standard and Level II – Aggravated cases in Figure 19-1 and Bylaw 19.12.6 and the additional penalties available under Bylaw 19.12.8. Pursuant to Bylaw 19.10.6, this negotiated resolution has no precedential value.

The COI advises Florida State and the assistant football coach that they should take every precaution to ensure that they observe the terms of the penalties. The COI will monitor the institution while it is on probation to ensure compliance with the penalties and terms of probation and may extend the probationary period, among other action, if the institution does not comply or commits additional violations. Likewise, any action by the institution and/or the assistant football coach contrary to the terms of any of the penalties or any additional violations shall be considered grounds for prescribing more severe penalties and/or may result in additional allegations and violations.

NCAA COMMITTEE ON INFRACTIONS PANEL
Tricia Turley Brandenburg, Chief Hearing Officer
Stephen Madva
Vince Nicastro