# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| STATE OF TENNESSEE, et al. | |
|---|---|
| *Plaintiff,* | |
| v. | No. 3:24-cv-33 |
| NATIONAL COLLEGE ATHLETIC ASSOCIATION, | |
| *Defendant.* | |

## DECLARATION OF JACKSON LAMPLEY, DIVISION I STUDENT-ATHLETE

1.  I am a current Division I FBS (football bowl subdivision) student-athlete on the University of Tennessee Knoxville (UT) football team. This declaration is based on my personal knowledge. If called to do so, I could testify competently to these facts under oath.

2.  I was a part of the UT football team prior to the NCAA's Interim Name, Image, and Likeness (NIL) Policy and have played every year since the Interim NIL Policy went into effect. The NCAA's Interim NIL Policy finally allowed collegiate athletes to earn NIL compensation in certain circumstances. Before the Interim Policy, my teammates and I were forbidden from earning any compensation from our NIL. I was not allowed to leverage the fact that I was a student-athlete at one of the greatest sports schools in the country to earn money.

3.  I understand that the Plaintiffs are challenging NCAA rules that prevent recruits and current student-athletes in the transfer portal from fully engaging in NIL opportunities before they formally commit to attend a school.

1

4. Like the vast majority of my teammates, I was a heavily recruited high school athlete. I was nationally ranked by the major recruiting services and I received scholarship offers from over 17 colleges in Power 4 (formerly Power 5) conferences and took dozens of visits to college campuses during my recruiting process. Although I was recruited prior to the Interim NIL Policy, I often host or interact with recruits on visits as a member of the UT football team. From this experience, I have a good understanding of the different factors that recruits consider when deciding where to enroll, both in the pre-NIL era and in the post-NIL era.

5. Like every other kind of student, student-athletes weigh many factors when choosing a school. To name just a few, those can include academic prestige and programs, campus setting, proximity to home, strength and tradition of program, coaching staff, style of play, program and campus culture, fan support, opportunity for early playing time, NFL track record, and career opportunities after football. Those factors are highlighted during the recruiting process as schools and coaches emphasize their relative strengths and advantages, especially as to facilities, coaching, opportunities to compete for championships, academic support, team culture, and by highlighting how deeply the fan base supports their teams. And much like every other student, I considered the long-term athletic, economic, and professional implications of where I wanted to enroll. All of those factors weighed into my decision to commit to Tennessee.

6. In my experience, today's recruits consider the same factors, but they now get to consider the possibility of NIL compensation.

7. Almost every recruit I meet with asks first and foremost about NIL. But they also ask about all the same factors I considered in the pre-NIL world. Just like finances are a factor for every other college student's decision for where to enroll, how much weight a recruit puts on financial costs and opportunities ought to be up to them, as simply part of finding the right fit for a given athlete's circumstances. In my observation, NIL has become one of the top factors that current recruits consider when determining where to go to school.

8. I've negotiated some NIL deals myself. I assume that some of my teammates playing skill positions get larger and more frequent NIL deals than I do, which is understandable. However, at a school like UT, there is a massive and deeply dedicated fanbase, so most of our student-athletes are known by the community to a large degree, even statewide.

9. I am always happy to see one of my teammates land a new NIL deal. For many student-athletes (and incoming recruits), college sports are their first and only chance to monetize the highly valuable skills they've dedicated thousands of hours to developing. During my time as a student-athlete, I've had hundreds of teammates on the football team. While most of those teammates hoped to go on to professional football, my experience confirms what the statistics show - that even those student athletes that are fortunate enough to move on to the next level do not have lengthy professional careers.

3

10. As a football player at UT, my teammates and I play in front of millions of people each year, both in person and on television. Hundreds of thousands of fans know our names and the names of my fellow student-athletes playing other sports at UT. After every game, there are hundreds of fans lined up outside the stadium just to get a picture or an autograph. Often a similar dynamic takes place when we go out into the community.

11. I've seen first-hand how NIL has helped so many student-athletes. I've seen my teammates finally find an avenue to monetize their name recognition and UT's fandom. Some of my teammates have been able to use NIL deals to help with living expenses, to send money back home to help support their family, or to save those earnings for future use.

12. I am concerned about any NCAA policies that restrict the short window in which student-athletes can monetize their value as a player.

13. When I interact with recruits as a student-athlete, I often tell recruits about the various types of academic, networking, and professional opportunities available throughout the state. There are a lot; Vols' fans are unmatched in their support for college sports. To the extent that the NCAA's rules force recruits to choose a school without full knowledge of NIL opportunities, that is a concern to me. I believe it is essential that recruits have direct and open conversations with a third party like a collective and commit to a school knowing the full scope of NIL opportunities available to them in college.

4

14. At most major sports schools, I believe there is only one "main" collective that handles most NIL activities. After formally committing to a school by signing a National Letter of Intent (LOI), a recruit will be effectively limited to that school's collective. I am not aware of any collectives signing deals with a recruit after he or she signs an LOI with a different school.

15. The signing of the LOI signals the end of the recruiting process. Once the LOI is executed, competing schools are forbidden from contacting that recruit. While many athletes provide non-binding "verbal" commitments to a school prior to signing the LOI, that does not necessarily signal the end of the recruitment process. Recruits still have the power to reconsider their commitment, and some recruits make it clear that they are still willing to hear from other schools, thus potentially shopping one opportunity against another. There is always a possibility of having an athlete who verbally committed to one school "flip" to another school on or before signing day. While I verbally committed to UT in the spring of my junior year of high school, the recruiting did not officially stop until I signed my LOI during my senior year. Had I given off indications that I was still amenable to offers from other schools before I signed, it is possible that my recruiting process would not have even slowed down.

16. An athlete's greatest negotiating leverage occurs when they're available and wanted by multiple schools. Recruits are no longer "available" after they sign the LOI. It is my understanding that February 7th is the beginning of the last, brief period for this year's college football recruits to sign a LOI.

5

17. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on February, 1, 2024, in Knoxville, TN.

*Jackson Lampley*

6