# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE;　　　　　　　　)
COMMONWEALTH OF VIRGINIA,　　)
　　　　　　　　　　　　　　　　　　)　　**Case No. 3:24-cv-00033-DCLC-DCP**
　　　　**Plaintiffs,**　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
NATIONAL COLLEGIATE ATHLETIC　)
ASSOCIATION,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　**Defendant.**　　　　　　　　)

---

## DEFENDANT'S OPPOSITION TO PLAINTIFFS'
## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

---

## <u>INTRODUCTION</u>

The State of Tennessee and the Commonwealth of Virginia have come to this court seeking "extraordinary relief," *Winter v. NRDC*, 555 U.S. 7, 22 (2008)—namely, a temporary restraining order and preliminary injunction—against longstanding and fundamental prohibitions against the professionalization of college sports. While they purport to seek this relief on behalf of student-athletes who participate in college sports organized by the National Collegiate Athletic Association (NCAA), they do not provide any concrete evidence of how those rules are harming student-athletes, and fail to acknowledge that the member institutions within their borders repeatedly agreed to follow the rules they now purport to challenge. Nor do they provide any convincing explanation why rules that have been in place for years, if not decades, have given rise to a state of emergency warranting extraordinary judicial intervention.

The Supreme Court has made clear that plaintiffs seeking such extraordinary relief must make a "clear showing that the[y ] are entitled to such relief." *Id.* Plaintiffs have not come close.

Exactly what rules Plaintiffs are challenging—and what relief they seek—remains opaque. At minimum, they appear to challenge a set of NCAA rules that purportedly (1) preclude prospective and current college athletes from "encourag[ing] competition between collectives at different schools to obtain competing NIL offers," Compl. ¶ 32, and (2) "restrict schools from competing to arrange NIL compensation" to student-athletes to entice their attendance, Compl. ¶ 35. But their proposed order sweeps in a variety of different rules with farther-reaching effects. *See* Decl. Geoff Silver ¶¶ 27–31, Ex. A to Declaration of Taylor Askew, attached hereto as Ex. 1.

Whatever the scope of the challenge, Plaintiffs have failed to establish irreparable injury— a central element of their request for injunctive relief. Plaintiffs also fail to show that the equities cut in their favor or that the public interest warrants an injunction. And they have not established a likelihood of success on the merits. Each of these flaws requires denying their request.

*First*, Plaintiffs cannot establish the "indispensable" element of irreparable injury. *Brown v. Hamilton Cnty.*, No. 22-3633, 2023 U.S. App. LEXIS 4232, *5 (6th Cir. Feb. 22, 2023 (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019)). Plaintiffs seek to enjoin rules precluding schools and student-athletes from facilitating compensation arrangements designed to incentivize enrollment. But the lead Plaintiff in this case is the State of Tennessee, and its own laws preclude such payments. *See* Tenn. Code Ann. § 49-7-2802(a) ("To preserve the integrity, quality, character, and amateur nature of intercollegiate athletics and to maintain a clear separation between amateur intercollegiate athletics and professional sports, such compensation must not be provided in exchange for athletic performance ***or attendance at an institution***.") (emphasis added). Tennessee is not irreparably harmed by rules restricting something the State's laws independently prohibit.

Plaintiffs also fail to provide any *evidence* of irreparable harm. Specifically, they provide no evidence that any student-athlete's opportunities are being chilled by these rules. The only evidence they have from any student-athlete comes in the form of a declaration filed a day after Plaintiffs' TRO/PI filing, that contains only speculation about how the rules may affect *other* student-athletes. The State's evidentiary showing simply does not meet the high bar required to short-circuit full consideration of the merits.

Nor do Plaintiffs offer any reason to think that an immediate injunction is required. The rules they seek to challenge have been in effect for years, and Plaintiffs offer no justification for claiming an entitlement to emergency relief on a truncated record after delaying years in seeking any relief. That is particularly so given that the primary institution whose interests are invoked by Plaintiffs—the University of Tennessee—has long participated in the NCAA's governance process, and agreed to be bound by the rules it now seeks to invalidate in Court. The rules at issue are also subject to an ongoing and longstanding lawsuit—filed back in 2020—by a certified class of student-athletes seeking broader relief with a trial date in January 2025. *See in re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal). Plaintiffs offer no evidence or argument for why they need injunctive relief on an even faster basis, or why money damages—the traditional remedy—would fail to adequately redress the injuries they claim.

*Second*, the equities and public interest cut against Plaintiffs. As courts in this Circuit have made clear, the purpose of preliminary relief is to preserve the status quo. The NCAA rules Plaintiffs challenge are, and have long been, the status quo. Plaintiffs are the ones seeking to upend those rules, but they have done nothing to tailor their request to the harms asserted. Plaintiffs' request to enjoin specific NCAA rules is underdeveloped, underthought, and underexplained. The scope of the challenged rules exceeds the NIL arrangements Plaintiffs seek to permit, and enjoining

3

the array of rules they attack would have negative implications reaching far beyond the use of NIL negotiations in collegiate athletic recruitment. As a result, Plaintiffs' requested relief lacks the specificity that the Federal Rules of Civil Procedure mandate. *See* Fed. R. Civ. P. 65(d).

*Third,* while the Court need not reach the issue at this juncture, Plaintiffs cannot show a likelihood of success on the merits. They have failed to provide evidence on critical elements of their antitrust challenge—including establishing anticompetitive effects in a properly pleaded relevant market—and the rules they seek to enforce are procompetitive in various ways. The permissibility of the rules at issue has been hotly litigated for over three years in federal court in California; Plaintiffs cannot, in the face of that litigation, meet their burden of showing they are more likely to succeed here on an exceedingly thin record.

