IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| STATE OF TENNESSEE and COMMONWEALTH OF VIRGINIA,<br><br>           *Plaintiffs*,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>           *Defendant*. | No. 3:24-cv-33-DCLC-DCP |

**REPLY IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR A
TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

The NCAA waits until page 16—two-thirds of the way into its brief—before it defends the NIL-recruiting ban on the merits. And even then, the NCAA defends a world that doesn't exist. It says it must "prohibi[t] NIL compensation" to protect amateurism, competition, and athletes. Opp. (Doc. 27) at 19. But NIL compensation *is allowed now.* The question is not whether college athletes can get paid for their name, image, and likeness. The question is whether the NCAA can make them get paid an artificially depressed amount by depriving them of crucial information. The NCAA has no defense of *that* practice.

Without a defense under the Sherman Act, the NCAA is left with a mishmash of weak procedural objections. Despite submitting no evidence of its own, it tries to nitpick Plaintiffs' evidence. It also claims that Tennessee is misreading its own NIL law. The NCAA insists that, because the private plaintiffs in a California class action didn't seek interim relief, these sovereign States can't seek it here either. And though its position on NIL has been an ever-moving target, it says its rules are either too old or too complicated to temporarily enjoin. None of these arguments should detain this Court very long. It should grant the TRO and later convert that TRO into a preliminary injunction.

## ARGUMENT

With football's regular signing period starting in three days, time is short. Plaintiffs' opening brief already presented their affirmative case, and replies aren't supposed to "reargue" points already

1

made. LR7.1(b). This reply will focus on what the NCAA concedes and what the NCAA raises for the first time on the merits, irreparable harm, and the balance of equities.

## I. The NIL-recruiting ban likely violates the Sherman Act.

The NCAA hopes this Court will "not reach" the merits, Opp.4, but the merits are "of primary importance" in antitrust cases, *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004). If the NIL-recruiting ban "likely" violates federal antitrust law, then the NCAA "face[s] a difficult task in justifying the nonissuance of a preliminary injunction." *FTC v. Univ. Health*, 938 F.2d 1206, 1225 (11th Cir. 1991). The NCAA has no legitimate interest in enforcing a policy that's likely illegal. *See id.*; *Ohio v. NCAA*, 2023 WL 9103711, at *11 (N.D.W. Va. Dec. 13). And it could not trump "the public interest in effective enforcement of the antitrust laws." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001); *accord Ohio*, 2023 WL 9103711, at *11. As sovereign States, "Plaintiffs' interests in consumer protection … heavily outweigh any interest Defendan[t] ha[s]." *Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, 2023 WL 2299570, at *10 (E.D. Tenn. Feb. 28).

On the merits, the NCAA concedes a lot. It agrees that the NIL-recruiting ban is subject to antitrust scrutiny. Opp.16. And it agrees, like it did in *Alston*, that it has "'monopsony power in the market for student-athlete services'" and that its restrictions on athlete compensation are "'horizontal agreements among competitors.'" Mot. (Doc. 2-1) at 8-9. The NCAA offers no defense of its Rule of Restitution either, thus conceding that this Court should enjoin that rule too if it agrees that the NIL-recruiting ban likely violates the Sherman Act. *Compare* Mot.22-23 (making this argument), *with* Opp. (never responding to it or even mentioning the Rule of Restitution). In terms of actual responses, the NCAA raises a factual quibble about whether the NIL-recruiting ban is anticompetitive. Opp.16-17. And it offers the same "procompetitive" defenses that Plaintiffs anticipated. Opp.17-24. Both responses fail.

