UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE and<br>COMMONWEALTH OF VIRGINIA, | )<br>) | |
| Plaintiffs, | )<br>)<br>) | 3:24-CV-00033-DCLC-DCP |
| v. | )<br>)<br>) | |
| NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, | )<br>)<br>) | |
| Defendant. | )<br>) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order [Doc. 2]. Defendant timely filed a response [Doc. 27] and Plaintiffs replied [Doc. 28]. Thus, the matter is fully briefed and ripe for resolution.

### I. BACKGROUND

For many college-bound student-athletes and college football fans the first Wednesday of February—National Signing Day—is observed as an unofficial holiday. It is the first day high school seniors can sign a National Letter of Intent ("LOI")—a binding contract between a student-athlete and a Division I or II institution wherein the student-athlete agrees to attend a particular college for the academic year and the college agrees to provide financial aid for that year. The signing of an LOI signifies the end of the recruiting process, because the student-athlete is taken "off the market." Other colleges are prohibited from recruiting the student-athlete, and the student-athlete must attend the college, request a release, or risk losing eligibility to compete for a year. The regular signing period for prospective 2024-25 Division I student-athletes closes on April 1, 2024. Current college athletes have an even smaller window of time to transfer to a different

1

school, because the transfer window for Division I football players is April 16 to April 30, 2024; the transfer window for basketball players is March 18 to May 1, 2024; and college athletes in programs in which the coach has left the position have 30 days to transfer.

With the foregoing deadlines rapidly approaching, Plaintiffs contend that this is the prime time for student-athletes to negotiate and consider an important factor in their commitment decisions—the value of their name, image, and likeness ("NIL"). However, they assert that the National Collegiate Athletic Association ("NCAA"), despite recently permitting student-athletes to engage in NIL activity, prevents any meaningful NIL discussions between prospective student-athletes and third-party entities. Although not a new concept in the legal community, NIL compensation is fairly new in the context of college athletics.

The NCAA, an unincorporated association and the governing body of intercollegiate athletics, has approximately 1,100 member institutions, which are organized into three divisions [Doc. 1, ¶ 12]. Division I is "the highest and most popular level of collegiate athletics" and any institution that wants to participate in Division I must maintain NCAA membership and abide by the rules promulgated by the NCAA [*Id.* at ¶ 13]. Those rules have historically limited compensation available to student-athletes.[1] However, in June 2021, the NCAA issued an Interim NIL Policy ("the Interim Policy") which went into effect on July 1, 2021 [Doc. 2-14]. The Interim Policy temporarily suspended enforcement of some, but not all, of the existing bylaws and, for the first time, allowed student-athletes to engage in NIL activity to the extent such activity complies

---

[1] Beginning in 1948, the NCAA adopted rules prohibiting member institutions from providing financial aid to student-athletes "that was based on athletic ability and not available to ordinary students." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1054 (9th Cir. 2015). Eight years later, the NCAA reformed the rules to allow scholarships on the basis of athletic ability so long as the scholarship did not exceed "the amount of a full 'grant in aid'"—"the total cost of 'tuition and fees, room and board, and required course-related books.'" *Id.* In 2014, "the NCAA announced it would allow athletic conferences to authorize their member schools to increase scholarships up to the full cost of attendance." *Id.* at 1054–55.

2

with state law. Specifically, the Interim Policy provides that "NCAA Bylaws, including prohibitions on pay-for-play and improper recruiting inducements remain in effect," subject to the new NIL rules [*Id.* at pg. 2].