As Plaintiffs acknowledge, the NCAA has recently taken steps to help student-athletes navigate the complicated environment surrounding name, image, and likeness rights, including by enacting transparency measures and proposing additional changes to the rules to allow schools to responsibly assist student-athletes with NIL without transforming them into paid employees. There is no reason to upend this process, invite chaos on a moment's notice, and transform college sports into an environment where players and schools match up based primarily on the dollars that can change hands. Requests for radical change require sound deliberation. They benefit from a complete record and fulsome consideration. The Court should deny Plaintiffs' late-breaking and ill-conceived request for injunctive relief.

## LEGAL STANDARD

"The purpose of [injunctive relief] is to maintain the status quo for a very short period of time 'so that a reasoned resolution of a dispute may be had.'" *Wheel Recovery Sys., LLC v. Nichols*, No. 3:22-cv-00342-DCLC-DCP, 2022 U.S. Dist. LEXIS 240144, at *6 (E.D. Tenn. Oct. 12, 2022)

4

(addressing TRO request) (quoting *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)); *see also Ministries v. Coffee Cnty.*, No. 22-5391, 2023 U.S. App. LEXIS 324, *5 (6th Cir. Jan. 5, 2023) (quoting *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (Readler, J., concurring and dissenting in parts) ("[A] preliminary injunction's 'fundamental purpose' is to preserve the status quo during litigation to avoid an irreparable injury.")).

"The moving party has the burden of proving that the circumstances 'clearly demand [injunctive relief].'" *Id.* (addressing TRO) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't.*, 305 F. 3d 566, 573 (6th Cir. 2002)); *see also Castillo v. Whitmer*, 823 F. App'x 413, 415 (6th Cir. 2020) (quoting same in affirming denial of PI). The Court must consider the following four factors when deciding whether to grant injunctive relief:

> (1) the likelihood that plaintiff 'will succeed on the merits of the claim;'
> (2) whether plaintiff will 'suffer irreparable harm without the grant of the extraordinary relief;'
> (3) whether granting an injunction 'will cause substantial harm to others;' and
> (4) 'whether the public interest is advanced' by issuing an injunction.

*Id.* (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)). "These factors present a balancing test and are 'not prerequisites that must be met.'" *Id.* (quoting same). That said, and critical to this dispute, "[t]he irreparable harm factor 'is indispensable'; 'even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *Brown v. Hamilton Cnty.*, No. 22-3633, 2023 U.S. App. LEXIS 4232, *5 (6th Cir. Feb. 22, 2023) (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019)).

5

## ARGUMENT

**I.** **Plaintiffs Will Not Suffer Irreparable Harm Absent the Issuance of Injunctive Relief.**

To obtain a TRO or preliminary injunction, the movant must be facing "immediate and irreparable harm absent injunctive relief." *Abney v. Amgen, Inc.*, 443 F.3d 540, 551 (6th Cir. 2006). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (emphasis in original). "An unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Huron Mountain Club. v. U.S. Army of Eng'rs*, 554 F. App'x 390, 397 (6th Cir. 2013) (quoting *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013)). Additionally, "the general rule is that 'a plaintiff's harm is not irreparable if it is fully compensable by money damages.'" *Langley v. Prudential Mortg. Capital Co., LLC*, 554 F.3d 647, 649 (6th Cir. 2009) (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

    **1.** **Injunctive Relief Will Not Prevent the Asserted Irreparable Harm Because, Irrespective of the NCAA's Rules, NIL Deals Conditioned on Attendance at an Educational Institution Violate Tennessee Law.**

With respect to the State of Tennessee, the issuance of the requested injunction will not prevent any harm. Plaintiffs seek an injunction against NCAA rules that prohibit "schools supported by collectives with enthusiastic alumni networks and boosters [to] be able to freely offer NIL compensation to prospective athletes" in exchange for the athletes attending those schools. Compl. ¶ 39, Docket Entry (D.E.) 1. But Tennessee law prohibits that. Specifically, the Tennessee Code forbids student athletes from receiving compensation for use of their NIL conditioned upon their attendance at a particular school. *See* Tenn. Code Ann. § 49-7-2802(a) ("To preserve the integrity, quality, character, and amateur nature of intercollegiate athletics and to maintain a clear

separation between amateur intercollegiate athletics and professional sports, such compensation must not be provided in exchange for athletic performance or attendance at an institution.").[1]

There exists no risk of irreparable harm to the persons whom the State of Tennessee purports to represent in this matter because, even if the Court issues the requested injunction, the relief Plaintiffs seek remains prohibited under Tennessee law. More significantly, Tennessee likely lacks standing to bring the instant challenge because, given its own existing law, its alleged injury would not be redressed through a ruling in its favor from this Court. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("redressability is an 'irreducible' component of standing . . . no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." (internal quotation marks and citation omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016))).

2.    **Plaintiffs Have Not Met Their Burden to Present Evidence Demonstrating a Likelihood of Irreparable Harm.**

Beyond that gating issue, to establish irreparable harm, a plaintiff must show an injury that is: (1) personal to them; (2) immediate; (3) incapable of being remedied through monetary damages; (4) nonspeculative; and (5) substantial. *United States v. Borden Co.*, 347 U.S. 514, 518 (1954). Plaintiffs have not made and cannot make the requisite showing. As a result, they are not entitled to the extraordinary remedy of injunctive relief. *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) ("[T]he irreparable harm factor is indispensable.") (internal citations omitted).