The NCAA's assertion that Plaintiffs have "no proof" of anticompetitive effects is bizarre. Opp.16. Plaintiffs have an expert analysis from an economist and declarations from the director of one of the largest athletic departments, a leading NIL collective, and a current college athlete. *See* Docs. 2-3, 2-4, 2-5, 13. These witnesses run the gamut of those who know the most about this market. The NCAA seemingly wants a testimonial from a current high schooler. *See* Opp.8. That's convenient, since the NCAA knows no current recruit would risk incurring the NCAA's wrath by admitting he has (or would like to) violate its rules. And no case says that kind of testimony is necessary. Plaintiffs' declarants speak from experience about the ban's harm to recruits, which is sufficient at this stage, *see* Mot.6-7. And as in *Alston*, the anticompetitive effects here are not disputed. The NCAA could not reasonably dispute that its monopolistic rules "*in fact* decrease the compensation that student-athletes receive compared to what a competitive market would yield." *NCAA v. Alston*, 141 S. Ct. 2141, 2154 (2021). Plaintiffs' economist proves it. *See* Doc. 2-5 ¶¶30-33. And the NCAA concedes that its ban keeps down the "[]value" and "[]volume" of "NIL compensation to prospective student-athletes"; that's the whole point. Opp.20. "'[N]o elaborate industry analysis is required to demonstrate the anti-competitive character of'" this horizontal agreement to suppress wages. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (holding unlawful under the rule of reason, without "any great difficulty," a horizontal restraint "impeding the ordinary give and take of the marketplace" by hindering the flow of information (cleaned up)).[1]

Same goes for the NCAA's assertion that Plaintiffs have "no evidence" proving the relevant market. Opp.17. As the NCAA's own case explains, no extended proof is necessary when the market is "well-known," "defined," "obvious," or "undisputed." *Worldwide Basketball & Sport Tours, Inc. v.*

---

[1] The NCAA cites news articles about high-profile athletes who nevertheless got large NIL deals. Opp.9 n.2. But these numbers in a vacuum prove nothing; those deals could have been larger without the NCAA's ban. And anecdotes about the nation's most high-profile college athletes say little about competition overall, especially for lesser-known athletes with less bargaining power.

*NCAA*, 388 F.3d 955, 961 (6th Cir. 2004); *accord In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 274-75 (6th Cir. 2014). Plaintiffs' identified markets are all those things. They come from *Alston* and *Ohio*, were undisputed there, and are undisputed here. Mot.8-10; *Ohio*, 2023 WL 9103711, at *4. Antitrust markets turn on the services affected by the restraint, *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 610 (1953), and the restraint here affects exactly the same services as the restraint in *Alston*.

If more were needed, Plaintiffs' evidence explains that schools compete nationwide for Division I athletes in each sport, that each area typically has only one NIL collective, and that the NCAA has complete control over Division I athletes. *See* Doc. 2-5 ¶¶30-33; Doc. 2-3 ¶¶16-17; *Ohio*, 2023 WL 9103711, at *4; *Alston*, 141 S. Ct. at 2154. "The purpose of defining" a market, after all, is to assess "market power." *Se. Milk*, 739 F.3d at 277. Where power is obvious (as it is here), market definitions need not be proven with a "detailed market analysis." *Ind. Dentists*, 476 U.S. at 460-61. The NCAA's "share of the market is more than adequate to establish a prima facie case of [market] power." *U.S. v. Dentsply Intern'l, Inc.*, 399 F.3d 181, 188 (3d Cir. 2005). As the *Ohio* court concluded about the same two markets, "The NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets." 2023 WL 9103711, at *4.[2]

The burden therefore shifts to the NCAA to prove that its ban has procompetitive effects, which it cannot do. The NCAA asserts that the NIL-recruiting ban preserves its amateurism model, including by increasing competitive balance, and prevents athlete exploitation. Opp.18-23. Plaintiffs predicted those arguments and explained why they're wrong. Plaintiffs said those effects are legally

---

[2] Just two days ago, another district court agreed with *Ohio* and entered another TRO against the NCAA. *Williams v. NCAA*, Doc. 5, No. 3:24-cv-614 (D.N.J. Feb. 2, 2024). It followed the *Ohio* court's analysis under the Sherman Act as "persuasive." *Id.* at 5. And it, too, enjoined the NCAA's Rule of Restitution to ensure its TRO "ha[d] meaningful effect." *Id.* at 7.