In response to "numerous questions about the application of . . . the [NIL] Interim Policy[,]" the NCAA issued additional guidance in the form of questions and answers [Docs. 2-15, 2-16]. The guidance informs that "[p]rospective student-athletes may engage in the same types of NIL opportunities available to current student-athletes" and student-athletes may enter into NIL agreements with boosters or collectives, but such agreements (1) must be *quid pro quo*—i.e., must "include the expected NIL deliverables by a student-athlete in exchange for the agreed upon compensation" and must compensate student-athletes for "work actually performed"; (2) cannot be an improper inducement, i.e., cannot be "contingent upon enrollment at a particular school"; and (3) cannot provide "[c]ompensation for athletic participation or achievement" [Doc. 2-15, pg. 3]. Additionally, institutions and entities "closely associated with an institution" may not compensate a student-athlete for use of their NIL [*Id.*; Doc. 2-16, pg. 2]. Finally, the guidance provides that NIL compensation is "excluded from NCAA financial aid limitations" [Doc. 2-15 at pg. 4].

Due to the rise of NIL opportunities in college athletics, collectives have been formed to facilitate NIL opportunities for student-athletes. Collectives are "independent businesses, separate from universities and athletic departments" which are often funded through contributions [Doc. 2-4, ¶ 12]. Plaintiffs state that, although collectives are independent from the NCAA's member institutions, they generally support and promote athletes and teams for a specific institution [Doc. 1, ¶ 30]. As a result, the NCAA's rules prevent prospective student-athletes from negotiating NIL deals during the recruiting process. This roadblock, referred to by Plaintiffs as the "NIL-recruiting ban," limits competition between collectives that promote specific Division I schools, artificially

3

Case 3:24-cv-00033-DCLC-DCP   Document 29   Filed 02/06/24   Page 3 of 12   PageID #: 1402

limits supply, depresses compensation paid to student-athletes for their NIL rights, and forecloses them from full access to the marketplace [*Id.* at ¶¶ 59, 60].

Based on the foregoing, Plaintiffs initiated this action, alleging that the NCAA's NIL-recruiting ban constitutes an "illegal agreement to restrain and suppress competition" within the labor market of Division I athletics [*Id.* at ¶¶ 48, 54]. Plaintiffs also moved for a temporary restraining order ("TRO") and a preliminary injunction (1) "enjoining the [NCAA]; its servants, agents, and employees; and all persons in active concert or participation with them, from enforcing its NIL-recruiting ban or taking any other action to prevent prospective college athletes and transfer candidates from engaging in NIL discussions prior to enrollment" and (2) enjoining enforcement of the "Rule of Restitution (NCAA Bylaw 12.11.4.2) as applied to the NIL-recruiting ban" [Doc. 2].[2] The Court addresses only Plaintiffs' request for a TRO at this stage of the proceedings.

## II. LEGAL STANDARD

The purpose of injunctive relief "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Both TROs and preliminary injunctions "are extraordinary remedies which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Barron v. PGA Tour, Inc.*, 670 F. Supp. 2d 674, 682 (W.D. Tenn. 2009) (citation omitted). In determining whether to grant such extraordinary relief, the Court considers the following factors:

> (1) whether the [movant] has shown a strong likelihood of success on the merits;
> (2) whether the [movant] will suffer irreparable harm if the injunction is not issued;
> (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

---

[2] The "Rule of Restitution" provides for potential retroactive punishments in the event an otherwise ineligible student-athlete is permitted to compete in accordance with the terms of a restraining order or injunction that is later voluntarily vacated, stayed, reversed, or if it is finally determined by the courts that injunctive relief was not justified [Doc. 2-10, pg. 79].

4

*Id.* at 682–83. Although "[t]he standard for issuing a [TRO] is logically the same as for a preliminary injunction," the "emphasis [is] on irreparable harm given that the purpose of a [TRO] is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

## III. DISCUSSION

Plaintiffs assert each of the four factors weigh in favor of granting a TRO enjoining enforcement of the NCAA's NIL-recruiting ban [Doc. 2-1, pg. 12]. The NCAA, in contrast, asserts Plaintiffs do not come close [Doc. 27, pg. 1]. The Court begins by examining Plaintiffs' likelihood of success on the merits.

### A. Likelihood of Success on the Merits

Plaintiffs allege the NCAA's NIL-recruiting ban constitutes a horizontal restraint on trade in violation of Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), 15 U.S.C. § 1 [Doc. 2-1, pg. 12]. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. This prohibition on restraints of trade has long been recognized to prohibit only "undue restraint[s]," *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021), and courts have "understood § 1 to outlaw only unreasonable restraints." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (citation and internal quotations omitted).