---

[1] Tennessee's original NIL law included an express ban on collectives compensating current or prospective athletes for their NIL "if the arrangement is contingent on the athlete's enrollment or continued participation at an institution." Act of May 11, 2021, ch. 400, 2021 Tenn. Pub. Acts 400, § 49-7-2802(c). The General Assembly has since repealed the provision. Act of April 20, 2022, ch. 400, Tenn. Pub. Acts 845, § 49-7-2802(c). Despite the amendment, the State's prohibition on the use of NIL agreements in exchange for attendance at an educational institution—the agreements for which Plaintiffs seek license—remains in effect.

7

Plaintiffs claim to bring this suit on behalf of citizens in their states "including prospective college athletes, and consumers of college athletics," Mot. 19. So they must provide evidence of an immediate, nonspeculative, substantial harm to such individuals that cannot be redressed by monetary damages. Plaintiffs do no such thing. First and foremost, Plaintiffs provide no evidence that athletes are being chilled or harmed in any way. Federal Rule of Civil Procedure 65 requires Plaintiffs to point to "specific facts" that "clearly show" immediate and irreparable injury. Fed. R. Civ. P. 65(b)(1)(A). At best, Plaintiffs present only theoretical harms—not factual harms and certainly not clear and specific ones. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical.") (internal citations omitted); *Hodge v. Field*, 320 F. Supp. 775, 777 (C.D. Cal. 1968) ("Without specific facts, this Court could not draft an injunction order to comply with Rule 65(d) of the Federal Rules of Civil Procedure . . . .").

Plaintiffs offer only one declaration relevant to the purported chilling effect on student athletes, that of a current University of Tennessee football player. Lampley Decl., D.E. 13. The declaration is not relevant proof on the issue of irreparable harm. As an initial matter, the declarant offers his "belief" and "concern[]" based on his conversations with recruits but not his specific personal knowledge or experience. *Id.* ¶¶ 12–13. He does not identify any deals or offers he was denied at any point during his career, and in fact acknowledges that he has been able to secure NIL compensation. That is so even though he was not recruited in either high school or through the transfer portal with the prospect of NIL agreements. *Id.* ¶ 8. If anything, his declaration is evidence that the challenged NCAA rules are ***not*** chilling the NIL market for student athletes.

The declarant's observations also are at odds with other accounts of what appears to be a vibrant NIL market (i.e. the status quo). There are ample media reports of student athletes signing

#240734817_v1

large NIL deals after arriving on campus.[2]  While it is true that such deals appear to have been negotiated after enrollment, the relevant point is that the rules do not appear to be chilling the ability to earn substantial NIL compensation, and Plaintiffs have provided no concrete evidence suggesting otherwise.

### 3. Plaintiffs' Years-Long Delay in Seeking the Requested Relief Preponderates Against a Finding of Irreparable Harm.

Plaintiffs admit in their brief that the NCAA has not passed any new NIL rules.  Memo. at 1–2 (indicating existing NCAA rules were "cemented.")  Instead, the rules Plaintiffs challenged have been in effect for years, if not decades.  Silver Decl. ¶¶ 15–16, 30.  The January 10, 2024 action that Plaintiffs reference involved the NCAA's passage of new rules providing greater protections to student-athletes and the introduction of new proposals to allow responsible school involvement in facilitating NIL opportunities for student athletes in a manner designed to avoid triggering employment status.  *Id.* ¶¶ 24–25.  These recent activities changed nothing about longstanding NIL rules regarding third-party involvement in recruitment.  *Id.* ¶ 26.  Plaintiffs offer no explanation for waiting years to challenge those rules.

---

[2] *See, e.g.*, Margaret Fleming, Business Insider, "Olivia Dunne made $500,000 from a single NIL deal.  Here's how she became the highest-paid female college athlete," (July 13, 2023) (available at: https://www.businessinsider.com/olivia-dunne-nil-earnings-brand-deals-collective);  Miles Schachner, New York Post, "Panthers' Bryce Young drove for DoorDash in college before NIL deals," (Aug. 1, 2023) (available at: https://nypost.com/2023/08/01/bryce-young-drove-for-doordash-at-alabama-before-nil-deal) ("Panthers quarterback Bryce Young, who was drafted No. 1 overall out of Alabama in 2023, said he worked a DoorDash job during his freshman year in Tuscaloosa to earn some spare cash. . . . [after] [t]he NCAA's new NIL rules went into effect . . . . Young was one of the biggest beneficiaries . . . reportedly earn[ing] $3.5 million from deals from companies like Subway, Dr. Pepper and Nissan."; Jasmine Browley, Essence, "Shadeur Sanders and Bronny James Are Highest Paid NCAA Athletes for NIL Deals," (Oct. 23, 2023) (available at https://www.essence.com/news/money-career/shedeur-sanders-bronny-james-nil/)    (indicating that James and Sanders have earned $5.9 million and $4.8 million, respectively, from their NIL deals).  The above articles are collectively attached as Ex. B to the Askew Decl.

9

Plaintiffs' claim that they are suddenly harmed by the NCAA's allegedly newfound interest in enforcing the rules is similarly off point. Memo at 2. First, the allegation is false. There is nothing sudden about the NCAA's current position. The NCAA announced that it would be investigating the propriety of NIL deals over a year ago. Compl. ¶¶ 37–38. Second, Plaintiffs do not offer an explanation as to how the NCAA's enforcement of these rules—even if that enforcement were recent—creates a unique risk of irreparable harm distinct from harm allegedly caused by the rules themselves. If Plaintiffs' asserted harm—the chilling effect on NIL deals being offered to recruits—were bona fide, the rules themselves (not merely investigations into institutions' compliance therewith) would create the chilling effect. Accordingly, Plaintiffs cannot avoid the conclusion that they have unreasonably delayed their request for relief. Plaintiffs' delay in seeking the relief weighs against a finding of irreparable harm. *Huron Mountain Club*, 554 F. App'x at 397.