irrelevant because they focus on the wrong market and complain about competition itself. Mot.14-18. The NCAA has no response. Plaintiffs also explained how the NIL-recruiting ban has no connection to, or worsens, these effects. Mot.15-18. The NCAA, again, has no response. And the NCAA does not disentangle, let alone with evidence, its NIL-recruiting ban from NIL itself. Mot.17-24. (Consumer demand for college sports only continues to grow, Mot.15, and surely doesn't turn on whether, say, Bronny James gets $5.9 million or $6.9 million. Opp.9 n.2.) Nor does the NCAA respond to Plaintiffs' less restrictive alternatives, like academic requirements, state consumer-protection laws, caps on roster size and scholarships, and more. Mot.17-18. By offering few arguments and zero evidence, the NCAA has given this Court no basis to conclude that *it* is likely to prevail.[3]

## II. Plaintiffs will suffer irreparable harm without interim relief.

Plaintiffs' need for interim relief is imminent. The NCAA does not dispute that the regular signing period for football opens on February 7 or respond to Plaintiffs' evidence that this period is the critical time for prospective athletes to leverage NIL deals. *See* Opp.13; Doc.2-3 ¶¶16-17; Doc. 13 ¶¶15-16. And, as explained, the NIL-recruiting ban prevents those athletes from knowing about their opportunities and obtaining fair market value for their NIL rights. Plaintiffs have thus shown their need for imminent relief with "'specific facts'" (setting aside that the NCAA plucks this requirement from an inapplicable rule about TROs issued "without … notice," Fed. R. Civ. P. 65(b)(1)). Opp.8. Every day that passes once the signing period opens would impose further irreparable harm on recruits who face mounting pressure to commit as available scholarships disappear and roster spots fill up during an ever-shrinking window. Doc. 2-3 ¶¶16-17.

---

[3] The NCAA *admits* that it has no evidence to carry its burden of showing procompetitive effects. Opp.18 n.4. It blames the calendar, but the NCAA should have amassed this evidence before it decided to adopt such anticompetitive rules after *Alston*. It's been asserting these same defenses in litigation for decades, after all. In fact, it says it's already amassed the evidence in another case in California. Opp.4, 12. No "protective order" could prevent its experts there from filing a new or modified report, or the NCAA from submitting the underlying evidence, here. Opp.18 n.4.

5

The NCAA says Plaintiffs can't prove what specific opportunities their athletes will lose if interim relief is not entered on February 6, Opp.13, but that's *Plaintiffs'* point. Irreparable harm exists when "an injury is not fully compensable" by money damages because, for example, "the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Plaintiffs are sovereign States who are representing all their current and prospective athletes. No court could reliably calculate their harm from missing out on an NIL deal, having their NIL deal undervalued due to a lack of competition, or choosing a school that wasn't the best fit for them. *See Shannon v. Bd. of Trustees of Univ. of Ill.*, 2024 WL 218103, at *16 (C.D. Ill. Jan. 19) (concluding "that the potential loss of NIL opportunities can constitute irreparable harm"); *Petrazzulo v. Lowen*, 534 F. Supp. 173, 176 (S.D.N.Y. 1982) ("Irreparable harm will naturally flow" to those forced to make decisions "without all pertinent financial information."). It is inherently difficult to calculate the harms from "the loss of fair competition," *Basicomputer*, 973 F.2d at 512, and the loss of "competitive advantages," *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995); *accord Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) ("It is appropriate to use a preliminary injunction to avoid harms to goodwill and competitive position.").

The NCAA doesn't bother responding to Plaintiffs' other irreparable harm: the States' "undoubtedly … strong public interest in enforcing their duly enacted state laws and protecting the underlying policies." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022). This interest is the same where "no party seeks to enjoin Plaintiff States from enforcing their laws; rather, the States themselves are pursuing injunctive relief." *Id.* at 841-42. A State's "intangible harms," including "coerced compliance" with unlawful rules, generally "cannot be monetarily redressed." *Kentucky v. Biden*, 23 F.4th 585, 612 n.19 (6th Cir. 2022).

Rather than addressing these harms directly, the NCAA offers a series of orthogonal points.