Although some restraints may be "unreasonable *per se* because they always or almost always tend to restrict competition and decrease output," *Am. Express Co.*, 138 S. Ct. at 2283, the reasonableness of the NCAA's restraints have historically been reviewed under the Rule of Reason—"'a fact-specific assessment of market power and market structure' aimed at assessing the challenged restraint's 'actual effect on competition[.]'" *Alston*, 141 S. Ct. at 2155 (quoting *Am.*

*Express Co.*, 138 S. Ct. at 2284); *see also O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1053 (9th Cir. 2015) (holding that the NCAA's amateurism rules "must be analyzed under the Rule of Reason."). Under the Rule of Reason, "a three-step, burden-shifting framework applies." *Am. Express Co.*, 138 S. Ct. at 2284. First, the plaintiff must show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If the plaintiff carries this burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If the defendant satisfies its burden, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

### 1. Substantial Anticompetitive Effect in the Relevant Market

Here, Plaintiffs define the relevant market as the labor market for student-athlete services within NCAA Division I college athletics, over which the NCAA enjoys monopsony control [Doc. 2-1, pgs. 14, 15]. Plaintiffs assert that the NCAA's NIL-recruiting ban harms prospective student-athletes and student-athletes entering the transfer portal by denying them information about the value of their NIL rights and suppressing the level of compensation they could receive for those rights [*Id.* at pgs. 16, 17]. The NCAA argues that Plaintiffs fail to meet their initial burden because they fail to provide any evidence as to the relevant market and offer no examples or evidence of students being harmed from the challenged restrictions [Doc. 27, pg. 17]. Plaintiffs, however, can make their initial showing of an anticompetitive effect directly or indirectly. *Am. Express*, 138 S. Ct. at 2284. Direct evidence, what the NCAA seeks, includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (internal citations and quotations omitted). On the other hand, Plaintiffs may produce indirect evidence in the form of "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

There can be no dispute that the NCAA enjoys complete power over the labor market within Division I athletics. *Alston*, 141 S. Ct. at 2156 ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."). On the record before the Court, there is sufficient evidence that the NCAA's NIL-recruiting ban likely harms competition. It is, in effect, analogous to an absolute ban on competitive bidding, which the Supreme Court found to be anticompetitive "[o]n its face[.]" *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 692 (1978) (holding that "no elaborate industry analysis [was] required to demonstrate the anticompetitive character of" an "agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer."). Here, the NCAA's NIL-recruiting ban is, in effect, "an agreement among competitors to refuse to discuss prices with [recruits] until after negotiations have resulted in the initial selection of [an institution]." *Id.* That arrangement was anticompetitive in *Nat'l Soc. of Pro. Engineers*, and it appears to be anticompetitive here.

### 2. Procompetitive Justifications

Because Plaintiffs have presented sufficient evidence that the challenged rules impose a restraint on competition in the relevant market, the NCAA must come forward with a procompetitive justification for the restraint. The NCAA proposes various procompetitive benefits of the NIL-recruiting ban. Specifically, it asserts that the rules (1) promote the balance of academics and athletics; (2) promote amateurism—the distinction between collegiate and professional athletics; (3) foster competitive balance and distribute talent across the member institutions; and (4) protect exploitation of student-athletes. As an initial matter, amateurism and the integration of academics and athletics have both historically been recognized as legitimate procompetitive goals of restraints on student-athlete compensation. *O'Bannon*, 802 F.3d at 1058–

7
Case 3:24-cv-00033-DCLC-DCP   Document 29   Filed 02/06/24   Page 7 of 12   PageID #: 1406

60. Thus, for purposes of the instant motion, the Court will adopt the same view. Indeed, preserving amateurism was the primary purpose behind the NCAA's initial formation. *Alston*, 141 S. Ct. at 2148.