Plaintiffs citation to an impending investigation (as opposed to an impending penalty) into the University of Tennessee (UT), which is not a party to this dispute, does not save their case. Memo. at 21. *Potential* enforcement of known, considered, and acknowledged rules—years later—is not grounds for injunctive relief. Moreover, Plaintiffs do not mention, much less address, however, the important facts that UT agrees every year to follow the rules it now purports to challenge, was represented during the process when the rules were passed, and never offered an alternative to or asked for clarification of those rules to which it acquiesced. Silver Decl. ¶¶ 20–21. As just one example, a professor at the University of Tennessee has served on multiple NCAA governance committees involving NIL, including currently serving on the Division I council, and was previously a member of a committee that issued a report emphasizing the importance of avoiding "[s]chools or boosters . . . using NIL opportunities as a recruiting

#240734817_v1

inducement." *Id.* ¶ 22. UT, moreover, is part of a conference that is defending *against* a similar challenge to the NIL rules. *See* Declaration of Rakesh Kilaru ¶ 1, attached as Ex. 2 hereto. It makes little sense for Plaintiffs to ask this Court to exercise its judicial power to enjoin those same rules under these circumstances.

4.    **Plaintiffs' Alleged Harm Is Not "Irreparable," As the Student-Athletes the State Purports To Represent Are Pursuing Relief In Parallel Litigation.**

The harms alleged also are not irreparable as they are compensable through money damages. *Langley*, 554 F.3d at 649. Many current and former student athletes—presumably including the sole student-athlete declarant in this case—are members of certified monetary damages classes in litigation pending in the United States District Court for the Northern District of California. *See in re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal) (California Litigation). That case is currently set for trial in January 2025, where the Plaintiffs will be seeking a permanent injunction and billions of dollars in damages as compensation for, *inter alia*, lost NIL opportunities. (*Id.*, D.E. 164, 227). Given that the student athletes themselves argue that their alleged harms are compensable through money damages, their alleged harm is not irreparable and preliminary injunctive relief is not necessary to redress their claimed harm.

Moreover, despite the fact that the California Litigation has been pending since 2020, no member of any certified class has at any point made a request for immediate injunctive relief. Instead, those class members opted to pursue monetary relief and a permanent injunction preventing those monetary harms from continuing after the conclusion of that dispute. That those class members—again, the same student athletes that Plaintiffs claim are in need of this Court's protection—determined that no such interim relief was necessary suggests there is no need or emergency here.

#240734817_v1

Trial in the California Litigation next January will resolve not only the issues raised here but also those student athletes' claims for ***broader*** NIL-related relief—and will occur after years of discovery, on a full record. The parties in the California Litigation have deposed over forty (40) fact witness, including deponents from the "Power Five" athletic conferences, the NCAA, and third-parties such as member institutions (Oregon and Georgetown), member institution athletic department employees (Michigan State, UNC Charlotte, Baylor, Iowa State, Oklahoma State, and Vanderbilt), the U.S. Olympic Committee, and member institution head coaches (Jim Harbaugh and Caryl Smith-Gilbert). Kilaru Decl. ¶ 5. That a trial on the merits is fast approaching on a thorough and developed factual record counsels against disruptive intervention here on an, at best, truncated record.

### 5. Denying Plaintiffs' Request for Preliminary Relief Is Essential to Preserve the Status Quo.

The purpose of a TRO or preliminary injunction is to preserve the status quo. *Proctor & Gamble Co.*, 78 F.3d at 226; *see also Wheel Recovery Sys., LLC*, 2022 U.S. Dist. LEXIS 240144, at *6. And the status quo is "the rules are the rules."

Plaintiffs' demand turns the inquiry on its head. They do not actually seek here to preserve the status quo, but instead to fundamentally alter the landscape of college athletics by mandating the creation of an NIL market for student-athlete recruits that does not presently exist. The requested injunction would facilitate, *inter alia*, recruiting inducements tantamount to pay for athletic performance; adulteration of a recruiting process aimed at allowing student-athletes to choose the schools and programs at which they best fit; exposing recruits to bad actors who cajole the recruits (many of whom are minors) into entering coercive contracts; and third parties overwhelming recruits with solicitations. Silver Decl. ¶¶ 27–30.

#240734817_v1

If the Court endeavors to preserve the status quo while this action is pending—as Federal Rule of Civil Procedure 65 contemplates—the Court should deny Plaintiffs' motion.

### 6. Plaintiffs Have Not Provided Any Evidence that the Ability to Negotiate NIL Opportunities During the Upcoming Recruiting Period Is Essential to Prevent Irreparable Harm.

Plaintiffs have not presented any evidence that the February 7, 2024–April 1, 2024 time period is of any specialized significance. There exists no evidence before the Court that enjoining the NCAA from enforcing the challenged NIL rules during that window is essential to preventing irreparable harm. Without such evidence, injunctive relief is unavailable.