It says Tennessee law already contains an NIL-recruiting ban. Opp.6-7. It says a class action in California somehow matters here. Opp.11-12. And it complains about Plaintiffs' timing. Opp.9-11, 12-13. None of these arguments can displace Plaintiffs' showing of imminent, irreparable harm.

### a. The NCAA misreads Tennessee's NIL law.

The NCAA claims that Tennessee lacks irreparable harm (or maybe "standing") because its own NIL law states that compensation cannot be "'provided in exchange for athletic performance ***or attendance at an institution***.'" Opp.2 (quoting Tenn. Code Ann. §49-7-2802(a)). The NCAA, apparently, knows the meaning of Tennessee law better than Tennessee's attorney general. This argument is both wrong and irrelevant.

The NCAA misreads Tennessee's law. The law merely prohibits "pay-for-play," like the NCAA itself has long done and that Plaintiffs do not challenge here. *See* Mot.3 ("To be clear, Plaintiffs do not challenge NCAA rules that prohibit pay, including through NIL compensation, tied directly to athletic participation or performance." (citing Ex. H, at 36-42 (NCAA prohibition on "pay-for-play")). Consistent with its name, NIL deals use only an athlete's intellectual-property rights as the consideration; they cannot use anything else, including performance or attendance, to award more than the fair market value of the NIL itself. Tenn. Code Ann. §49-7-2802(a). Parties in Tennessee can and do structure those agreements in compliance with this and all other provisions of Tennessee law. *See* Doc. 2-4 ¶14; *see also, e.g.*, Tenn. Code. Ann. §49-7-2802(k) (NIL deals in Tennessee must be limited to "the duration of the athlete's participation in an athletic program at an institution").

The NCAA's argument is also irrelevant. The NCAA makes no similar argument about the NIL law in Virginia—a co-plaintiff here—and only one plaintiff needs irreparable harm and standing to get relief. *Missouri v. Biden*, 83 F.4th 350, 367 (5th Cir. 2023) (standing); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 489 (3d Cir. 2000) (irreparable harm). Tennessee's law also wouldn't affect its prospective college athletes who want to compete for NIL deals in other States, and Tennessee represents

those Tennesseans' interests as well. Likewise, colleges in Tennessee recruit prospective athletes from other States with different NIL laws who will become Tennessee athletes upon matriculation.

Most importantly, Tennessee law expressly *permits* prospective athletes to "have direct and open conversations with a third party like a collective and commit to a school knowing the full scope of NIL opportunities available to them in college." Doc. 13 ¶13. But that conduct is all proscribed by the NCAA's NIL-recruiting ban. *See Name, Image and Likeness Policy Question and Answer*, NCAA (July 2022), perma.cc/WD9G-SYH7 (prohibiting a "booster/NIL entity," including collectives, from engaging in "recruiting conversations"—namely, conversations "to encourage the [prospective college athlete] to attend the institution" based on available NIL opportunities); Doc. 2-15 (warning schools against "their possible involvement in arranging NIL transactions" for even current athletes at the school). Injunctive relief would redress Plaintiffs' harms by eliminating this gag rule.

### b. The California class action is irrelevant.

The NCAA's next argument is convoluted: Plaintiffs do not face irreparable harm, the NCAA says, because their injuries "are compensable through money damages"; and their injuries are compensable by money damages because private plaintiffs in a similar class action in California decided not to seek interim relief. Opp.11. Plaintiffs do not follow this logic. That different counsel, in a different case, with different motivations decided not to seek interim relief does not suggest that Plaintiffs aren't entitled to it here. Perhaps class-action counsel forwent a preliminary injunction to maximize the damages or to increase the likelihood of settlement. But the States here, on behalf of the athletes they are bound to protect, can make a different choice. And notably, the NCAA took the opposite position in California, stressing that money damages for lost NIL opportunities are too "speculative" to certify a class. *In re Coll. Athlete NIL Litig.*, Doc. 249 at 3, 6, 21, 23, 33, No. 4:20-cv-3919-CW (N.D. Cal. Apr. 28, 2023). Why they're now clear and certain enough to justify harming Plaintiffs' athletes until the end of trial is left unsaid.