The opposite is true for the NCAA's third justification—competitive balance. This justification has historically been *rejected* as a procompetitive benefit of restrictions on student-athlete compensation. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 978 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015) ("[S]ince the 1970s, numerous sports economists have studied the NCAA's amateurism rules and nearly all have concluded that the rules have no discernible effect on the level of competitive balance."). Andrew D. Schwarz, an economic consultant, examined the data available since the issuance of the Interim NIL Policy and found that it "indicates that small improvements have been made in competitive balance" but, ultimately, the data reveals that restraints on student-athletes' earnings "will have little or no impact on the distribution of talent across a sport" [Doc. 2-5, pg. 6].

The final procompetitive justification alleged by the NCAA, preventing the potential exploitation of student-athletes, also misses the mark. The NCAA asserts that the challenged rules "act as a safeguard for prospective student-athletes, who are often underrepresented and unlikely to have an advanced understanding of their own NIL value . . . and the complexities of the deals presented to them" [Doc. 27, pg. 22]. But the NCAA fails to demonstrate how protecting student-athletes from potential exploitation is procompetitive. "The social justifications proffered for [the NCAA's] restraint of trade . . . do not make it any less unlawful." *Alston*, 141 S. Ct. at 2159 (quoting *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424 (1990)). Nonetheless, the challenged restraints likely foster economic exploitation of student-athletes. Schwarz explains that "exploitation" in the economic sense means that compensation "has been reduced from the market outcome by means of the use of market power" [Doc. 2-5, pg. 6]. Plaintiffs claim exactly that—

8
Case 3:24-cv-00033-DCLC-DCP   Document 29   Filed 02/06/24   Page 8 of 12   PageID #: 1407

the NCAA, by means of its market power, reduces the market value of student-athletes' NIL rights by prohibiting student-athletes from freely negotiating their services.

### 3. Less Anticompetitive Means to Achieve Procompetitive Justifications

With two procompetitive justifications surviving the second step—amateurism and the integration of academics and athletics—the burden shifts back to Plaintiffs to demonstrate that less anticompetitive means exist to achieve those benefits. At this final stage of the Rule of Reason analysis, the relevant inquiry is whether the proposed alternatives are "virtually as effective" in achieving the procompetitive benefits of the NIL-recruiting ban. Plaintiffs allege that both procompetitive benefits are accomplished through less restrictive rules already in place within the NCAA Bylaws [Doc. 2-1, pg. 23].

For instance, the rules require student-athletes to maintain progress toward college degrees (Bylaw 14.4.1); impose minimum credit hour and grade point averages for college athletics (Bylaw 14.4.3); and prohibit in-season transfers within the same sport to prevent unbounded free agency (Bylaw 14.5.5.3). In addition to the foregoing, the NIL rules that remain unchallenged in this action, i.e., those prohibiting agreements without *quid pro quo*, athletic performance as consideration, and compensation directly from member institutions, are each virtually as effective in preserving amateurism as the NIL-recruiting ban. Considering the evidence currently before the Court, Plaintiffs are likely to succeed on the merits of their claim under the Sherman Act.

### B. Irreparable Harm

The second factor the Court considers is whether Plaintiffs will suffer irreparable harm absent the issuance of the requested TRO. Plaintiffs must show that unless the NCAA is enjoined from enforcing the NIL-recruiting ban, "they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citations omitted). Plaintiffs allege they "have quasi-sovereign interests in protecting their

9
Case 3:24-cv-00033-DCLC-DCP   Document 29   Filed 02/06/24   Page 9 of 12   PageID #: 1408

citizens . . . from economic harm and in ensuring their economy and labor market are not suppressed by unjustified restraints of trade" [Doc. 2-1, pg. 24]. Plaintiffs further contend that, absent the requested TRO, prospective student-athletes will miss out on opportunities during the upcoming signing period to maximize NIL opportunities that would be available to them in a free market [*Id.* at pg. 25].