Even if Plaintiffs had provided such evidence, Plaintiffs have not met their burden to obtain a TRO, specifically. They have not presented any evidence that athletes will suffer unique irreparable harm if not permitted to negotiate NIL deals in their recruitment from February 7, 2024 (the commencement of the recruiting period), through February 13, 2024 (the date of the Court's injunction hearing). The Division I football recruiting period, however, extends through April 1, 2023. *See* Compl. ¶ 44. Given that irreparable harm, if any, could be addressed through a preliminary injunction absent the issuance of a TRO, the TRO should be denied.

## II. The Balance of Equities Tips in the NCAA's Favor.

Plaintiffs' requested relief threatens to introduce immediate disarray into collegiate athletics. While Plaintiffs purport to request a narrow remedy, the rules they seek to enjoin sweep much broader, and Plaintiffs make no effort to explain how their injunction could be tailored to the harm they claim, and thereafter implemented without significant unintended (and, frankly, uncontemplated by Plaintiffs) collateral damage to NCAA enforcement more generally.

For example, Plaintiffs contend that NCAA Division I Bylaw 13.2.1 "prohibits 'offers and inducements' from schools or their representatives to prospective student athletes before an athlete

enrolls at the institution[,]" and its enforcement should be enjoined. Memo. At 3. That rule prohibits institutions from facilitating an NIL agreement for a prospective recruit, *but also prevents* educational institutions, their staff, or third-party representatives from providing any direct financial remuneration or other benefits to prospective student athletes, their family members, or friends. *See* Pls.' Ex. H at 92. Plaintiffs do not explain how this rule could be enforced in some circumstances and not others, particularly given the gray line between these categories.

Likewise, Plaintiffs ask the Court to enjoin Bylaw 22.01.02 because it indicates "[n]ame[,] image and likeness activities may not be used as an inducement to enroll or remain enrolled at a specific institution." Memo. at 3. That rule, however, also expressly prohibits NIL deals "in return for athletic participation or achievement." *See* Pls.' Ex. I at 27. While Plaintiffs purport not to challenge NCAA rules "that prohibit pay, including NIL compensation, tied directly to athletic participation or performance," their requested injunctive relief does just that by eliminating a prohibition on such compensation. Memo. at 3.

Many of the challenged NCAA rules operate in tandem with those "unchallenged." Silver Decl. ¶ 29. For example, the elimination of rules governing who may permissibly contact recruits would have significant negative impacts on recruits and their families. *Id.* ¶ 30. The time demands placed on recruits, particularly those most coveted, is immense—even in the current landscape where only coaches may contact recruits and for limited time periods. *Id.* Exposing recruits to an uncapped number of third parties, for unregulated periods of time, will not only threaten to overwhelm recruits, but expose them to bad actors seeking to take advantage of them. *Id.* Even if the NCAA could enact rules governing the above-described contacts, its compliance division could not possibly monitor each third party attempting to engage with recruits. *Id.* This is not some

14

hypothetical risk to recruits, many of whom are children. Based on observed pressures under even current rules on recruits, these dangers are very real.

Plaintiffs' requested injunctive relief should thus be rejected as overly broad. "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction." *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). "Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires." *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (citation omitted) (reversing an injunction "as overly broad"). *See also Union Home Mortg. Corp. v. Cromer*, 31 F.4[th] 356, 364–65 (6th Cir. 2022) (vacating an "overly broad" preliminary injunction); *Singh Mgmt. Co. v. Singh Dev. Co.*, 775 F. App'x 921, 926 (6th Cir. 2019) ("Courts must closely tailor injunctions to the harm that they address.") (quoting *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 595 (6th Cir. 2015)); *Williams v. Owens*, 937 F.2d 609 (6th Cir. 1991) (dissolving an injunction for not being sufficiently narrowly tailored).

Here, Plaintiffs' requested equitable relief seeks to enjoin several NCAA rules—rules that have been in place for decades—without consideration to how the Court, the NCAA, or its member institutions across the country are supposed to deal with the sweeping impact such actions would have on still-existing Bylaws, student-athletes, and college athletics. Plaintiffs make no attempt to address the disarray that would follow were this Court to grant their requested relief. This reality further counsel in favor of resolving this dispute through orderly deliberation on the merits with a fully fleshed out factual record and not through preliminary remedies. It is not only unnecessary, but also imprudent, to rush to judgment under the circumstances.

15

### III. Plaintiffs Have Not Met Their Burden to Demonstrate a Likelihood of Success on the Merits

In assessing whether a restraint on trade violates the Sherman Act, the Court must assess whether the restraint is undue. *NCAA v. Alston*, 141 S. Ct. 2141, 2151 (2021) (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 227, 2283 (2018). "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what [the United States Supreme Court has] described as a 'rule of reason analysis.'" *Id.* (quoting *Texaco Inc. v. Dagher*, 547 U. S. 1, 5 (2006); *Standard Oil Co. of N. J. v. United States*, 221 U. S. 1, 60–62 (1911)).

Under a rule of reason analysis, the Court must assess whether the challenged rules are an undue restraint on competition using "a three-step, burden shifting framework." *Am. Express*, 138 S. Ct. at 2284. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

#### 1. Plaintiffs Have Not Shown Substantial Anti-Competitive Effects from the Challenged Rules in the Relevant Market.

Plaintiffs have failed to present evidence on several elements of their Sherman Act claim. Plaintiffs cannot establish under the first step of the rule of reason analysis "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Plaintiffs offer no proof of harm that is germane to the claims they are bringing. They provide no examples or evidence of students being chilled from receiving or negotiating NIL compensation as a result of the rules they challenge. *See supra* at 8–9.