Even if it somehow mattered, Plaintiffs' athletes are not bound or fully protected by the California lawsuit. Those plaintiffs have not yet won, are bringing broader claims than Plaintiffs here, and class members will still have the right to opt out. The damages class there is also limited to athletes who played college sports and closed on November 3, 2023. *In re Coll. Athlete NIL Litig.*, Doc. 387 at 5-6, No. 4:20-cv-3919 (N.D. Cal. Nov. 3, 2023); *see also In re Coll. Athlete NIL Litig.*, 2023 WL 7106483, at *3 (granting class certification to another class seeking injunctive relief). With that case set for trial in January 2025, the certified classes exclude many, if not all, of the *prospective* college athletes harmed by the NIL-recruiting ban. *See In re Coll. Athlete NIL Litig.*, 2023 WL 7106483, at *1. The class action also does nothing for prospective college athletes who suffer harm before they commit to a school and first "compete on a Division I athletic team," *id.*—including those who would enter the regular signing period on February 7 and be forced to make a life-changing decision under the NCAA's anti-competitive restraints.

### c. The NCAA's delay argument fails.

The NCAA accuses Plaintiffs of unreasonable delay, which it says "'weigh[s] against a finding of irreparable harm.'" Opp.6. Its cited case involved a delay of "six years." *Huron Mountain Club. v. U.S. Army of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013). And here, the NCAA says the challenged rules have been around for "decades," Opp.9, even though it didn't even allow NIL until 2021. This argument misses the mark badly.

Delay does not weigh against a finding of irreparable harm here because Plaintiffs' harm is "continuing." *Grand Lodge FOP v. Lab. Council Mich. FOP*, 1994 WL 589569, at *3 (6th Cir. Oct. 24). Even if the NCAA interfered with past recruiting cycles, it's about to interfere again in a few days—this time hurting a new class of recruits during their best, and often only, time to maximize the value of their NIL rights. Doc. 13 ¶11. The NCAA's past violations do not somehow excuse its current and future ones, like a perverse form of adverse possession. A "plaintiff's past dilatoriness," in other

9

words, cannot excuse "defendant's ongoing behavior that threatens future harm." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959-60 (9th Cir. 2001). "Here, the harm to the Plaintiffs is in the future, and the exact amount and timing of the harm is not clear. In these circumstances, [any] delay in bringing this action for injunction does not suggest a lack of urgency or bar them from relief." *Metro. Taxicab Bd. of Trade v. N.Y.C.*, 2008 WL 4866021, at *6 (S.D.N.Y. Oct. 31).

Plaintiffs did not engage in "lengthy delay" here anyway. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019). Even a "three-year delay" is not long enough to defeat interim relief. *Id.* And here, it hasn't even been three years since the NCAA allowed NIL compensation in July 2021. Doc. 2-14. Its rules on NIL and recruitment have been in constant flux ever since, creating a series of guidance documents that were a fluid, vague, and contradictory mess. Doc. 2-3 ¶9, ¶13; *see also* Doc. 2-8 (NCAA admitting the rules have been "'inconsistent and unclear, and the ambiguity has filled schools, student-athletes, and collectives with uncertainty'"); Doc. 2-16 (NCAA acknowledging it "continues to receive numerous questions" about its NIL policy); Doc. 2-6 (NCAA making still more changes and floating still more new proposals in 2024). The NCAA did not enforce these rules— and seemed to have nothing concrete *to* enforce—until last month. *See* Docs. 2-21, 2-22, 2-7. The NCAA's dramatic shift in enforcement hit home for Tennessee on January 29, when the NCAA threatened UT-Knoxville with severe penalties based on guidance that wasn't even in place at the time of the alleged violation (and then likely leaked it to the press). Doc. 2-8; *Sources: Tennessee Under Potential NCAA Investigation for NIL Violations in Multiple Sports*, Sports Illustrated (Jan. 30, 2024), shorturl.at/fvzI0. Plaintiffs sued just two days later to protect their athletes from this brave new world. Only interim relief would protect the "status quo," Opp.12, properly defined as "'the last uncontested status between the parties'" before the NCAA "'disturbed'" it. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014); *accord Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