A plaintiff's asserted harm, however, is not irreparable if it is "fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 519 (9th Cir. 1984) (reiterating "the principle that the exercise of equitable jurisdiction is predicated on the absence of an adequate remedy at law."). Plaintiffs assert that student-athletes will "never be able to recover the lost NIL opportunities" once they commit to a school during the upcoming signing period [Doc. 2-1, pg. 25]. To be sure, Plaintiffs do not claim that student-athletes will miss out on *all* NIL opportunities; rather, the claim is that student-athletes will receive *less* compensation in the absence of a TRO. But the difference is purely monetary, and Plaintiffs offer no support for the conclusory assertion that any loss in monetary compensation could not be recovered or would be too speculative. In fact, the NCAA points to a class action currently pending in the United States District Court for the Northern District of California in which many current and former student-athletes are seeking damages as compensation for, among other things, lost NIL opportunities [Doc. 27, pg. 11] (citing *in re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal)). Thus, this further establishes that any lost NIL opportunities are likely compensable by monetary damages.

Plaintiffs also assert that irreparable harm is imminent due to the NCAA's recent decision to commence enforcement actions for NIL activities [Doc. 2-1, pg. 26]. The NCAA recently took enforcement action against Florida State University's ("FSU") football program, which resulted

10
Case 3:24-cv-00033-DCLC-DCP Document 29 Filed 02/06/24 Page 10 of 12 PageID #: 1409

in various penalties [*Id.* at pg. 26; Doc. 2-21]. And Plaintiffs contend the NCAA is investigating the University of Florida football program "after a failed NIL deal" with a former recruit and "threatening the University of Tennessee with an imminent enforcement action" [Doc. 2-1, pg. 26].

Plaintiffs argue these "credible threat[s] of enforcement" support injunctive relief [Doc. 2-1, pg. 26] (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). But the case Plaintiffs rely on concerns the injury-in-fact requirement for Article III standing. *See Driehaus*, 573 U.S. at 158 ("This case concerns the injury-in-fact requirement, which helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"). The injury-in-fact requirement for standing is distinct from the irreparable harm required for equitable injunctive relief. *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."). Not every injury-in-fact can be classified as irreparable—if so, every plaintiff with Article III standing would be permitted to sidestep the requisite showing of irreparable harm for injunctive relief, which would be nonsensical. Nonetheless, Plaintiffs fail to show how enforcement of the rules creates a risk of imminent and irreparable harm separate and distinct from the alleged harm caused by the rules themselves.

Finally, Plaintiffs assert that, without the requested injunctive relief, prospective student-athletes will be inhibited from "realizing the full benefit of NIL protections codified in state law" [Doc. 2-1, pg. 27]. Specifically, Plaintiffs contend that "schools supported by collectives with enthusiastic alumni networks and boosters" will be unable to offer NIL compensation to student-athletes "at true fair market value" and schools will be unable to facilitate NIL discussions as part of the recruiting process which would include providing services to assist student-athletes in

11

navigating NIL discussions and comparing NIL offers [*Id.*]. As discussed *supra*, to the extent student-athletes are unable to obtain the true value of their NIL, the harm is compensable by monetary damages and, thus, not irreparable. The inability of schools and collectives to facilitate NIL discussions and provide services to assist student-athletes in navigating the NIL market is also does not constitute irreparable harm. Although such discussions and services would likely prove beneficial, Plaintiffs have failed to show how the absence of those discussions and services would cause actual and imminent harm.

Based on the foregoing, Plaintiffs have failed to demonstrate, at this juncture, the requisite irreparable harm for the issuance of a TRO. This failure is not inconsequential, because "[i]rreparable harm is an 'indispensable' requirement" for injunctive relief. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019)). Accordingly, due to the want of irreparable harm, the Court cannot grant the requested injunctive relief and declines to examine the remaining two factors—substantial harm to others and public interest.

## IV. CONCLUSION

For the reasons provided herein, Plaintiffs' Motion for Temporary Restraining Order [Doc. 2] is **DENIED**.

**SO ORDERED:**

_____
United States District Judge