16

Moreover, Plaintiffs offer literally no evidence as to the relevant market. Their expert does not even address the issue. Instead, Plaintiffs purport to rely on citations to other cases, such as *Alston* and the recent *Ohio* district court decision. But those citations do not establish a relevant market in this case, because Plaintiffs are pursuing a different claim. In *Alston*, the rules being challenged governed the compensation that institutions can provide to student-athletes. *Alston*, 141 S. Ct. at 2147. In *Ohio*, the rules governed transfer between institutions. *Ohio v. National Collegiate Athletic Association*, No. 1:23-CV-100, 2023 U.S. Dist. LEXIS 221953, at *7–8 (N.D.W.V. Dec. 13, 2023). But here, Plaintiffs' claims implicate payments by *third parties*, namely collectives.

In order to succeed on the merits, Plaintiffs must provide evidence of the relevant market and the effect that the challenged rules have on the economic interests of *all market participants*. *See, e.g.*, *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 963–64 (6th Cir. 2004) ("Because the Promoters failed to meet their duty to define the relevant market and submarket, this court has insufficient information to reach the question of whether the Promoters suffered an antitrust injury-that is, an injury resulting from interference with 'the economic freedom of participants in the **relevant market**.'") (emphasis in original) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983)). Plaintiffs do nothing to account for this unique aspect of their case, or how it affects the relevant market analysis. Without such proof, they cannot meet their burden.

### 2. There Exist Myriad Pro-Competitive Benefits from the Challenged Rules.

Plaintiffs' failure to marshal any evidence of "a substantial anticompetitive effect" should end the inquiry. *Alston*, 141 S. Ct. at 2160. But even if Plaintiffs could clear that first hurdle, their case would fail because the NCAA can show procompetitive benefits from the challenged rules.

#240734817_v1

*Alston*, 141 S. Ct. at 2160 (noting burden shifts to plaintiff upon showing by defendant of a procompetitive rationale for the restraint). This showing would shift the burden back to Plaintiffs to either disprove these benefits or show that they could be achieved in a substantially less restrictive manner without increased cost. *Epic Games*, 67 F.4th at 990 (9th Cir. 2023). Plaintiffs have failed to do either.[4]

### *a. Preserving collegiate athletics as a unique offering.*

The NCAA and its member institutions provide student-athletes with the unique opportunity to achieve academically—often at no or reduced cost—with unmatched institutional support, while at the same time competing at the highest levels of their respective sports and accessing first-rate training, coaching, facilities, and competition. The NIL-related rules promote the longstanding mission and structure of the NCAA that provides this balance of academics and athletics for student-athletes. A key component of this unique offering to student-athletes is the distinction between collegiate and professional athletics. This distinction, which arises "from the fact that student-athletes do not receive unlimited cash payments, especially those unrelated to education, like those seen in professional sports leagues," *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1101 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Alston*, 141 S. Ct. 2141, not only benefits student-athletes, but has also been found by courts to be a procompetitive benefit, *id.* at 1102. Accordingly, courts have recognized that the NCAA has some ability to preserve that unique offering by regulating and prohibiting benefits unrelated to a student-athlete's education. *Alston*, 141 S. Ct. at 2165.

---

[4] The NCAA acknowledges that, at this stage of the litigation, it too has offered limited evidence on the competitive effects at issue. The NCAA has submitted expert reports in other litigation thoroughly addressing the benefits of the challenged rules, but those reports are subject to protective orders, and the NCAA cannot obtain leave to file the reports with this Court before the deadline to file this Response. The time pressures and the ability to introduce additional evidence dispositive of the merits, however, underscores both that awarding an interim remedy here could later prove imprudent and that the merits will more effectively be resolved through deference to the pending California litigation in which the expert reports have been exchanged.

#240734817_v1

The NIL-related rules challenged by Plaintiffs play a particularly important role in preserving this distinction. While Plaintiffs claim to not challenge the NCAA rules prohibiting pay for athletic participation or performance, Mot. at 3, that is precisely the result their requested relief envisions. Because the value of a prospective student-athlete's NIL is connected and cannot be fully disentangled from an athlete's athletic talent and performance, prohibiting NIL compensation from member institutions and their associated group and individuals is necessary to prevent pay-for-play agreements under the guise of NIL. This is especially true in the context presented by Plaintiffs here, where NIL deals from institutions and associated groups or individuals are conditioned on a prospective student-athlete attending and performing in athletic competitions for a particular institution. Such arrangements would eviscerate the distinction between the collegiate structure and professional sports, and undermine the unique balance of academics and athletics that the NCAA structure provides.

Separately, allowing institutions and associated groups to enter NIL deals with prospective student-athletes risks moving toward an employment-like relationship between the institution and its student-athletes, a dynamic that many student-athletes do not want and that may carry negative impacts for student athletes. *See* Ex. C to Askew Decl., Division I Student-Athlete Advisory Committee Letter to Congressional Leaders (June 12, 2023), available at https://ncaaorg.s3.amazonaws.com/committees/d1/saac/2023D1SAAC_LetterCongress.pdf; *see also* Ex. D to Askew Decl., Nicole Auerbach & Chris Vannini, NCAA President Charlie Baker: Most College Athletes Don't Want To Be Employees, The Athletic (Apr. 24, 2023), https://perma.cc/D8NA-FGAD; Ex. E to Askew Decl., Eric Prisbell, 'Devastating' or Progress? College Sports Stakeholders Weigh Potential Employee Model, ON3 (December 7, 2023), available at https://www.on3.com/os/news/ncaa-college-sports-stakeholders-weigh-potential-

#240734817_v1

student-athlete-employee-model/.  A lawsuit purporting to benefit student-athletes should not make many of them worse off.