The NCAA cannot minimize these harms by arguing that UT-Knoxville is a member of the NCAA that supposedly approved these rules. *Cf.* Opp.10. UT-Knoxville would certainly disagree that it "approved" the NCAA's most recent weaponization of its rules. *See* Doc. 2-8. At any rate, States can sue the NCAA for violating the Sherman Act, as many States did in *Ohio*, even if some of their schools are members. As the NCAA concedes, UT-Knoxville is "not a party" here. Opp.10. The NIL-recruiting ban injures athletes, in both Virginia and Tennessee, by artificially deflating their value in the marketplace. And athletes who get even close to the line, whether that line is drawn by the NCAA now or later, could have their eligibility taken away or their school competitively sanctioned. Either would further impact their NIL opportunities for the remainder of their brief opportunity to participate in college athletics.

### III. The balance of equities favors Plaintiffs.

The NCAA does not meaningfully dispute that, if it's likely to lose on the merits, then the balance of equities favors Plaintiffs. Nor could it. For the same reasons that "the public has an interest in discouraging unfair trade practices," *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003) (per curiam), the equities too favor "free and fair competition," *Bailey v. Chattem, Inc.*, 684 F. 2d 386, 391 (6th Cir. 1982); *accord Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (affirming a preliminary injunction against a party who "was engaging in unfair competition" because "the public interest weighs in favor of enjoining this behavior"). "The equities favor allowing these student-athletes to realize the present and future economic potential of their participation in college athletics and … to use the market to … seek the most beneficial situation for their own well-being unencumbered by the [NCAA's rules]." *Ohio*, 2023 WL 9103711, at *11.

The NCAA predicts "disarray" and the end of college sports, but this rhetoric is notably backed up by zero evidence. Opp.13-15. And the argument has lost in court over and over, including in *Alston* and the transfer-rule cases. The Sherman Act is "the Magana Carta of free enterprise," and

11
Case 3:24-cv-00033-DCLC-DCP Document 28 Filed 02/04/24 Page 11 of 16 PageID #: 1394

its protections "cannot be foreclosed with respect to one sector of the economy because certain … groups believe that such a foreclosure might promote greater competition in a more important sector." *United States v. Topco Ass'ns*, 405 U.S. 596, 610 (1972). Conversely, Plaintiffs have provided evidence that NIL dealings are mired in uncertainty and secrecy *now* because of the NIL-recruiting ban. Doc. 2-3 ¶¶13-15, Doc. 2-4 ¶16; Doc. 13 ¶¶4, 13. And contrary to the NCAA's naked assertions, the evidence demonstrates that interim relief will allow prospective college athletes to make more fully informed decisions about their future and reduce inefficiencies in the marketplace. Doc. 2-5 ¶¶30-33. The NCAA admits that it is still "develop[ing]" its policies in this area and has proposed "changes" to broaden NIL. Opp.23. It thus appears that, once again, "NCAA thinks it best to restrain the student-athletes now, and conduct further studies later to determine if the restraint was necessary. Without evidence" at this juncture, this Court should temporarily require the "NCAA [to] treat all student-athletes equally." *Ohio*, 2023 WL 9103711, at *9. The "public will be best served by enjoinment of this [conduct] pending extensive analysis of its competitive effect." *Univ. Health*, 938 F.2d at 1225.

The NCAA is concerned about the possible scope of injunctive relief. Opp.15. It cites several cases for the uncontroversial proposition that an injunction should not be "overly broad." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994). But the rule against overbroad injunctions is not a reason to wholly deny one; it's a reason to tailor the relief. The NCAA's own cases make this point. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 878-79 (6th Cir. 1972) (reversing "without prejudice" because "we do not hold that an injunction could never issue," "merely that the injunction was not issued properly"); *Singh Mgmt. Co. v. Singh Dev. Co.*, 774 F. App'x 921, 927 (6th Cir. 2019) ("On remand, the district court should clarify its ruling.").