### b. *Competitive Balance*

The NCAA is composed of over a thousand member institutions, including hundreds of Division I member universities.[5]  The challenged rules foster competitive balance among these members institutions by promoting the distribution of talent across them.[6]  This distribution of talent to a wide range of institutions is a key component of ensuring that student-athletes are able to participate in meaningful athletic competition at the highest level.

Allowing member institutions and associated groups or individuals to induce prospective student-athletes to attend a particular institution by offering NIL compensation would inevitably lead to a greater concentration of talent in a smaller number of member institutions.  Without these rules, member institutions and their associated groups would be incentivized to offer high-value and high-volume NIL compensation to prospective student-athletes.  And because member institutions have varying financial resources and athletic budgets—and similarly have varying levels of support from collectives, boosters, and alumni networks—talented prospective student-athletes would concentrate at institutions with greater resources and collective or alumni support.[7]

---

[5]  NCAA Directory: Division I Institutions, NCAA, available at https://web3.ncaa.org/directory/memberList?type=12&division=I, attached as Ex. F to Askew Decl.

[6] Under the current rules, member institutions attract top student-athlete talent through a number of factors such as educational opportunities and offerings, athletic opportunities, including facilities, coaches, exposure to fans and television broadcasts, and training and development, and connections to alumni networks or university history and tradition.

[7] NIL deals are impacting "the way college athletes select what school they'll attend" and "could eventually lead to a system . . . in which no more than a dozen or so top schools can deploy their booster collectives to arrange NIL sponsorships." *In Choosing Colleges, Top Youth Athletes Say: "Show Me The NIL"*, CBS News (June 3, 2022), available at https://www.cbsnews.com/news/nil-

#240734817_v1

That process would also play out at the conference level, as member institutions with better talent and superior on-field performances would realign into conferences with other, similar institutions that have better talent and on-field performance.[8]  Such consolidation, at both the institution and conference level, would decrease the competitive balance that currently exists within the NCAA.

Courts and industry experts have all acknowledged that maintaining competitive balance in sports in a legitimate and important endeavor. *See, e.g.*, *American Needle, Inc. v. National Football League et al.,* 560 U.S. 183 (2010) ("We have recognized . . . that the interest in maintaining a competitive balance' among 'athletic teams is legitimate and important") (internal citations omitted); Roger Blair, Sports Economics, (Cambridge University Press, 2011) at 65 (noting importance of competitive balance to consumer demand); Daniel Rasher, *Free Ride, Take It Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing* (2011) at 373 Kinesiology (Formerly Exercise and Sport Science), available at http://repository.usfca.edu/ess/22 ("A fundamental belief in professional sport leagues is that competitive balance is needed to maximize demand and revenues; therefore, leagues have created policies attempting to attain

---

college-athletes-boosters-collectives-nick-saban-coaches//, attached as Ex. G to Askew Decl.  This process would be significantly exacerbated by allowing institutions and associated groups to enter NILs with prospective student-athletes as part of their recruitment efforts.

[8] Recent examples demonstrate this tendency as PAC-12 institutions with the highest financial resources realigned with the Big Ten, creating a cascading effect for others institutions to join the Big 12 and ACC and leaving one two institutions in the PAC-12. *See, e.g.*, Nicole Auerbach, "Will the Power 5 soon become the Power 2? Unpacking new TV revenue projections for a 12-team CFP world," The Athletic, March 29, 2022, available at https://theathletic.com/3215360/2022/03/29/will-the-power-5-soon-become-the-power-2-unpacking-new-tv-revenue-projections-for-a-12-team-cfp-world/. *See also* Joseph Zucker, "USC, UCLA Announce Move to Big Ten from Pac-12 Beginning in 2024," Bleacher Report June 30, 2022, available at https://bleacherreport.com/articles/10040548-usc-ucla-announce-move-to-big-ten-from-pac-12-beginning-in-2024; Matt Bonesteel, "Everything you need to know about USC and UCLA's move to the Big Ten," *The Washington Post*, July 1, 2022, available at https://www.washingtonpost.com/sports/2022/07/01/usc-ucla-big-ten-expansion/.  The foregoing are collectively attached as Ex. H to the Askew Decl.

#240734817_v1

proper competitive balance."), attached as Ex. I to Askew Decl. Plaintiffs' expert, Mr. Schwarz, fails to acknowledge this well-established principle, or the real-world developments confirming the concern. And his cursory analysis of football recruiting ratings does not disprove this procompetitive benefit, particularly as his analysis is based on a time period when the practices Plaintiffs seek to permit were prohibited.

### c. *Preventing student-athlete exploitation.*

The challenged rules also act as a safeguard for prospective student-athletes, who are often underrepresented and unlikely to have an advanced understanding of their own NIL value—which can increase over the course of a collegiate career—and the complexities of the deals presented to them. Prospective student-athletes are therefore particularly vulnerable to entering into abusive and unfair agreements for their NIL, an issue that has been reported for current student-athletes since 2021 when student-athletes were permitted to enter NIL deals with third parties. For example, in 2022 NBC News reviewed "a dozen written offers to high schoolers that experts . . . described as exploitative," including marketing contracts with exorbitant commissions and booster contracts with "complex fee structures" that "reduc[ed] the athletes' freedom to transfer or enter outside deals." *There's No Rules. It's Crazy: New Money In NCAA Recruiting Leaves Elite Athletes Ripe For Exploitation*, NBC News (Nov. 27, 2022), available at https://www.nbcnews.com/news/us-news/star-high-school-athletes-can-now-profit-nil-deals-rcna51075, attached as Ex. J to Askew Decl. In another example, an attorney reviewed "over 100 [NIL contracts]," expressing concern that the "deals that athletes are entering into . . . are extremely exploitative" and ultimately advising his client not to sign a single one of the offered deals. *College Athletes Suffered When Schools Weren't Ready For NIL*, FiveThirtyEight (Jun. 30, 2022), available at https://fivethirtyeight.com/features/college-athletes-suffered-when-schools-werent-