As originally requested, Plaintiffs' relief is not overbroad. They want a restraint on the NCAA's *conduct*. *See Coltec Indus. v. Hobgood*, 280 F.3d 262, 272 (3d Cir. 2002) (an "injunction envisions a restraint of future *conduct*"). While the NCAA identifies some of its rules that apply to more than NIL and

recruiting, Plaintiffs do not seek "the elimination of rules" or an injunction that does anything more than stop the NCAA from enforcing its NIL-recruiting ban. Opp. 13-14. As Plaintiffs have made clear, their requested relief is narrow. It would not permit pay-for-play; nor would it upend other NCAA rules that govern the recruiting timeline, the recruiting process, or myriad other aspects of college sports. Mot.3 (citing Doc. 2-10 at 36-42, 48, 109-10). Rather, Plaintiffs seek an order "enjoining the NCAA's NIL-recruiting ban" to permit prospective college athletes (and current college athletes in the transfer portal) to engage in meaningful NIL discussions with collectives and others before committing to a particular institution. Mot.3. This relief would let prospective college athletes know their NIL opportunities during the recruitment process, allowing schools and collectives to compete to determine their true value—rather than forcing them to commit while in the dark about the financial realities of attending a particular school. Plaintiffs asked for precisely that relief in their motion. Doc. 2 at 1.[4]

And it's not *Plaintiffs'* fault that the NCAA has decided to regulate NIL and recruitment through a byzantine set of overlapping rules of guidance. To the extent there's confusion on which rules the NCAA thinks give it the power to enforce the NIL-recruiting ban, that problem is one of the NCAA's own creation. The NCAA cannot benefit from the fact that its rules—scattered across a 437-page manual—are often impenetrable, shifting, and vague. *See* Doc. 2-10. Any uncertainty or burden from that approach to governance should fall on the drafter, the NCAA, not on prospective athletes.

---

[4] The NCAA identified one sentence from the complaint that, as truncated, suggests college athletes could be able to earn NIL compensation directly from schools in exchange for attendance. Opp.6 (citing Compl. (Doc. 1) ¶39). Plaintiffs meant no such thing. NIL agreements exist between an athlete and a collective, Doc. 2-4 ¶¶9-12, which is why the rest of the sentence clarifies that "schools could facilitate those discussions as part of the recruiting process, including by providing services to help prospective college athletes navigate NIL discussions and compare NIL offers." Compl. ¶39. To be clear, an order enjoining the NCAA's NIL-recruiting ban would not permit schools to provide NIL compensation to college athletes in exchange for their attendance at the school. Such an arrangement is not permitted under state law anyway. *E.g.*, Tenn. Code Ann. §49-7-2802(a).

## CONCLUSION

The Court should issue the requested TRO by February 6, and then convert that TRO into a preliminary injunction after the hearing on February 13.

Respectfully submitted,

Dated: February 4, 2024

*/s/ Cameron T. Norris*

Adam K. Mortara
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
Cameron T. Norris
David L. Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
david@consovoymccarthy.com

Patrick Strawbridge*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, Massachusetts 02109
(617) 227-0548
patrick@consovoymccarthy.com

*Counsel for Plaintiffs*

*\*pro hac vice* application forthcoming
\*\*admitted *pro hac vice*

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

LACEY E. MASE
Chief Deputy Attorney General
J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS*
Senior Assistant Attorney General
TYLER T. CORCORAN*
MARILYN GUIRGUIS*
Assistant Attorneys General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 741-8722
Ethan.Bowers@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

JASON S. MIYARES
ATTORNEY GENERAL OF VIRGINIA

ANDREW N. FERGUSON
Solicitor General

STEVEN G. POPPS
Deputy Attorney General, Civil Division
TYLER T. HENRY**
Assistant Attorney General & Manager, Antitrust Unit
JONATHAN M. HARRISON II**
Assistant Attorney General, Consumer Protection

Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 692-0485
THenry@oag.state.va.us
JHarrison@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

15

## CERTIFICATE OF SERVICE

On February 4, 2024, I efiled this brief, which will email everyone requiring service.

<u>/s/ Cameron T. Norris</u>