ready-for-nil/, attached as Ex. K to Askew Decl. And in another recent article, journalists described examples of student-athletes entering into scam NIL deals, "forever deals" assigning away their NIL rights in perpetuity, and deals with "obscene" and unfair commission rates. *College Athletes Lured by NIL Deals, Exploited by Fine Print*, Bloomberg Law (July 18, 2023), available at https://news.bloomberglaw.com/ip-law/college-athletes-lured-by-nil-deals-exploited-by-fine-print, attached as Ex. L to Askew Decl.[9]

Plaintiffs' expert ignores these real-world issues, and instead makes the wholly unsupported assertion that in a theorical "truly open market," exploitation would disappear and the market would push student athletes' offers up to their full market value." Plaintiffs' Exhibit C at 20. But assertions are not evidence. Mr. Schwarz similarly overlooks the fact that the NCAA's member institutions already provide the large majority of student-athletes with benefits and services that far exceed the market value of their NIL—a development that could well change if Plaintiffs' challenge prevails.

The NCAA has taken steps to propose changes that would aid in reducing exploitation by increasing transparency and allowing member institutions to better support student-athletes in navigating NIL deals. *See* Pls.' Ex. D. These proposals include standardizing NIL contracts, instituting disclosure requirements, and providing comprehensive NIL education for student-athletes. *Id.* The still early stage of NIL in collegiate athletics and the continued development in

---

[9] *See also Inception of New Era: Are Companies Taking Advantage of Student-Athletes*, University of Baltimore Law Review (Jan. 14, 2022), available at https://ubaltlawreview.com/2022/01/14/inception-of-a-new-era-are-companies-taking-advantage-of-student-athletes/ (describing examples of two companies signing student-athletes to perpetual NIL deals); *Florida Legislator Says Bears DT Gervon Dexter's NIL Deal Violated Law*, ESPN (Sep. 5, 2023), available at https://www.espn.com/college-football/story/_/id/38335229/florida-legislator-says-bears-dt-gervon-dexter-nil-deal-violated-law (describing a purported student-athlete NIL deal assigning 15% of the student-athlete's future NFL earnings in exchange for a one time payment). The foregoing articles are collectively attached to the Askew Decl. as Ex. M.

#240734817_v1

this area is one more reason eliminating these rules, even temporarily, would create havoc for student-athletes and institutions alike.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Plaintiffs are not entitled to the "extraordinary relief" they seek. The Court should deny their motion. Based upon the record presented, Plaintiffs have failed to demonstrate a specific, immediate, and irreparable harm that is certain to occur absent the issuance of injunctive relief. That alone is fatal to Plaintiffs' request. But even if it were not, Plaintiffs' requested injunction would upend the status quo—defeating the purpose for which federal courts order preliminary relief. The requested radical departure from long-established rules is inappropriate at this infant stage of Plaintiffs' lawsuit. Further, Plaintiffs make no effort to explain how their disruptive injunction could be tailored to the harm they claim this Court must prevent. Plaintiffs do not meet the high bar required to obtain the relief they seek. They are not entitled to it. And the Court should deny the request accordingly.

<div style="margin-left: 40%">

*s/ Robert E. Boston*
Robert E. Boston (Tenn. BPR # 009744)
Taylor J. Askew (Tenn. BPR # 033193) (*Pro Hac Vice*)
David J. Zeitlin (Tenn. BPR # 037664) (*Pro Hac Vice*)
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
bob.boston@hklaw.com
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

Rakesh Kilaru (Appearing *Pro Hac Vice*)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com

*Attorneys for Defendant*

</div>

#240734817_v1

Case 3:24-cv-00033-DCLC-DCP   Document 27   Filed 02/03/24   Page 24 of 25   PageID #: 738

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 3rd day of February 2024, a true and correct copy of the foregoing document was electronically filed with the United States District Court for the Eastern District of Tennessee using the Court's Electronic Case Filing (ECF) system, which will serve all parties below as indicated on the electronic filing notice to receive service in this manner.  Hard copies are also being sent via first-class mail.

Adam K Mortara
Lawfair LLC
40 Burton Hills Blvd
Suite 200
Nashville, TN 37215
773-750-7154
mortara@lawfairllc.com

David L Rosenthal
Patrick Strawbridge
Thomas R. McCarthy
Cameron T. Norris
Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209
703-243-9423

Ethan Bowers
Marilyn Guirguis
Tyler Corcoran
J. David McDowell
Lacey E. Mase
State of Tennessee
Office of Attorney General
PO Box 20207
Nashville, TN 37202-0207

Andrew N. Ferguson
Office of the Attorney General
200 North 9th Street
Richmond, VA 23219
804-786-7704
aferguson@oag.state.va.us

Jonathan M Harrison, II
Tyler T. Henry
Commonwealth of Virginia
Office of the Attorney General
204 Abingdon Place
Abingdon, VA 24211

Steven G Popps
Office of Attorney General
(VA)
900 East Main Street
Richmond, VA 23219

*/s/ Robert E. Boston*
Attorney for Defendant

#240734817_v1